# EXHIBIT 1

PRODUCED AT THE NATIONAL ARCHIVES

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

        Plaintiff,

    v.                          Civil Action No. 88-0501

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

**FILED**

**JAN 3 0 1990**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### MEMORANDUM

    This case is before the Court on the parties' cross motions for summary judgment. After careful consideration of the motions, the oppositions thereto, and the entire record in the case, the Court concludes that plaintiff's motion for summary judgment must be granted in part and denied in part and defendant's motion for summary judgment must be denied.

    The facts may be briefly stated. Plaintiff, the National Security Archive ("Archive"), is a nonprofit public interest scholarly research institute and library in Washington, D.C. The purpose of the Archive is to collect and disseminate comprehensive government documentation pertaining to selected issues of major public concern in the areas of foreign, defense, intelligence, and international economic policy. This case arises from the denial by defendant, the Central Intelligence Agency ("CIA"), of the Archive's request under the Freedom of Information Reform Act of 1986 ("FIRA"), Pub. L. No. 99-570, §§ 1802, 1803, 100 Stat. 3207-48, 3207-49 (1986), for a waiver of fees pertaining to its Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552(a)(4) (West Supp. 1989), request for certain CIA

PRODUCED AT THE NATIONAL ARCHIVES

2

records.

FIRA amends FOIA by providing for reduced fees for certain types of document requests made by any entity that qualifies as an educational institution or as a representative of the news media. In its view, the Archive was eligible for this preferred fee status based on its status as either an educational institutional or a representative of the news media. The CIA, however, disagreed and instead categorized the Archive as a commercial requester subject to fees for search, review and copying of requested records. The Archive seeks declaratory and injunctive relief to enjoin the CIA from denying its pending fee waiver requests on the ground that the Archive is a commercial requester. Additionally, the Archive seeks a reversal of the CIA determination that it is ineligible for waiver of search, review, and copying fees. Finally, the Archive requests the entry of a declaratory judgment that plaintiff is per se eligible for, and entitled to waiver of all search and review fees based on its status as a "noncommercial educational institution" and "representative of the news media".

This case turns on the interpretation and application of FIRA's fee limitation provisions, i.e. whether the Archive is a "commercial use" requester subject to denial of its public interest fee waiver request. Subsequent to the parties' briefing of their cross motions for summary judgment, the Court of Appeals for the District of Columbia Circuit decided National Security Archive v. U.S. Dept. of Defense, 800 F.2d 1381 (D.C. Cir. 1989).

PRODUCED AT THE NATIONAL ARCHIVES

3

In National Security Archive, the Archive similarly challenged the Department of Defense's denial of its request for preferential pricing under the FOIA and sought to have itself classified as an educational institution or a representative of the news media. Moreover, the Department of Defense advanced the same argument the CIA asserts herein, i.e. that the Archive is a commercial user not entitled to a fee waiver. In considering the FIRA, the court examined its text and conducted an exhaustive analysis of the statute's legislative history. The court held that the Archive was not an educational institution, id. at 1385, but agreed with the Archive's alternative contention that it is entitled to preferred fee status under the FIRA as a representative of the news media. Id. at 1387.

In so holding, the court viewed the Archive as a representative of the news media by reason of its publication activities. Id. at 1388. The court noted that the Archive does not simply "make information available" as would a data broker. Id. at 1386. Rather, the Archive "gets the [FOIA requested] documents for its own purpose, which is to assemble them, along with documents for other sources, into an encyclopedic work that it will then offer to the public." Id. at 1387. Thus, the court associated the publication activities carried out by the Archive with its intended distribution of these document sets. Id. at 1386. The court further held that when the Archive's intention is to publish such works, or document sets, from the documents it requests, it is not a commercial requester within the meaning of

4

FOIA's fee waiver provisions.  Id. at 1388.

The issues to be decided in this case are identical to those addressed in National Security Archive and need no further elaboration.  In addition, the facts of this case are substantially identical to those underlying the National Security Archive opinion.  Most importantly, in the instant case the Archive has also stated an intention to use the information it requests for publication of indexed, cross-referenced "document sets".  This is precisely the type of activity which the court in National Security Archive found sufficient to qualify the Archive as a representative of the news media.  The rulings set forth in National Security Archive are, therefore, controlling and dispositive of the issues currently before this Court. Accordingly, under the reasoning set forth in National Security Archive, this Court concludes that the Archive is a representative of the news media within the meaning of FIRA by reason of its publication activities.  Thus, the Archive is entitled to preferred fee status.  On the other hand, the Archive is not an educational institution.  Thus, the Archive's motion for summary judgment must be granted in part and denied in part, and the CIA's motion for summary judgment must be denied.

An appropriate Order accompanies this Memorandum.

DATE:  _____          _____
                                            JOHN GARRETT PENN
                                      UNITED STATES DISTRICT JUDGE

PRODUCED AT THE NATIONAL ARCHIVES

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL SECURITY ARCHIVE,

        Plaintiff,

    v.                        Civil Action No. 88-0501

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

**FILED**

**JAN 3 0 1990**

O R D E R

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

    Upon consideration of the parties' cross motions for summary judgment, the oppositions thereto, and the record in this case, the Court concludes for the reasons discussed in an accompanying Memorandum, it is hereby

    ORDERED that plaintiff's motion for summary judgment is granted in part and denied in part; and it is further

    ORDERED that judgment is entered in favor of plaintiff; and it is further

    ORDERED that defendant's motion for summary judgment is denied; and it is further

    ORDERED that defendant's determination that plaintiff is not entitled to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(ii)(II) is reversed; and it is further

    ORDERED that defendant is hereby enjoined from denying plaintiff's pending fee waiver requests on the ground that plaintiff is a "commercial requester" under 5 U.S.C. §552(a)(4)(A)(ii) ; and it is further

23

PRODUCED AT THE NATIONAL ARCHIVES

**ORDERED** that defendant must treat plaintiff as a "representative of the news media," within the meaning of 5 U.S.C. 552(a)(4)(A)(ii)(II).

DATE:  ___JAN 3 0 1990___

_____
JOHN GARRETT PENN
UNITED STATES DISTRICT JUDGE

2

# EXHIBIT 2

Requests Submitted by the National Security Archive to the CIA:
August 1, 2005 to the present[1]

| Date of Initial FOIA Request | CIA FOIA Number | NSArchive FOIA Number | CIA's Determination of Preferential Fee Treatment |
|---|---|---|---|
| 8/10/2005 | F-2005-01773 | 20051224CIA157 | Denied 11/25/05 |
| 8/15/2005 | F-2005-01811 | 20051294CIA165 | Denied 11/25/05 |
| 10/11/2005 | F-2006-00039 | 20051114CIA141 | Denied 11/25/05 |
| 10/12/2005 | F-2006-00051 | 20051502CIA190 | Denied 2/8/06 |
| 10/11/2005 | F-2006-00052 | 20051500CIA189 | Denied 11/25/05 |
| 10/12/2005 | F-2006-00057 | 20051507CIA192 | Denied 11/25/05 |
| 10/12/2005 | F-2006-00058 | 20051505CIA191 | Denied 2/8/06 |
| 10/18/2005 | F-2006-00081 | 20051532CIA193 | Denied 2/8/06 |
| 10/19/2005 | F-2006-00083 | 20051545CIA195 | Denied 2/8/06 |
| 10/19/2005 | F-2006-00084 | 20051541CIA194 | Denied 2/8/06 |
| 10/21/2005 | F-2006-00087 | 20051562CIA199 | Denied 2/8/06 |
| 10/21/2005 | F-2006-00088 | 20051564CIA200 | Denied 2/8/06 |
| 10/20/2005 | F-2006-00098 | 20051548CIA196 | Denied 2/8/06 |
| 10/20/2005 | F-2006-00099 | 20051551CIA197 | Denied 2/8/06 |
| 10/20/2005 | F-2006-00100 | 20051559CIA198 | Denied 2/8/06 |
| 10/25/2005 | F-2006-00104 | 20051576CIA204 | Denied 2/8/06 |
| 10/25/2005 | F-2006-00105 | 20051574CIA203 | Denied 2/8/06 |
| 10/25/2005 | F-2006-00106 | 20051573CIA202 | Denied 2/8/06 |
| 10/25/2005 | F-2006-00107 | 20051568CIA201 | Denied 2/8/06 |
| 10/26/2005 | F-2006-00114 | 20051582CIA207 | Denied 2/8/06 |
| 10/26/2005 | F-2006-00116 | 20051580CIA206 | Denied 2/8/06 |
| 10/27/2005 | F-2006-00118 | 20051586CIA208 | Denied 2/8/06 |
| 10/27/2005 | F-2006-00121 | 20051593CIA210 | Denied 2/8/06 |
| 10/27/2005 | F-2006-00122 | 20051591CIA209 | Denied 2/8/06 |
| 10/28/2005 | F-2006-00126 | 20051595CIA211 | Denied 2/8/06 |
| 10/28/2005 | F-2006-00127 | 20051598CIA212 | Denied 2/8/06 |
| 10/31/2005 | F-2006-00129 | 20051601CIA213 | Denied 2/8/06 |
| 11/2/2005 | F-2006-00173 | 20051612CIA214 | Denied 2/8/06[2] |
| 11/4/2005 | F-2006-00186 | 20051619CIA215 | Denied 2/8/06 |
| 11/4/2005 | F-2006-00187 | 20051622CIA216 | Denied 2/8/06 |
| 11/8/2005 | F-2006-00190 | 20051645CIA220 | Denied 2/8/06 |
| 11/8/2005 | F-2006-00191 | 20051637CIA219 | Denied 2/8/06 |
| 11/8/2005 | F-2006-00194 | 20051632CIA218 | Denied 2/8/06 |
| 11/8/2005 | F-2006-00195 | 20051629CIA217 | Denied 2/8/06 |
| 11/10/2005 | F-2006-00198 | 20051655CIA223 | Denied 2/8/06 |
| 11/10/2005 | F-2006-00199 | 20051658CIA224 | Denied 2/8/06 |

---

[1]    In addition, by letter dated March 9, 2006, the CIA informed the National Security Archive that, with respect to a FOIA request first submitted by the Archive on March 30, 1999 (Nos. F-1999-00850, 990130CIA036), it was a requester in the "all other" category and the Archive was required to pay search as well as reproduction fees for the request. The CIA had earlier treated the Archive as a representative of the news media with respect to this same request. *See* Letter from CIA dated October 27, 1999.

[2]    The Archive withdrew this request on June 1st, 2006.

| Date of Initial FOIA Request | CIA FOIA Number | NSArchive FOIA Number | CIA's Determination of Preferential Fee Treatment |
|---|---|---|---|
| 11/9/2005 | F-2006-00202 | 20051652CIA222 | Denied 2/8/06 |
| 11/9/2005 | F-2006-00203 | 20051649CIA221 | Accepted |
| 12/1/2005 | F-2006-00286 | 20051686CIA225 | Denied 2/8/06 |
| 12/1/2005 | F-2006-00293 | 20051693CIA226 | Denied 2/8/06 |
| 12/5/2005 | F-2006-00296 | 20051700CIA227 | Denied 2/8/06 |
| 2/3/2006 | F-2006-00622 | 20060134CIA012 | Denied 5/31/06 |
| 2/3/2006 | F-2006-00623 | 20060132CIA011 | Denied 5/31/06 |
| 2/14/2006 | F-2006-00667 | 20060203CIA016 | Accepted |
| 3/7/2006 | F-2006-00728 | 20060339CIA032 | Accepted |

2

# EXHIBIT 3

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**

**Phone: 202/994-7000**
**Fax: 202/994-7005**
**nsarchiv@gwu.edu**
**www.nsarchive.org**

August 10, 2005

Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC 20505

**Re: Request under the FOIA, in reply please refer to Archive # 20051224CIA157**

Dear Mr. Koch,

Pursuant to the Freedom of Information Act (FOIA), I hereby request disclosure of all documents pertaining in whole or in part to the following:

**All biographical documents created between January 1, 1985 and July 1, 2005 including reports, intelligence summaries, photos, biographic sketches, profiles, and all other biographical summaries, reports and materials related in whole or in part to the following members of the Taliban in Afghanistan.**

- **Mullah Mohammad Omar (Mullah Omar)**
- **Mullah Mohammad Rabbani**

If you regard these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable nonexempt portions of these documents. To permit me to reach an intelligent and informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld portions and explain the basis for your exemption claims.

As you know, the National Security Archive qualifies for waiver of search and review fees as a representative of the news media. This request is made as part of a scholarly and news research project and not for commercial use. For details on the Archive's research and publication activities, please see our Web site at the address above. Please notify me before incurring photocopying costs over $100.

If you have any questions regarding the identity of these records, their location, the scope of the request or any other matters, please call **(202) 994-7045** or e-mail me at **belias@gwu.edu**. I look forward to receiving your response, thank you.

Sincerely,

Barbara Elias
Freedom of Information Coordinator

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

# EXHIBIT 4

Central Intelligence Agency



Washington, D.C. 20505

28 October 2005

Ms. Barbara Elias
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C.  20037

Reference:  F-2005-01773 (Archive # 20051224CIA157)

Dear Ms. Elias:

The office of the Information and Privacy Coordinator has received your 10 August 2005 Freedom of Information Act (FOIA) request for:

> "All biographical documents created between January 1, 1985 and July 1, 2005 ...related in whole or in part to the following members of the Taliban in Afghanistan:
> * **Mullah Mohammad Omar (Mullah Omar)**
> * **Mullah Mohammad Rabbani.**"

We have assigned your request the number referenced above.  Please use this number when corresponding with us so that we can identify it easily.

Your letter states that "...the National Security Archive qualifies for a waiver of search and review fees as a representative of the news media."  Your request, however, does not appear to satisfy the criteria our published regulations require to receive preferential fee treatment as a representative of the news media.  You may find these criteria at 32 C.F.R. § 1900.02 (h)(3).  Before we can determine the proper fee category for your request, please provide, pursuant to 32 C.F.R. § 1900.02 (h), additional information on why and how the documents you seek:

* concern current events;
* interest the general public;
* enhance the public understanding of the operations or activities of the U.S. Government; and
* how you plan to disseminate the information to a significant element of the public at minimal cost.

Please specifically address each of these points.  Your thorough response will help ensure that we place your request in the most appropriate and favorable fee category possible.

20051224CIA157          CIA
RECNO:31804            SEQCOR:117756
11/2/2005              FOISG: Elias, Barbara
Taliban Members (Omar, Rabbani)

We will hold your request in abeyance for 45 days from the date of this letter, pending your clarification of the points above.  If we do not hear from you within that time, we will assume that you are no longer interested in receiving the information you seek and we will close the case.

Sincerely,

Scott Koch
Information and Privacy Coordinator

# EXHIBIT 5

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**

**Phone: 202/994-7000**
**Fax: 202/994-7005**
**nsarchiv@gwu.edu**
**www.nsarchive.org**

November 10, 2005

**By Facsimile and First Class Mail**

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC   20505
Fax: (703) 613-3007

RE:    Fee Categorization Determination for FOIA Requests **F-2005-01811** 20051294CIA165
**F-2005-01773** 20051224CIA157
**F-2006-00057** 20051507CIA192
**F-2006-00039** 20051114CIA141
**F-2005-00052** 20051500CIA189

Dear Mr. Koch:

This is in response to your letters of October 26, October 28 and November 1, 2005, in which you contest the categorization of the National Security Archive as "representative of the news media" with respect to the five FOIA requests listed above. This letter concerns all five of your responses to these requests and any similar responses to other requests.

I would like to refer you to *National Security Archive vs. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), in which the D.C. Circuit held that the National Security Archive is entitled to a waiver of all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The court also determined that FOIA requests submitted by the National Security Archive in furtherance of its publication activities are not for a "commercial use." *Id.* at 1388. Each of the FOIA requests in question were for documents that would directly further the publication activities of the National Security Archive (which have expanded dramatically since the time that the *National Security Archive v. U.S. Dep't of Defense* case was decided).

- Two requests (F-2005-01773 and F-2005-01811) request biographical materials on leading members of the Taliban movement in Afghanistan. For your reference please see our publication: "The Taliban File, Part IV," (Sept. 2004) (available at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB134/index.htm) in which documents released by the State Department on these same figures were highlighted.
- F-2006-00039 pertains to U.S. and Mexican officials meeting at a critical period in Mexican history. A previous related publication, "The Blind Man and the Elephant; Reporting on the Mexican Military," (April 2004), can be seen at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB120/index.htm.
- F-2006-00057 and F-2005-00052 request documents on events and civil unrest in Indonesia in February 1977 and November 1994. Similar documents received through the FOIA were

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
November 10, 2005
Page 2 of 5

published by the National Security Archive in "Indonesia's 1969 Takeover of West Papua not by Free Choice," (July 2004), which can been seen at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB128/index.htm.

The materials sought by the above referenced FOIA requests are part of ongoing research and publication projects and will be used in a range of publications. The Archive's publication activities, including books, document sets, periodical articles, and more are discussed further below.

The regulation cited in your October 26, 28 and November 1 letters, 32 C.F.R. § 1900.02 (3) states, "Representative of the news media means a request from an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public pursuant to their news dissemination function and not commercial interests." As you undoubtedly know, this language is drawn from Office of Management and Budget ("OMB") guidelines applicable to all agencies subject to the FOIA. OMB has indicated that news media be "defined generically as 'an entity that is organized and operated to publish or broadcast news to the public.'" *See* Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,012, 10,012-17 (1987). Furthermore, when establishing qualification as a member of the "news media," OMB advised, "a history of continuing publication . . , would suffice." *Id*.

Here the National Security Archive unquestionably qualifies for "news media" status. The National Security Archive has an extensive publication history, including the production of over 20 books published by well-respected publishing houses and receiving broad distribution. These include, *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 551 pp.); *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by William Burr (New York: The New Press, 515 pp.); *Bay of Pigs Declassified: The Secret CIA Report* by Peter Kornbluh (New York: The New Press, 340 pp); and *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940* by Stephen I. Schwartz with Thomas S. Blanton, William Burr et al. (Washington, D.C.: Brookings Institution Press, 680 pp.). A more complete list of books by Archive analysts is attached. As you may know, the D.C. Circuit has explicitly recognized book authorship as an activity qualifying for news media status.[1]

Further, the Archive publishes substantial document sets, along with indexes and finding aids, that are broadly distributed through universities, libraries, and research institutes around the world. It is on the basis of the plan to publish such document sets that the D.C. Circuit first recognized the Archive's news media status. *National Security Archive v. U.S. Dep't of Defense*, 880 F.2d at 1386. Our most recent document sets include *U.S. Policy in the Vietnam War, Part I, 1954-1968, U.S. Policy in the Vietnam War, Part II: 1969-1975, Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992* and *Guatemala and the United States, 1954-1999*. A complete list of our 26 already published document sets is attached. The materials sought by the requests that are the subject of this letter are reviewed for inclusion in upcoming document sets.

---

[1]    "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. Surely when a newspaper publisher, such as the New York Times Company, brings out The Pentagon Papers in the form of a paperback book, adding perhaps an introduction and an index, it is acting as a representative of the news media every bit as much as when it publishes a daily newspaper." National Security Archive v. U.S. Dep't of Defense, 880 F.2d at 1387.

Letter to Scott Koch
November 10, 2005
Page 3 of 5

In addition, articles written by National Security Archive analysts have appeared in *The Washington Post, The New York Times, The Wall Street Journal, Congressional Quarterly, The LA Times, Harpers Magazine, The Miami Herald, The Nation, The Guardian, Vanity Fair, The Bulletin of the Atomic Scientists, World Policy Journal, Foreign Affairs, Foreign Policy, Newsweek, The International Journal of Intelligence and Counterintelligence, International Security, Intelligence and National Security* and other publications.

Additionally, the National Security Archive actively distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently released through the National Security Archive's FOIA requests or update the public on issues pertaining to the operations and activities of the U.S. government. As noted on the first page of this letter, the Archive has published electronic briefing books on all of the subjects of the FOIA requests referenced in this letter and intends to publish additional briefing books on related subjects. A complete list of our electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

Moreover, your agency has – until recently – always recognized the National Security Archive as a "representative of the news media" for similar FOIA requests based on our continuing publication of articles and books. At no time have we been asked to describe "additional information on why and how the documents" will be used. (e.g., Koch Letter of October 28, 2005.). Although I recognize that each fee determination is made on a case-by-case basis, the D.C. Circuit held in *National Security Archive v. Department of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), when it found that the Archive is a representative of the news media, that "[a]bsent [] a change in circumstances … the Archive is entitled to preferred [news media] status." Given the Archive's history with your agency and our publication history, the letters questioning our entitlement to news media status suggest an inappropriate and arbitrary use of the fee categorization provisions.

In particular, I am sure you are aware that the problem of FOIA processing delays stemming from fee categorization has been a topic of recent congressional concern (see GAO Report 05-405). Two of the requests in question, F-2005-01773 and F-2005-01811, suggest that the issue of fees is being used to delay the already backlogged FOIA process. These two requests were submitted to your office on August 10 and August 15, 2005. The first correspondence received from your agency pertaining to these requests were the fee categorization inquiry letters of October 28 and November 1, 2005, that are the subject of this letter. Your agency's first acknowledgment of the requests thus were sent 10 weeks (or approximately 50 business days) after these requests were submitted. This strongly suggests that the agency has not even begun to process these requests even though it is a month past when the CIA was statutorily required to have substantively responded. Presumably, the agency is not currently processing these requests, as it is waiting for this letter of clarification regarding fee categorization. At least three months will have passed between the date the FOIA requests were submitted and date the agency will (hopefully) start to substantively process the requests. This is not the type of government response to a public inquiry for information that Congress intended when it enacted the Freedom of Information Act.

This letter has addressed how the National Security Archive disseminates information to the public at a minimal cost and how the Archive's activities enhance public understanding of the operations and activities of the U.S. government. Your agency's October 26, 28 and November 1 letters additionally request that we specifically address how the documents we are seeking concern current events and are of interest to the general public.

Letter to Scott Koch
November 10, 2005
Page 4 of 5

**F-2005-01773** and **F-2005-01811** request biographical material on leading members of the Taliban, including Mullah Mohammad Omar and Maulawi Wakil Mutawakil. As you are aware, the United States was attacked by members of al-Qaeda on September 11, 2001. The Taliban regime in Afghanistan, headed by Mullah Omar, was providing sanctuary to several members of al-Qaeda, including Osama bin Laden, at the time of the attacks. The release of biographical information on Taliban members will provide greater context for the terrorist attacks of September 11 and the resulting U.S. military activity in Afghanistan under Operation Enduring Freedom that sought to eliminate the Taliban. Current ongoing military operations and the background for terrorist attacks on the U.S. homeland are of obvious current and widespread public interest.

**F-2006-00039** asks for information regarding a May 12-14, 1973 meeting between U.S. Secretary of State William Rogers, Mexican Foreign Minister Emilio Rabasa and Mexican President Luis Echeverria. Mexico's developing civil society has demanded that its President Vicente Fox thoroughly investigate human rights abuses committed under former President Echeverria's rule, including a 1971 massacre that left many student protesters dead or missing. President Fox has appointed a special prosecutor to investigate Echeverria's possible human rights offenses. Documents regarding interactions between President Echeverria and U.S. officials are of the utmost public interest to these human rights abuse investigations and to U.S. citizens concerned with U.S.-Mexico relations. The special prosecution of Echeverria is currently in progress. It is of broad interest because Echeverria is Mexico's only president to be indicted for alleged human rights abuses. Mexico and Mexican politics are a critical interest to the United States because Mexico is a close neighbor; the political, economic and social events in Mexico directly impact the general U.S. public as well as the significant portion of U.S. citizens and residents whose families originated in Mexico. The issue of human rights abuse around the world has been an issue of particular importance in the news recently.

**F-2006-00057** asks for documents related to Ali Murtopo's role in the resurgence of Muslim extremist activities and the Indonesian government's announcement in February 1977 that it uncovered an antigovernment conspiracy calling itself the Komando Jihad. The resurgence of radical Islamic forces in Indonesia is one of the central events of recent Indonesian history, as the 2002 Bali bombings and other terrorist events in the world's largest Muslim country makes clear. Furthermore, the rise of Islamic extremism in Indonesia is of central concern to U.S.-Indonesian bilateral relations. As discussed above, the context for the rising tide of terrorist attacks is of critical concern to the American public. Efforts to understand the historical roots of such a crucial contemporary phenomenon are of clear and obvious importance and interest to the general public.

**F-2005-00052** requests materials on the November 1994 APEC Summit and visit to Indonesia of U.S. President Bill Clinton and Secretary of State Warren Christopher. East Timor's efforts to document the history of human rights abuses between 1974 and 1999 are central to its continued transition to democracy, which in turn is import to the United States foreign policy efforts. Indonesia is initiating a Truth Commission process to examine the history of human rights abuses during the Suharto era from 1966-1998. The events surrounding the 1994 APEC conference were crucial in highlighting ongoing

Letter to Scott Koch
November 10, 2005
Page 5 of 5

debates about Indonesia's occupation of East Timor and human rights abuses there, in addition to posing a major challenge to U.S.-Indonesian bilateral relations. As such they are of clear interest and concern to Indonesians, East Timorese, and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context.

Moreover, when new information concerning important events is released, it is "news" even if the underlying events took place long ago. The public's thirst for knowledge is not satisfied with the mere passage of time. For example, just last week the *New York Times* published a story about the 1964 Gulf of Tonkin incident and the role intelligence failures at the National Security Agency's played in that incident.  Scott Shane, "Vietnam Study, Casting Doubts, Reamins Secret," *New York Times* (Oct. 31, 2005).  This sort of news plays an important role in out system.  As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment."  The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate a broad range of information to the public.

I hope to receive your response reversing the fee categorization determination related to FOIA requests F-2005-01811, F-2005-01773, F-2006-00057, F-2006-00039 and F-2005-00052.

Please feel free to contact me by telephone if you wish to discuss this matter further.  I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

cc:    Thomas Blanton
       Executive Director

# EXHIBIT 6

# The National Security Archive

**The George Washington University**
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Phone: 202/994-7000
Fax: 202/994-7005
nsarchiv@gwu.edu
www.nsarchive.org

December 22, 2005

**Letter by Facsimile**
**Letter and Attachments by First Class Mail**

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC  20505

RE:     Fee Categorization Determination for FOIA Requests F-2006-00081 20051532CIA193
F-2006-00098 20051548CIA196
F-2006-00099 20051551CIA197
F-2006-00100 20051559CIA198
F-2006-00106 20051573CIA202
F-2006-00107 20051568CIA201
F-2006-00118 20051586CIA208
F-2006-00129 20051601CIA213
F-2006-00173 20051612CIA214
F-2006-00186 20051619CIA215
F-2006-00187 20051622CIA216
F-2006-00190 20051645CIA220
F-2006-00191 20051637CIA219

Dear Mr. Koch:

This is in response to your letters of November 7, 8, 16, 17, and December 8 and 9, 2005 (**Enclosure A**) in which you question the categorization of the National Security Archive (the "Archive") as a "representative of the news media" with respect to the thirteen FOIA requests listed above. This letter concerns all thirteen of your responses to these requests and any similar responses to other requests.

## Federal Recognition of the Archive as a Representative of the News Media

In *National Security Archive v. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), the D.C. Circuit held that the National Security Archive is entitled to a waiver of all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The D.C. Circuit's decision was based on the fact the Archive had published one book and intended to publish document sets in the future. The now-Chief Judge of the D.C. Circuit, Judge Ginsburg, writing for a unanimous court, explained: "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.* As is discussed in greater detail in the next section of this letter, since the time of the court decision, the Archive's publication activity has expanded dramatically. Moreover, the Archive's journalistic work has received numerous

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
December 22, 2005

awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.

In the *National Security Archive* decision, the D.C. Circuit also held that FOIA requests submitted by the National Security Archive in furtherance of its publication activities are not for a "commercial use," *Id.* at 1388. Each of the FOIA requests referenced above is for documents that will directly further the publication activities of the National Security Archive.

Further, the D.C. Circuit held that "[a]bsent [] a change in circumstances … the Archive is entitled to preferred [news media] status." The *National Security Archive* decision was based on a full consideration of the statute and the legislative history. The language of the FOIA prohibiting search and review fees for representatives of the news media is no different today than it was at the time of the *National Security Archive* decision. Moreover, as explained in the next section of this letter, the facts today are even more supportive of the Archive's news media status than they were at the time of the decision.

And, in fact, the D.C. Circuit is bound by that decision. As the Supreme Court has frequently explained, considerations of *stare decisis* are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades. With respect to the FOIA there is no argument that the CIA is entitled to deference, as the statute and legislative history makes clear that this is not an area of statutory interpretation that is within the particular expertise of the CIA or that has been delegated to the agencies. Recently, Justice Scalia explained how this works: "The Court's unanimous holding in *Neal v. United States*, 516 U.S. 284 (1996), plainly rejected the notion that any form of deference could cause the Court to revisit a prior statutory-construction holding: 'Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law.' *Id.*, at 29."

Moreover, the CIA – and indeed every other federal agency – has for 15 years abided by the *National Security Archive* decision and recognized the National Security Archive as a "representative of the news media" for similar FOIA requests based on our continuing publication of articles and books. This includes the Department of Defense and all of its component agencies, every other intelligence agency, and the Department of State. The CIA's sudden change in policy, without any explanation, is arbitrary and capricious, and appears that way to all the news media organizations we have spoken with. An agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so. "Indeed, where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *see also Wisconsin Valley Improvement Company v. FERC*, 236 F.3d 738 (D.C. Cir. 2001) (finding sudden imposition of fees on a licensee that was not previously subject to fees arbitrary and capricious and vacating the fees); *AT & T v. FCC*, 974 F.2d 1351, 1355 (D.C. Cir. 1992) (faulting the FCC for failing to explain why it "changed the original price cap rules" and concluding that the Commission's "Reconsideration Order is arbitrary and capricious for want of an adequate explanation"). As the Supreme Court has put it, "an agency changing its course must supply a reasoned analysis...." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (citation omitted). It is hard to imagine, under the circumstances presented here, that the CIA will be able to come anywhere close to meeting this standard.

2

Letter to Scott Koch
December 22, 2005

Given this overwhelming precedent, I am troubled that in your recent letter of November 25, 2005, rejecting news media status for five other FOIA requests, you invite the Archive to address your denial of news media status in court. Under the provisions of the FOIA and the CIA's FOIA regulations, the Archive has a right to an administrative appeal before the CIA Agency Release Panel. *See, e.g.,* 32 C.F.R. Sec. 1900.42 ("A right of administrative appeal exists whenever ... a request for a fee waiver is denied."). We intend to exercise that right for the requests denied on November 25, 2005, and – if you reject these requests or any others – we will appeal those as well to the CIA Agency Release Panel. As a matter of good government, it does not appear sensible to use taxpayer money to clog up the CIA's administrative appeal process or cause frivolous legal defenses to be litigated through three courts.

Moreover, I direct you to the Conference Report on the 1974 amendments to the FOIA, which was approved by both houses of Congress when the news media provisions were enacted into law. There Congress cautioned: "The conferees intend that fees should not be used for the purpose of discouraging requests for information or as obstacles to disclosure of requested information." S. Rep. No. 93-1200, Conference Report on the 1974 Amendments to the FOIA.

### The Archive's News Media Activities

The regulation cited in your above-referenced letters, 32 C.F.R. § 1900.02 (3), states "[r]epresentative of the news media means a request from an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public pursuant to their news dissemination function and not commercial interests." That language is drawn from Office of Management and Budget ("OMB") guidelines that all agencies subject to the FOIA are mandated by Congress to follow. 5 U.S.C. Sec. 552(a)(4)(A)(i) (agency fee schedules should "conform to the guidelines ... promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget."). OMB has indicated that news media be "defined generically as "an entity that is organized and operated to publish or broadcast news to the public."" See Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,012, 10,012-17 (1987). Furthermore, when establishing qualification as a member of the "news media," OMB advised, "a history of continuing publication... would suffice." *Id.*

Here, the National Security Archive unquestionably qualifies for "news media" status. The National Security Archive has an extensive publication history, including the production of over 40 books. These include: *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 551 pp.), *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by William Burr (New York: The New Press, 515 pp.), *Bay of Pigs Declassified: The Secret CIA Report* by Peter Kornbluh (New York: The New Press, 340 pp), *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940* by Stephen I. Schwartz with Thomas S. Blanton, William Burr et al. (Washington, D.C.: Brookings Institution Press, 680 pp.) A more complete list of books by Archive analysts is attached. **(Enclosure B)**

The decision to recognize the Archive as a representative of the news media in the *National Security Archive* case was based on the Archive's intention to publish document sets, along with indexes and finding aids. Our most recent document sets, which publish documents obtained through the FOIA, along with commentary, indexes and finding aids, include *U.S. Policy in the Vietnam War, Part I, 1954-1968, U.S. Policy in the Vietnam War, Part II: 1969-1975, Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992* and *Guatemala and the United States, 1954-1999.* A list of our 26 published document sets is attached as well. **(Enclosure C)** These sets are available

3

Letter to Scott Koch
December 22, 2005

digitally and on microfiche, and are distributed to a broad range of libraries, universities, research institutes, and the like. In addition, any member of the public is able to access these for free in our own public reading room.

Articles written by National Security Archive analysts have appeared in *The Washington Post, The New York Times, The Wall Street Journal, Congressional Quarterly, The LA Times, Harpers Magazine, The Miami Herald, The Nation, The Guardian, Vanity Fair, The Bulletin of the Atomic Scientists, World Policy Journal, Foreign Affairs, Foreign Policy, Newsweek, The International Journal of Intelligence and Counterintelligence, International Security, Intelligence and National Security* and other publications.

Additionally, the National Security Archive actively distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently released through the National Security Archive's FOIA activities or update the public on issues pertaining to the operations and activities of the U.S. government. A complete list of our electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

### Archive's Satisfaction of CIA's Additional Criteria for News Media Status

The CIA's definition of "news media" contains additional requirements not found anywhere in the OMB Fee Guidelines or in other agencies' FOIA regulations. Although Congress, in the FOIA, directed that agency fee schedules should "conform to the guidelines ... promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget," 5 U.S.C. Sec. 552(a)(4)(A)(i), the CIA's regulations do not meet this standard. Interestingly, when the CIA added additional criteria to its regulations in an Interim Regulation published in the Federal Register eight years ago, it stated that the revised regulations would "not alter substantially any existing rights of members of the public." 62 C.F.R. 32479 (June 16, 1997).[1] We and the other news media organizations believe that the new interpretation that the CIA is applying to its regulations does just the opposite. Of course, many of the other news media outlets are profoundly interested in definitions of news media because they have been actively pursuing an expansion of news media definitions to include non-traditional news media, such as the definition in the OPEN Government Act proposed by Senators Cornyn and Leahy.

Since you request a thorough response detailing how each of these requests concerns current events, interests the general public, and enhances public understanding of the operations or activities of the U.S. Government, and since you ask how we plan to disseminate the information to a significant element of the public at minimal cost, the following sections clarify how each of these requests satisfies all of these criteria. Although we feel that we meet these standards, it is the Archive's position that these standards are not the appropriate ones by which to judge whether a FOIA requester is a representative of the news media.

In general, when new information concerning important events is released it is "news" even if the underlying events took place long ago so long as it is of "current interest to the public." *See* OMB Guidelines ("The term 'news' means information that is about current events **or** that would be of current

---

[1]    The CIA's additional criteria appear to be drawn from the FOIA's definition of what would qualify for a public interest fee waiver, and the cases decided under that provision. The Archive is requesting news media status and is not requesting a public interest fee waiver. Congress was well aware of how to limit applicability of a fee waiver to information meeting content criteria, as demonstrated by its definition of the standard for a public interest fee waiver. Under elementary principles of statutory construction, it is clear that Congress declined to impose such content criteria for the news media fee waiver.

Letter to Scott Koch
December 22, 2005

interest to the public.") (emphasis added); 32 C.F.R. 1900.02 ("the term news means information which
… would be of current interest to the general public"). That is the case with many of the requests
described below. The public's desire for knowledge is not satisfied with the mere passage of time. For
example, a few weeks ago *The New York Times* published a story about the 1964 Gulf of Tonkin incident
and the role intelligence failures at the National Security Agency's played in that incident. Just this week
recently uncovered documents from Guatemala's civil war in the late 1970s and 80s made major news,
including an Associated Press story "Official Says Guatemala Killed Leftists," from December 14, 2005,
which was reproduced in over twenty print publications. New, definitive or official information on these
events, some of which took place decades ago, are still some of today's most important news stories
because the information is revelatory for the public's understanding of their own histories, and of events
that have changed the course of history and that impact current events.

        In addition, as to how the Archive will disseminate the information to a significant element of the
public at minimal cost, the same response applies to every one of the Archive's FOIA requests. As the
National Security Archive has repeatedly done in the past, publication and public dissemination of these
documents will be accomplished by one or more methods, all with the explicit goal of reaching the largest
audience possible at the lowest cost possible. If the document is released and contains new information
not previously widely known to the public, or policy not previously widely documented in the public
record, we will immediately publish a briefing book explaining the significance of the document and
providing relevant historical background with the document. We also publish short electronic briefing
books (collections of 5-50 documents that describe a specific event or a specific U.S. government policy).
These are circulated at no cost to our over 7000 subscribers and made available at no cost on our Web site
for all members of the public. *See* www.nsarchive.org. The documents themselves will be available on
our Web site, at no cost, indefinitely, for anyone with Internet access to view, copy, download,
disseminate and further utilize. We provide a comprehensive full-text keyword search so that people can
locate documents related to their research even if they don't know exactly what document they are
looking for.

        In addition, the Archive's centerpiece publications are its document sets. If the requested
documents contain substantive information, they will be included in a published document set. These
document collections are published in microfiche (available at any of the hundreds of libraries that
purchase access to our sets), paper copies of documents (available in our reading room to anyone present
or via mail to anyone who sends an inquiry), or through the Digital National Security Archive, a database
that contains full-text searchable and chronologically organized images of released government
documents. For these published sets, the National Security Archive will take between 2-5 years to gather
all recently declassified documents on a particular issue. Each set focuses on specific U.S. government
policies on a region or an issue and provides an unparalleled resource of declassified government
documents to the public.

### F-2006-00081 20051532CIA193
Concern Current Events and of Interest to the General Public:
        In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth
and Reconciliation Commission charged with investigating human rights abuses during the "New Order"
period of President Suharto from 1966 to 1998. Such efforts in Indonesia to document past human rights
abuses and the historical context of political conflict are crucial to its ongoing democratic transition and
thus of clear interest to the U.S. general public. Questions of human rights and efforts to hold former

Letter to Scott Koch
December 22, 2005

officials accountable for abuses are always issues that remain newsworthy and of widespread interest to the general public. Human rights abuses have consistently been a topic of current events.[2]

During the New Order period, military repression of university students was a potent symbol of the Suharto regime's determination to prevent the emergence of widespread dissent. In May 1998, for example, the killing of six university students at Trisakti University in the capitol of Jakarta triggered mass protests which played a crucial role in the downfall of the Suharto regime. As such, efforts to document military repression of student activists are of clear interest and concern to the public's efforts to place the human rights abuses of the Suharto regime in their proper historical context.

Enhance public understanding of the operations or activities of the U.S. government:
A crucial component of the National Security Archive's efforts involves establishing the international context in which New Order era human rights abuses took place, such as the awareness of the U.S. government of such abuses. Documents concerning U.S. government knowledge of Indonesian military repression of political activity by university students will thus help increase public understanding of the workings and activities of the U.S. government, in particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses. Such events are also of clear interest to the general public in both Indonesia and the United States, where recent decisions to lift conditions on the provision of military assistance and training to the Indonesian armed forces have generated substantial publicity and concern among nongovernmental organizations in both countries (See attached article **Enclosure D**).

Disseminate the information to a significant element of the public at minimal cost:
*For this and other requests submitted by the National Security Archive for the Indonesia/East Timor project:*
The National Security Archive is collaborating with U.S. and Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result demonstrating its relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

In addition to the general means of disseminating the information described above, the Archive recently donated copies of over 1,000 declassified documents it obtained through the FOIA to the truth commission in East Timor, making copies accessible to thousands of members of the general public in the United States and in Asia. The analyst making these requests has several previous print publications on U.S.-Indonesia relations and human rights abuses in East Timor that have used declassified U.S. government documents obtained through the FOIA. As an example, see "'Illegally and Beautifully': The United States, the Indonesian Invasion of East Timor and the International Community, 1974–76," published in *Cold War History* Vol. 5, No. 3, August 2005, pp. 281–315. (**Enclosure E**).

---

[2] "Turkey's human rights in spotlight as author goes on trial for insulting nation," The Independent, December 16, 2005. "Timor truth commission set to examine bloodshed," Reuters Newswire, December 16, 2005. "Afghan war crimes plan hailed, but key tests ahead," Reuters Newswire, December 15, 2005. "Mass grave exhumed with remains of 100 people killed in riots 24 years ago in Morocco," Associate Press Newswire, December 13, 2005.

Letter to Scott Koch
December 22, 2005

In addition to working in support of Indonesia's Truth Commission process, the National Security Archive's Indonesia and East Timor Documentation Project is preparing to undertake a collaborative publishing effort with *Tempo*, Indonesia's leading weekly print news magazine. This collaborative effort will involve the regular publication of articles exploring important events in recent Indonesian history and U.S.-Indonesian relations using recently declassified U.S. documents. This effort will support Indonesian public access advocates seeking to expand the reach of Indonesia's own freedom of information legislation by modeling examples of open access from other countries. Several of these FOIA requests have been made specifically for media collaboration with *Tempo*.

## F-2006-00098 20051548CIA196
Concern Current Events and of Interest to the General Public:

This FOIA request concerns President-elect Bill Clinton's first meeting with a foreign leader – Mexican President Carlos Salinas in Austin, Texas on January 8, 1993. The central issue discussed by the two men was the status of the North American Free Trade Agreement (NAFTA). Although the free-trade accord was ratified and well developed by the time of this meeting, critical disagreements between U.S. and Mexican negotiators about environmental and labor standards – among other issues – had not yet been settled. President-elect Clinton used the meeting to assure Salinas that he supported the agreement, but that he believed the two countries had to hammer out side arrangements to protect American workers and the environment. He told the Mexican President that he would back rapid implementation of NAFTA after those remaining issues were settled.

According to *The New York Times* (1/9/93, p.A1), President-elect Clinton told reporters that the trade talks were vital not only to the U.S.-Mexican relationship, but also could "lay the foundation for further trade agreements between the United States and other nations in Central and South America." As the two presidents met inside the Texas Governor's mansion for an hour and a half, demonstrators opposed to the accord marched and chanted outside. The demonstrators were a reminder of the divisions within the Democratic Party over NAFTA and the difficulties Clinton would face in trying to assuage his supporters that the U.S. would not lose jobs as a result of the treaty.

The information sought is of tremendous relevance to discussions under way today between the U.S. and Latin America. As the administration of President George W. Bush continues to negotiate for a Central American free trade agreement – as well as a broader pact that would cover the entire hemisphere – these early discussions of the North American Free Trade Agreement are of intense current public interest to Americans and Latin Americans alike. Many of the issues that were debated by the United States and Mexico in the final months leading up to the implementation of NAFTA have bearing on the current U.S. position toward free trade, and information about those early discussions would help scholars, journalists, and policy analysts understand the current debate. They include the details of what bilateral differences remained (on topics such as labor, health and the environment), how other political issues – such as democratic governance, domestic social programs and support for U.S. foreign policy goals – may have affected the talks, and how negotiations over the international treaty affected the domestic political dynamic in the United States.

Enhance public understanding of the operations or activities of the U.S. government:

Not only does information regarding the 1993 meeting in Austin have bearing on current events, but it will assist scholars of the United States to better understand the operations and policies of the U.S. government. Complex bilateral and multilateral treaties such as the North American Free Trade Agreement unfold before the public's eyes in very limited, controlled ways – while behind the scenes, government negotiators spend months or years hammering out every detail they believe important. Today,

7

Letter to Scott Koch
December 22, 2005

more than a decade after the passage of NAFTA, gaining insight into how the U.S. government
participated in the drafting, discussing, changing and finally passing such a critical bilateral accord will
help the public comprehend how the government functions in similar circumstances – such as the
negotiations now under way between the U.S. and many other Latin American nations for a wider trade
accord.

Disseminate the information to a significant element of the public at minimal cost:
*For this and other requests submitted by the National Security Archive for the Mexico and Mexico/U.S.
Relations project:*
   The Archive's Mexico Project, which has existed since 1994, in addition to the general means
described above, has a variety of means for sharing the information we obtain through our FOIA requests.
Much of the information is disseminated though publications that are distributed to over 7000 subscribers
and made available for free on the Archive's Web site (www.nsarchive.org/mexico). Further, the Project
publishes regularly in the mainstream media in both Mexico and the United States (see, for example, our
monthly series in the well-known Mexican newsweekly print magazine *Proceso*). In addition the analyst
who made the requests writes for scholarly journals (see, for example, "Forgetting Is Not Justice," *World
Policy Journal*, Summer 2003), speaks at conferences and teaches classes on both sides of the border. For
your consideration, I've attached examples of some of these articles. (**Enclosure F**)

**F-2006-00099 20051551CIA197**
Concern Current Events and of Interest to the General Public:
   This FOIA request concerns a crucial set of meetings between President George H.W. Bush and
President Carlos Salinas of Mexico in late 1990. The background to the meetings was a formal proposal
to President Bush by President Salinas during the previous summer for a free trade agreement, much in
agreement with U.S. government goals. As an article from *The New York Times* pointed out (11/11/90, p.
F12), the accord, heavily favored by Bush, "would go a long way toward the Administration's goal of
creating a hemispheric free-trade zone." Even before the negotiations got under way, U.S. critics were
already expressing their fears about the flight of manufacturing and agriculture jobs to Mexico, where
labor was cheap and environment and labor regulations lax.

   President Bush's first visit to President Salinas's home town, Agualeguas – on November 26,
1990 – was important as a symbol of the unprecedented warmth between Salinas and Bush, but also
offered the first opportunity for the two presidents to speak personally in an informal setting before the
intense negotiations on the proposed free trade agreement got under way. In addition, it provided Bush a
chance to press his counterpart on political freedom in Mexico, a key issue in the wake of what were
allegedly fraudulent recent elections.

   The Monterrey meeting on the following day (November 27, 1990) was critical for beginning to
clarify details of the proposed agreement. Contemporary news reports stated that for the first time Salinas
began to mention publicly the possibility that Canada could be included in a free-trade zone, as both
Canada and the U.S. had proposed. Although formal ratification of the accord was still two years away,
after Monterrey the United States and Mexico appeared to be closer than ever to reaching an agreement to
eliminate trade barriers between the two nations. Peripheral issues also benefited from the bilateral
discussions. Treasury Secretary Nicholas Brady told reporters, for example, that the talks might lead to
access for U.S.-owned oil drilling companies to Mexican oil fields for the first time, a privilege long
sought by the American-owned firms.

Enhance public understanding of the operations or activities of the U.S. government:

8

Letter to Scott Koch
December 22, 2005

The National Security Archive seeks news media status in the review and declassification of CIA documents concerning these talks because the information is of tremendous relevance to discussions under way right now between the U.S. and Latin America. As the administration of George W. Bush continues to negotiate for a Central American free trade agreement – as well as a broader pact that would cover the entire hemisphere – these early discussions of what would become the North American Free Trade Agreement are of intense current public interest to Americans and Latin Americans alike. Many of the issues that were debated by the United States and Mexico four years before NAFTA went into effect have bearing on the current U.S. position toward free trade, and information about those early discussions would help scholars, journalists, and policy analysts understand the current debate. They include the details of what bilateral tensions may (or may not have) existed at the beginning of the talks, how other political issues – such as democratic governance, domestic social programs and support for U.S. foreign policy goals – may have affected the talks, and how the more complicated bilateral issues (such as environment and labor standards) were approached.

Disseminate the information to a significant element of the public at minimal cost:
See prior explanation of how any documents released to the Archive's Meixco and U.S./Mexico Relations Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Mexico and U.S./Mexico Relations Project.

**F-2006-00100 20051559CIA198**
Concern Current Events and of Interest to the General Public:
See Background Explanation provided for Request F-2006-00081 20051532CIA193. In addition, the 1978 elections in which Suharto won a second consecutive term occurred at a crucial moment in U.S.-Indonesian relations, shortly before the May 1978 visit of Vice President Walter Mondale to Jakarta and following the release of 30,000 political prisoners by the Suharto regime. This major political event in Indonesia is thus of great interest to Indonesians and Americans seeking to understand the evolution of the U.S.-Indonesian relationship in the 1980s. It is also of clear relevance for enhancing public understanding of the operations or activities of the U.S. government, which was seeking to encourage greater respect for human rights and political openness at the time of the elections.

Enhance public understanding of the operations or activities of the U.S. government:
In support of this process the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

Disseminate the information to a significant element of the public at minimal cost:
See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

**F-2006-00106 20051573CIA202**
Concern Current Events and of Interest to the General Public:

9

Letter to Scott Koch
December 22, 2005

        See Background Explanation provided for Request F-2006-00081 20051532CIA193.  In addition,
During the New Order period, anti-Chinese riots served as a potent expression of popular discontent with
the Suharto regime, which cultivated Indonesia's economically powerful Chinese community as a
political constituency.  The May, 1998, protests which brought down the Suharto regime, for example,
included widespread anti-Chinese rioting and attacks on Chinese women and business interests, some of
which was orchestrated by Indonesian military units.  As such, efforts to document the history of anti-
Chinese violence are of clear interest and concern to Indonesians and Americans currently seeking to
place the human rights abuses of the Suharto regime in their proper historical context.

Enhance public understanding of the operations or activities of the U.S. government:
        A crucial component of the National Security Archive's efforts to support the Truth Commission
process under way in Indonesia involves establishing the international context in which New Order era
human rights abuses took place, such as the awareness of foreign governments of such abuses.
Documents concerning U.S. government knowledge of the causes and consequences of anti-Chinese riots
will thus help increase public understanding of the workings and activities of the U.S. government, in
particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses.

Disseminate the information to a significant element of the public at minimal cost:
        See prior explanation of how any documents released to the Archive's Indonesia/East Timor
Project will be disseminated to the general public at minimal cost. This request is directly related to our
publication activities for the Indonesia/East Timor Project.

## F-2006-00107 20051568CIA201
Concern Current Events and of Interest to the General Public:
        The requested documents regard the development of U.S. policy in Afghanistan five months
before President Carter signed the July 3, 1979 Presidential Finding authorizing U.S. aid to the
Mujahadeen opposing the Soviet-backed Afghan regime. (For your reference, the Carter Library
declassified this July document in its entirety in March 2004.) The requested March 1979 documents are
key pieces of information that would significantly aid researchers, scholars and general members of the
U.S. public to better understand how the U.S. policy of providing aid to the Mujahadeen in the late 1970s
and 1980s developed. Without these documents, there is no insight into the how the SCC at the NSC
made the decision to aid the Mujahadeen - a decision which continues to have tremendous ramifications
for the safety and security of the U.S. public today, as many of these same Mujahadeen fighters currently
now advocate and participate in terrorist activities against U.S. interests and the U.S. public. The terrorism
that has bred in Afghanistan since 1979 is very much a current event.

        Additionally, it is beyond any doubt that terrorism against the American public is within the public
interest and concerns current events. Fortunately, there has been no major attack on U.S. territory in over
four years, but the issue of combating terrorism and understanding the events that led up to September 11,
2001 is absolutely of current interest. Please see the hundreds of news stories from December 4, 2005 –
December 7, 2005 regarding the 9/11 Commission.[3] The 9/11 Commission was an entity established by
the president to investigate the events of September 11, 2001, including the history leading up to 9/11
which includes the topic of this request, U.S. policy in Afghanistan in the late 1970s. The requested

---

[3] Shenon, Philip. "9/11 Panel Issues Poor Grades for Handling Terror," *The New York Times*, December 6, 2005. Yen, Hope.
"9/11 Commission Says U.S. Not Doing Enough," *Associated Press*, December 5, 2005. Eggen, Dan. "U.S. Is Given Failing
Grades By 9/11 Panel," *The Washington Post*, December 6, 2005. Also See White House Press Release, "Fact Sheet: Progress
on the 9/11 Commission Recommendations," December 5, 2005.

Letter to Scott Koch
December 22, 2005

documents are directly related to the decision to take action in Afghanistan supporting organizations that currently threaten the American public and therefore concern not only current, but overwhelmingly important current events.

The 9/11 Commission Report, which discusses the events of 9/11 and historic U.S. involvement in Afghanistan, was available free on the Internet, and yet still sold over 600,000 copies of a $10 print edition. Steve Coll's *Ghost Wars*, a *New York Times* bestseller, only addresses the history behind 9/11 (not the actual events of 9/11), and goes into great detail regarding CIA and White House documents from 1979 and 1980, the topic of this request. There clearly is widespread continuing interest from the general public in U.S. policy in Afghanistan in the late 1970s, as this policy has greatly impacted current U.S. policies, as well as current terrorist threats and questions of public safety. Indeed, the Archive's publications concerning Afghanistan have generated some of the greatest interest from subscribers and others.

Enhance public understanding of the operations or activities of the U.S. government:
President Carter authorized U.S. aid to the Afghan Mujahadeen in July 1979. The requested documents are related in whole or in part to the March 5, 1979 action memoranda sent from the CIA to the SCC regarding Afghanistan. These March documents would elucidate what information was provided by the CIA that was used by the SCC to create U.S. government policy. The release of these requested documents would clarify how information flowed from the CIA to the SCC, resulting in this major foreign policy decision, and what U.S. government action the requested "action memoranda" detailed. These documents are fundamentally and directly related to U.S. government operations and activities in Afghanistan.

Disseminate the information to a significant element of the public at minimal cost:
*For this and other requests submitted by the National Security Archive for the Afghanistan project:*

In addition to the general explanation for how the Archive intends to disseminate the information requested, the analyst who made the request is currently working on a briefing book that provides recently released documents on U.S. aid to the Mujahadeen between January 1979 and January 1992. Any documents that contain substantive information released in response to this request, which asked for all documents related to the March 5, 1979 action memoranda sent from the CIA to the SCC regarding Afghanistan, will certainly be included in this briefing book and would be published and disseminated to thousands.

The National Security Archive already published a collection on Afghanistan, 1979-1990 in March 1991. However, since many important documents related to U.S. policy in Afghanistan from 1979-1990 are just now being reviewed and released, the Archive is planning to update this published set with new documentation that will help the public understand the actions of the U.S. government in Afghanistan.

## F-2006-00118 20051586CIA208
Concern Current Events and of Interest to the General Public:
The U.S. monitoring of Soviet activity in 1979 greatly concerns current events as the U.S. invasion of Afghanistan in 2001 and the current major U.S. military presence in Afghanistan were instigated by the terrorist attacks of 9/11 - events that have clear roots in the Soviet invasion of Afghanistan in 1979. The background that leads up to this U.S. military involvement does not have diminished importance because it is historical or background material for these current events. As the CIA

11

Letter to Scott Koch
December 22, 2005

is well aware, events do not happen in vacuums, but are direct products of their histories. The Soviet invasion of Afghanistan, which the requested documents directly monitor, gave the Mujahadeen, the Afghan resistance fighters, an opportunity to train in guerrilla warfare, organize, and gain confidence that they could defeat a global superpower such as the Soviet Union. Many of these same Soviet-jihad trained Mujahadeen fighters, including Mullah Omar, supreme leader of the Taliban and Osama bin Laden, the most wanted terrorist in the world, (certainly a man who has shaped current events) continue to plot against U.S. citizens and U.S. interests. The history, including the requested documents that relate to the September 14, 1979 and December 19, 1979 "Alert" memoranda authored by CIA Director Admiral Stansfield Turner regarding Afghanistan, are pieces of critical information needed in order to put together the history of the Soviet invasion of Afghanistan and the subsequent jihad that first trained many of the virulent anti-American terrorists who threaten the current safety and security of the U.S. public. The release of this information would provide overwhelmingly important background to current events related to terrorism and Afghanistan. The release of these documents would be undoubtedly newsworthy.

As I'm sure the CIA appreciates, the terrorists that carried out the 9/11 attacks were operating out of Afghanistan. Since 9/11 there has been no larger concern to the general U.S. public than the threat of terrorism. Additionally, current and ongoing U.S. military activity is of overwhelming concern to the general public. As discussed in the previous paragraph, the requested materials, documents pertaining in whole or in part to September 14, 1979 and December 19, 1979 "Alert" memoranda authored by CIA Director Admiral Stansfield Turner relating to Afghanistan, would shed light on the Soviet invasion of Afghanistan, an event that is directly linked to the 2001 U.S. invasion and ongoing occupation of Afghanistan and is directly related to the terrorism concerns that pervade the general public today. Without the Soviet invasion of Afghanistan the Mujahadeen would not have gained the strength, unity and momentum they eventually did. Many of these Mujahadeen are now active anti-American terrorists and therefore the history of Afghanistan's recent history, including the Soviet invasion, is of overwhelming general public interest.

Enhance public understanding of the operations or activities of the U.S. government:
Access to primary documents used by U.S. government policymakers to create policy shaping the operations of the government is extraordinarily important to understanding these government policies and activities. Understanding the decision for action taken by the government directly enhances public understanding of how government operates and how the government responds to information with action. Discussing the requested September 14, 1979 "Alert" memoranda, former Director of Central Intelligence Robert Gates states in his book, *From the Shadows*, New York: Simon & Schuster Inc., 1996, p. 133, "However hedged, the "alert" memorandum did galvanize action at the White House. On September 20, a week after the paper was issued, there was an interagency meeting at the Old Executive Office Building to discuss contingency planning against the possibility of Soviet military intervention in Afghanistan. The focus was on action that might be taken--diplomatic, political, and propaganda--in advance of an intervention to sensitize the countries most concerned." The requested "Alert" memo directly prompted an enormous U.S. government response, and is therefore critical to public understanding of the operations of the U.S. government.

Disseminate the information to a significant element of the public at minimal cost:
See prior explanation of how any documents released to the Archive's Afghanistan Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Afghanistan Project.

F-2006-00129 20051601CIA213

12

Letter to Scott Koch
December 22, 2005

Concern Current Events and of Interest to the General Public:
    See Background Explanation provided for Request F-2006-00081 20051532CIA193.

    In support of this process the National Security Archive is collaborating with U.S. and Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period.  In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government. (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

Enhance public understanding of the operations or activities of the U.S. government:
    The July 1982 visit of Indonesian Defense Minister Mohammed Jusuf took place shortly before the first visit of Indonesian President Suharto to the U.S. and shortly before the country's 1982 elections in which Suharto's Golkar party scored a massive victory.  This visit by a high-ranking Indonesian official is thus of great interest to Indonesians and Americans seeking to understand the evolution of the U.S.-Indonesian relationship in the 1980s.  It is also of clear relevance for enhancing public understanding of the operations or activities of the U.S. government, which was seeking to improve relations with the Suharto regime at the time of Jusuf's visit.

Disseminate the information to a significant element of the public at minimal cost:
    See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

## F-2006-00173 20051612CIA214
Concern Current Events and of Interest to the General Public:
    The request concerns current events and is of current interest to the public because of the controversy in the media and in Congress over intelligence briefings to the President of the United States. In recent years, Presidential Daily Briefs (PDBs) prepared by the CIA for President Bush on such subjects as terrorist threats and weapons of mass destruction have been the subject of major media attention.  The 9/11 Commission process led to the disclosure of a PDB on Osama bin Laden.  More recently, Senator Edward Kennedy called for the declassification of PDBs bearing on Iraq. In light of the ongoing controversy, it is important to look back at the early days of the CIA to see how it first began briefing the president.  Harry Truman, the first president to receive such briefings, presided over the creation of the Agency.  To show what daily information on international crises the CIA provided to President Truman, the Archive analyst has requested issues of the "Daily Summaries" for several days leading up to the crises--the coup in Czechoslovakia (February 1948), Berlin Crisis (June 1948), a major battle in the Chinese civil war (January 1949), the first Soviet atomic test (August 1949), the outbreak of the Korean war (June 1950) and the Chinese intervention in the fighting in Korea (October 1950).

Enhance public understanding of the operations or activities of the U.S. government:
    The documents, to the extent that they are released, will do much to "enhance public understanding of the operations or activities of the United States government."  They will show the results of activity by U.S. government officials--CIA analysts--to cull on a daily basis the intelligence information at their disposal to update the President of the United States on the critical events of the day. President Truman saw the CIA summaries as his own "newspaper" which confirms the significance of

13

these documents to understanding government operations. By showing what intelligence information became available to the president the declassification of the summaries will enhance the public's understanding of a significant U.S. government activity during an important time in U.S. history. Moreover, releasing these documents would be consistent with the recommendations of the CIA's Historical Advisory Committee, which has urged declassification of top-level CIA records from its early years.

Disseminate the information to a significant element of the public at minimal cost:
       In addition to the general means of dissemination described above, depending on how much is released, this requester sees several possible paths for disseminating the information. To contribute to the Archive's ongoing series of electronic briefing books, he will publish the summaries for distribution to our over 7000 subscribers and on our Web site at no cost. The documents will be published with commentary putting them in broad historical context. Finally, if enough documents are released, he will write and publish an article about intelligence briefings for President Truman for one of the scholarly historical journals such as *Diplomatic History* or *Journal of Cold War History*. Through such methods it should be possible to disseminate information on presidential briefings to a large, even possibly global, audience.

**F-2006-00186 20051619CIA215**
Concern Current Events and of Interest to the General Public:
       See Background Explanation provided for Request F-2006-00081 20051532CIA193.

Enhance public understanding of the operations or activities of the U.S. government:
       The Indonesian government's efforts between 1983 and 1985 to compel allegiance to the pancasila as a state doctrine came at a time of enormous political turmoil in Indonesia, which included the Tanjung Priok killings of September 1984, the "Petition of Fifty" movement, and a campaign of "mysterious killings" in Jakarta and other major cities. They represented a clear attempt to contain and roll back rising dissent among the Indonesian public against the Suharto regime. As such, efforts to document these events are of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context (see the referenced article for contemporary discussion of the Tanjung Priok killings).[4]

       A crucial component of the National Security Archive's efforts to support the Truth Commission process under way in Indonesia involves establishing the international context in which New Order era human rights abuses took place, such as the awareness of foreign governments of such abuses. Documents concerning U.S. government knowledge of Indonesian government efforts to repress dissent and tighten control of the political system will thus help increase public understanding of the workings and activities of the U.S. government, in particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses. Such events are also of clear interest to the general public in both Indonesia and the United States.

Disseminate the information to a significant element of the public at minimal cost:
       See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

---

[4] "Govt ready to set up truth, reconciliation commission," The Jakarta Post, Jakarta, April 4, 2005.

Letter to Scott Koch
December 22, 2005

**F-2006-00187 20051622CIA216**
Concern Current Events and of Interest to the General Public:
　　　See Background Explanation provided for Request F-2006-00081 20051532CIA193.

Enhance public understanding of the operations or activities of the U.S. government:
　　　The visit to Indonesia of a high ranking official, especially the President of the United States, is an inherently significant political event and is thus of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context.   But this visit -- though cancelled -- is important for its timing as well.   President Reagan's trip came in the midst of Indonesia's campaign of "Mysterious Killings," a program of state-sponsored murder and disappearance aimed at alleged street criminals in the capital of Jakarta and other major Indonesian cities.   Documents pertaining to the planned visit of an American president would clearly enhance public understanding of how the U.S. government plans such official visits, how the American delegation was preparing to deal with the issue of human rights in Indonesia and general U.S-Indonesian relations.

Disseminate the information to a significant element of the public at minimal cost:
　　　See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

**F-2006-00190 20051645CIA220**
Concern Current Events and of Interest to the General Public:
　　　See Background Explanation provided for Request F-2006-00081 20051532CIA193.  In addition the emergence of the "petition of 50" group in Indonesia in the fall of 1984 represented one of the first open civilian challenges to the Suharto regime.  The regime's suppression of the group came in the wake of the military's killing in September of at least 30 Muslim demonstrators in the Jakarta port area of Tanjung Priok.  As such, efforts to document military repression of dissidents are of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context (see the referenced article for contemporary discussion of the Tanjung Priok killings).[5]

Enhance public understanding of the operations or activities of the U.S. government:
　　　In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth and Reconciliation Commission charged with investigating human rights abuses during the "New Order" period of President Suharto from 1966 to 1998.  Such efforts in Indonesia to document past human rights abuses and the historical context of political conflict are crucial to its ongoing democratic transition and thus of clear interest to both the Indonesian and U.S. general public. Questions of human rights and efforts to hold former officials accountable for abuses are always issues that remain newsworthy and of widespread interest to the general public. Human rights abuses have consistently been a topic of current events.[6]

　　　A crucial component of the National Security Archive's efforts to support the Truth Commission process under way in Indonesia involves establishing the international context in which New Order era human rights abuses took place, such as the awareness of foreign governments of such abuses.

---

[5] See Note 7
[6] See Note 2.

15

Documents concerning U.S. government knowledge of Indonesian military repression of political activity by intellectuals will thus help increase public understanding of the workings and activities of the U.S. government, in particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses. Such events are also of clear interest to the general public in both Indonesia and the United States. (See **Enclosure G**)

Disseminate the information to a significant element of the public at minimal cost:
　　　　See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

**F-2006-00191 20051637CIA219**
Concern Current Events and of Interest to the General Public:
　　　　See Background Explanation provided for Request F-2006-00081 20051532CIA193.

Enhance public understanding of the operations or activities of the U.S. government:
　　　　The visit to Indonesia of a high ranking official, especially the Vice President of the United States, is an inherently significant political event and thus of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context. But this visit is important for its timing as well. Vice President Bush's trip came on the heels of a similar trip by Secretary of State George Schultz before which 22 U.S. Senators wrote urging him to raise the issue of East Timor in his meetings. The visit also came just after a visit to the U.S. by Portuguese Prime Minister Mario Soares, before which more than 130 Portuguese politicians and intellectuals urged President Ronald Reagan to find a solution to the Indonesian occupation of East Timor.

　　　　Documents pertaining to this visit will thus offer a crucial window into the workings and activities of the U.S. government at a crucial time in its relationship with Indonesia, in particular the degree to which U.S. officials were aware of ongoing human rights abuses in East Timor or raised them with Indonesian officials.

Disseminate the information to a significant element of the public at minimal cost:
　　　　See prior explanation of how any documents released to the Archive's Indonesia/East Timor Project will be disseminated to the general public at minimal cost. This request is directly related to our publication activities for the Indonesia/East Timor Project.

---

　　　　In a democracy the public acts as a check on government conduct. As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment." The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate information to the public. Again, in the Supreme Court's words: "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). In carrying out its civic role in our society, the public is entitled to the wide range of information that can be useful to inform debate, to act as a check against abuse, and to impact government policy.

16

Letter to Scott Koch
December 22, 2005

I hope to receive your response granting news media fee status related to FOIA requests F-2006-00081, F-2006-00098, F-2006-00099, F-2006-00100, F-2006-00106, F-2006-00107, F-2006-00118, F-2006-00129, F-2006-00173, F-2006-00186, F-2006-00187, F-2006-00190, F-2006-00191.

Furthermore, if you decide to deny news media status for any of the above-listed requests or any other requests that the Archive has filed, please specifically indicate which of the criteria in 32 C.F.R. Sec. 1900.02 you have determined is not met. Your failure to specify which criterion has not been satisfied will be viewed by the Archive, as well as by the news media organizations that have been briefed, as further evidence of your effort to interfere with the Archive's legitimate FOIA activities. As you noted in your November 25, 2005 letter, it would assist the CIA if the Archive addresses these factors on its initial request. Our ability to do so would be enhanced by an understanding of which criteria the CIA believes are not met.

Please feel free to contact me by telephone if you wish to discuss this further. I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

17

# EXHIBIT 7

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**

**Phone: 202/994-7000**
**Fax: 202/994-7005**
**nsarchiv@gwu.edu**
**www.nsarchive.org**

January 27, 2006

**Letter by Facsimile**
**Letter and Attachments by First Class Mail**

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC   20505

RE:    Fee Categorization Determination for FOIA Requests **F-2006-00051 20051502CIA190**
**F-2006-00058 20051505CIA191**
**F-2006-00083 20051545CIA195**
**F-2006-00084 20051541CIA194**
**F-2006-00087 20051562CIA199**
**F-2006-00088 20051564CIA200**
**F-2006-00104 20051576CIA204**
**F-2006-00105 20051574CIA203**
**F-2006-00114 20051582CIA207**
**F-2006-00116 20051580CIA206**
**F-2006-00121 20051593CIA210**
**F-2006-00122 20051591CIA209**
**F-2006-00126 20051595CIA211**
**F-2006-00127 20051598CIA212**
**F-2006-00194 20051632CIA218**
**F-2006-00195 20051629CIA217**
**F-2006-00198 20051655CIA223**
**F-2006-00199 20051658CIA224**
**F-2006-00202 20051652CIA222**
**F-2006-00286 20051686CIA225**
**F-2006-00293 20051693CIA226**
**F-2006-00296 20051700CIA227**

Dear Mr. Koch:

This is in response to your letters of December 13, 14, 20 and 22, 2005 **(Enclosure A)** in which you question the categorization of the National Security Archive (the "Archive") as a "representative of the news media" with respect to the 22 FOIA requests listed above.  This letter concerns all 22 of your responses to these requests and any similar responses to other requests.

## Federal Recognition of the Archive as a Representative of the News Media

In *National Security Archive v. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), the D.C. Circuit held that the National Security Archive is entitled to a waiver of

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
January 27, 2006

all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The D.C. Circuit's decision was based on the fact the Archive had published one book and intended to publish document sets in the future. The now-Chief Judge of the D.C. Circuit, Judge Ginsburg, writing for a unanimous court, explained: "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.* As is discussed in greater detail in the next section of this letter, since the time of the court decision, the Archive's publication activity has expanded dramatically. Moreover, the Archive's journalistic work has received numerous awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.

In the *National Security Archive* decision, the D.C. Circuit also held that FOIA requests submitted by the National Security Archive in furtherance of its publication activities are not for a "commercial use," *Id.* at 1388. Each of the FOIA requests referenced above is for documents that will directly further the publication activities of the National Security Archive.

Further, the D.C. Circuit held that "[a]bsent [] a change in circumstances … the Archive is entitled to preferred [news media] status." The *National Security Archive* decision was based on a full consideration of the statute and the legislative history. The language of the FOIA prohibiting search and review fees for representatives of the news media is no different today than it was at the time of the *National Security Archive* decision. Moreover, as explained in the next section of this letter, the facts today are even more supportive of the Archive's news media status than they were at the time of the decision.

And, in fact, the D.C. Circuit is bound by that decision. As the Supreme Court has frequently explained, considerations of *stare decisis* are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades. With respect to the FOIA there is no argument that the CIA is entitled to deference, as the statute and legislative history makes clear that this is not an area of statutory interpretation that is within the particular expertise of the CIA or that has been delegated to the agencies. Recently, Justice Scalia explained how this works: "The Court's unanimous holding in *Neal v. United States*, 516 U.S. 284 (1996), plainly rejected the notion that any form of deference could cause the Court to revisit a prior statutory-construction holding: 'Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law.' *Id.*, at 29."

Moreover, the CIA – and indeed every other federal agency – has for 15 years abided by the *National Security Archive* decision and recognized the National Security Archive as a "representative of the news media" for similar FOIA requests based on our continuing publication of articles and books. This includes the Department of Defense and all of its component agencies, every other intelligence agency, and the Department of State. The CIA's sudden change in policy, without any explanation, is arbitrary and capricious, and appears that way to all the news media organizations we have spoken with. An agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so. "Indeed, where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *see also Wisconsin Valley Improvement Company v. FERC*, 236 F.3d 738 (D.C. Cir. 2001) (finding sudden imposition of fees on a

2

Letter to Scott Koch
January 27, 2006

licensee that was not previously subject to fees arbitrary and capricious and vacating the fees); *AT & T v. FCC*, 974 F.2d 1351, 1355 (D.C. Cir. 1992) (faulting the FCC for failing to explain why it "changed the original price cap rules" and concluding that the Commission's "Reconsideration Order is arbitrary and capricious for want of an adequate explanation"). As the Supreme Court has put it, "an agency changing its course must supply a reasoned analysis...." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (citation omitted). It is hard to imagine, under the circumstances presented here, that the CIA will be able to come anywhere close to meeting this standard.

Given this overwhelming precedent, I am troubled that in your recent letter of November 25, 2005, rejecting news media status for five other FOIA requests, you invite the Archive to address your denial of news media status in court. Under the provisions of the FOIA and the CIA's FOIA regulations, the Archive has a right to an administrative appeal before the CIA Agency Release Panel. *See, e.g.,* 32 C.F.R. Sec. 1900.42 ("A right of administrative appeal exists whenever ... a request for a fee waiver is denied."). We intend to exercise that right for the requests denied on November 25, 2005, and – if you reject these requests or any others – we will appeal those as well to the CIA Agency Release Panel. As a matter of good government, it does not appear sensible to use taxpayer money to clog up the CIA's administrative appeal process or cause frivolous legal defenses to be litigated through three courts.

Moreover, I direct you to the Conference Report on the 1974 amendments to the FOIA, which was approved by both houses of Congress when the news media provisions were enacted into law. There Congress cautioned: "The conferees intend that fees should not be used for the purpose of discouraging requests for information or as obstacles to disclosure of requested information." S. Rep. No. 93-1200, Conference Report on the 1974 Amendments to the FOIA.

### The Archive's News Media Activities

The regulation cited in your above-referenced letters, 32 C.F.R. § 1900.02 (3), states "[r]epresentative of the news media means a request from an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public pursuant to their news dissemination function and not commercial interests." That language is drawn from Office of Management and Budget ("OMB") guidelines that all agencies subject to the FOIA are mandated by Congress to follow. 5 U.S.C. Sec. 552(a)(4)(A)(i) (agency fee schedules should "conform to the guidelines ... promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget."). OMB has indicated that news media be "defined generically as "an entity that is organized and operated to publish or broadcast news to the public."" See Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,012, 10,012-17 (1987). Furthermore, when establishing qualification as a member of the "news media," OMB advised, "a history of continuing publication.... would suffice." *Id.*

Here, the National Security Archive unquestionably qualifies for "news media" status. The National Security Archive has an extensive publication history, including the production of over 40 books. These include: *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 551 pp.), *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by William Burr (New York: The New Press, 515 pp.), *Bay of Pigs Declassified: The Secret CIA Report* by Peter Kornbluh (New York: The New Press, 340 pp), *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940* by Stephen I. Schwartz with Thomas S. Blanton, William Burr et al. (Washington, D.C.: Brookings Institution Press, 680 pp.) A more complete list of books by Archive analysts is attached. (**Enclosure B**)

3

Letter to Scott Koch
January 27, 2006

The decision to recognize the Archive as a representative of the news media in the *National Security Archive* case was based on the Archive's intention to publish document sets, along with indexes and finding aids. Our most recent document sets, which publish documents obtained through the FOIA, along with commentary, indexes and finding aids, include *U.S. Policy in the Vietnam War, Part I, 1954-1968, U.S. Policy in the Vietnam War, Part II: 1969-1975, Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992* and *Guatemala and the United States, 1954-1999*. A list of our 26 published document sets is attached as well. **(Enclosure C)** These sets are available digitally and on microfiche, and are distributed to a broad range of libraries, universities, research institutes, and the like. In addition, any member of the public is able to access these for free in our own public reading room.

Articles written by National Security Archive analysts have appeared in *The Washington Post, The New York Times, The Wall Street Journal, Congressional Quarterly, The LA Times, Harpers Magazine, The Miami Herald, The Nation, The Guardian, Vanity Fair, The Bulletin of the Atomic Scientists, World Policy Journal, Foreign Affairs, Foreign Policy, Newsweek, The International Journal of Intelligence and Counterintelligence, International Security, Intelligence and National Security* and other publications.

Additionally, the National Security Archive actively distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently released through the National Security Archive's FOIA activities or update the public on issues pertaining to the operations and activities of the U.S. government. A complete list of our electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

### Archive's Satisfaction of CIA's Additional Criteria for News Media Status

The CIA's definition of "news media" contains additional requirements not found anywhere in the OMB Fee Guidelines or in other agencies' FOIA regulations. Although Congress, in the FOIA, directed that agency fee schedules should "conform to the guidelines … promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget," 5 U.S.C. Sec. 552(a)(4)(A)(i), the CIA's regulations do not meet this standard. Interestingly, when the CIA added additional criteria to its regulations in an Interim Regulation published in the Federal Register eight years ago, it stated that the revised regulations would "not alter substantially any existing rights of members of the public." 62 C.F.R. 32479 (June 16, 1997).[1] We and the other news media organizations believe that the new interpretation that the CIA is applying to its regulations does just the opposite. Of course, many of the other news media outlets are profoundly interested in definitions of news media because they have been actively pursuing an expansion of news media definitions to include non-traditional news media, such as the definition in the OPEN Government Act proposed by Senators Cornyn and Leahy.

Since you request a thorough response detailing how each of these requests concerns current events, interests the general public, and enhances public understanding of the operations or activities of the U.S. Government, and since you ask how we plan to disseminate the information to a significant

---

[1]     The CIA's additional criteria appear to be drawn from the FOIA's definition of what would qualify for a public interest fee waiver, and the cases decided under that provision. The Archive is requesting news media status and is not requesting a public interest fee waiver. Congress was well aware of how to limit applicability of a fee waiver to information meeting content criteria, as demonstrated by its definition of the standard for a public interest fee waiver. Under elementary principles of statutory construction, it is clear that Congress declined to impose such content criteria for the news media fee waiver.

Letter to Scott Koch
January 27, 2006

element of the public at minimal cost, the following sections clarify how each of these requests satisfies all of these criteria. Although we feel that we meet these standards, it is the Archive's position that these standards are not the appropriate ones by which to judge whether a FOIA requester is a representative of the news media.

In general, when new information concerning important events is released it is "news" even if the underlying events took place long ago so long as it is of "current interest to the public." *See* OMB Guidelines ("The term 'news' means information that is about current events <u>or</u> that would be of current interest to the public.") (emphasis added); 32 C.F.R. 1900.02 ("the term news means information which ... would be of current interest to the general public"). That is the case with many of the requests described below. The public's desire for knowledge is not satisfied with the mere passage of time. For example, a few weeks ago *The New York Times* published a story about the 1964 Gulf of Tonkin incident and the role intelligence failures at the National Security Agency's played in that incident. Just this week recently uncovered documents from Guatemala's civil war in the late 1970s and 80s made major news, including an Associated Press story "Official Says Guatemala Killed Leftists," from December 14, 2005, which was reproduced in over twenty print publications. New, definitive or official information on these events, some of which took place decades ago, are still some of today's most important news stories because the information is revelatory for the public's understanding of their own histories, and of events that have changed the course of history and that impact current events.

In addition, as to how the Archive will disseminate the information to a significant element of the public at minimal cost, the same response applies to every one of the Archive's FOIA requests. As the National Security Archive has repeatedly done in the past, publication and public dissemination of these documents will be accomplished by one or more methods, all with the explicit goal of reaching the largest audience possible at the lowest cost possible. If the document is released and contains new information not previously widely known to the public, or policy not previously widely documented in the public record, we will immediately publish a briefing book explaining the significance of the document and providing relevant historical background with the document. We also publish short electronic briefing books (collections of 5-50 documents that describe a specific event or a specific U.S. government policy). These are circulated at no cost to our over 7000 subscribers and made available at no cost on our Web site for all members of the public. *See* www.nsarchive.org. The documents themselves will be available on our Web site, at no cost, indefinitely, for anyone with Internet access to view, copy, download, disseminate and further utilize. We provide a comprehensive full-text keyword search so that people can locate documents related to their research even if they don't know exactly what document they are looking for.

In addition, the Archive's centerpiece publications are its document sets. If the requested documents contain substantive information, they will be included in a published document set. These document collections are published in microfiche (available at any of the hundreds of libraries that purchase access to our sets), paper copies of documents (available in our reading room to anyone present or via mail to anyone who sends an inquiry), or through the Digital National Security Archive, a database that contains full-text searchable and chronologically organized images of released government documents. For these published sets, the National Security Archive will take between 2-5 years to gather all recently declassified documents on a particular issue. Each set focuses on specific U.S. government policies on a region or an issue and provides an unparalleled resource of declassified government documents to the public.

Letter to Scott Koch
January 27, 2006

**SUBJECT**: U.S.-Mexico Relations
**F-2006-00116** Archive 20051580CIA206
Miguel de la Madrid Visit to Washington 1984

This Freedom of Information Act request concerns the visit of Mexican president Miguel de la Madrid to Washington on May 1984. Documents related to meetings between American and Mexican officials provide a unique opportunity to study how the relationship between the United States and Mexico has evolved over the past decades. These documents allow scholars, government officials, journalists and the general public on both sides of the border to evaluate how key bilateral issues were handled in the past and use that understanding to bear on contemporary diplomatic, political and economic relations and current events.

In 1984, the United States and Mexico were engaged in vehement debate over bilateral topics ranging from illegal immigration and border issues, to economic and trade concerns. Tensions were at a peak because of the financial crisis faced by Mexico from 1982 to 1984. The U.S. government and private sector feared that Mexico would be unable to service payments on its 96 million dollar foreign debt. The early 1980s also saw a 40% increase of illegal migration of Mexicans to the United States. These concerns strained relations between the two countries and were certainly discussed during de la Madrid's visit to Washington in May 1984.

More than twenty years later, public interest in Mexican immigration and trade, among other key bilateral issues, continues to be very strong, as evidenced by the debate that rages in the U.S. Congress and the press about them. President George W. Bush is currently proposing major changes in U.S. immigration law. Declassified records about discussions between a former Mexican President and U.S. officials on these same issues would enhance the public's understanding on how the United States crafts policy and negotiates with Mexico on such sensitive areas of bilateral concern.

The National Security Archive considers dissemination to be the core of our work. We make the declassified records we obtain under FOIA available through our comprehensive published collections (distributed digitally and on microfiche to university libraries), frequent postings on our Web site (www.nsarchive.org/mexico), publications in the U.S. and international media, participation in academic associations, and through our Washington-based reading room, open to the general public.

SUBJECT: Carlos Salinas' Administration and role as ex-President
**F-2006-00051** Archive 20051502CIA190
Francisco Ruiz Massieu's Assassination
**F-2006-00058** Archive 20051505CIA191
Colosio Assassination
**F-2006-00104** Archive 20051576CIA204
Ernesto Zedillo Presidential Candidacy
**F-2006-00122** Archive 20051591CIA209
Salinas Hunger Strike
**F-2006-00105** Archive 20051574CIA203
Salinas' WTO Candidacy

These Freedom of Information Act requests concern developments that marked the last year of Carlos Salinas' six-year term as president of Mexico (1994), his pick for a successor, and two controversial events that followed after he left office (1995). Salinas's presidency was a turning point for Mexican

6

Letter to Scott Koch
January 27, 2006

domestic and international policies, and profoundly affected U.S. policy in Mexico. Documents related to this critical time period will shed light on many pressing questions about his administration that have yet to be answered, but will also enhance public understanding of the crisis that these events created for U.S.-Mexico relations.

What seemed to be a successful term that brought political and economic stability to the country was overshadowed in 1994 by a series of events that started with the Zapatista uprising in the state of Chiapas in January. Later that year in March, Luis Donaldo Colosio Murrieta presidential candidate from the ruling Institutional Revolutionary Party (PRI) was assassinated during a campaign rally (request 20051505CIA191). Salinas handpicked his successor Ernesto Zedillo Ponce de León shortly afterwards (request 20051576CIA204).

Another turning point was the assassination of José Francisco Ruiz Massieu, secretary general of the PRI on September 28, 1994 (20051502CIA190). There were convictions on both assassination cases, but both cases have remained in the public spotlight. Last year, Raúl Salinas, brother of the ex-president Salinas was acquitted for the murder of Ruiz Massieu.

Mexico suffered an economic crisis that led to the collapse of the peso in December 1994, weeks after Salinas left office. Although the press and public opinion blamed his administration, Salinas accused Zedillo of responsibility for the crisis. Salinas started a hunger strike to demand the government to stop blaming him for the country's economic problems. In a later interview Salinas said he had made that move after hearing from a close Zedillo aide that he would be arrested. Salinas left Mexico shortly afterwards on a self-imposed exile in Ireland.

Mounting public anger about his role in the economic crisis, as well as the murder conviction of his brother Raúl, led Salinas to retire his bid to head the World Trade Organization in March 1995 (20051574CIA203). Initially, the Clinton administration had backed Salinas's candidacy, but revelations about corruption and fraud in his government caused the U.S. to pressure him to withdraw.

Before his demise in 1994, Carlos Salinas was one of the most loved and powerful presidents in Mexican history. As an economist trained in the United States, he also managed to forge a uniquely close relationship to his American counterparts, George H. Bush and Bill Clinton. He has remained a controversial figure and is still seen by many – including front-running presidential candidate, Andres Manuel López Obrador – as being a key player in Mexican politics. Records declassified in response to this request will help illuminate not just U.S. policy toward Salinas in the past, but how the United States may judge Salinas's current and future influence on Mexican politics.

The Archive's Mexico Project, which has existed since 1994, has a variety of means for sharing the information we obtain through our Freedom of Information Act requests. We disseminate declassified documents through frequent postings on our Web Site (www.nsarchive.org/mexico), publish them in the mainstream media in both Mexico and the United States (see, for example, our monthly series in the well-known Mexican newsweekly Proceso), write for scholarly journals (see, for example, "Forgetting Is Not Justice" the World Policy Journal, Summer 2003), speak at conferences and teach classes on both sides of the border.

SUBJECT: Corruption and Democratic Transition in Mexico
**F-2006-00087** Archive 20051562CIA199
Partido Verde Ecologista de Mexico

7

Letter to Scott Koch
January 27, 2006

**F-2006-00088** Archive 20051564CIA200
1997 Elections
**F-2006-00198** Archive 20051655CIA223
1990 Elections
**F-2006-00199** Archive 20051658CIA224
Salinas' Electoral Reform
**F-2006-00121** Archive 20051593CIA210
Corruption in the Oil Worker's Union Under Joaquín Hernández Galicia "La Quina"
**F-2006-00126** Archive 20051595CIA 211
Corruption at the State Level: Mario Villanueva Madrid

These of Freedom of Information Act requests are related to corruption and democratic transition in Mexico. Two of the requests focus on corrupt practices at the federal and state level. Another request is related to a political party that was accused of nepotism and receiving bribes. One of the requests concerns electoral reform in 1990. Two of the requests are related to elections: one that was plagued by fraud allegations in 1990, and the other in 1997 which was broadly considered legitimate.

Mexico has evolved dramatically during the last decades. In 2000, the 70 years of one-party rule of the Institutional Revolutionary Party ended peacefully and democratically with the election of Vicente Fox. Before and after the election there have been a series of reforms and changes within Mexican society that are transforming Mexico from a semi-authoritarian regime to a full democracy.

This year Mexico is holding presidential elections that are putting these reforms to the test. Issues such as corruption, electoral reform and democratic transition are being closely followed by political and economic analysts in the United States. Moreover, given the commitment the U.S. has to promoting democracy in the world, understanding the experiences its southern neighbor has had in this respect will be valuable for U.S. government officials and scholars alike.

Joaquín Hernández Galicia "La Quina" was a powerful and untouchable labor leader of the Mexican Oil Worker's Union who was closely allied with the Institutional Revolutionary Party (PRI). His dishonest management of the union was characteristic of Mexico's old regime. La Quina's corruption practices were widely known and he was arrested in 1989 and later sentenced to 35 years in prison. He was liberated in 1997.

Mario Villanueva Madrid is another classic example of corruption in Mexico. He is currently imprisoned accused of 28 charges related to organized crime, drug trafficking, money laundering and using his authority as governor of the state of Quintana Roo (1993-1999) to protect and promote drug trafficking activities of the Juarez Drug Cartel. The fact that once such powerful men were convicted on corruption charges sent a message to Mexican officials, investors and foreign governments that serious anti-corruption measures would be taken.

Another sphere where corruption was evident was in the electoral realm. During Carlos Salinas's term the electoral system was reformed making it independent from the government, and establishing anti-fraud measures like a voter's id card. The National Security Archive has published documents related to electoral fraud and democracy in Mexico on our website and in the Mexican newsweekly Proceso. In two of the aforementioned requests we are specifically asking for documents related to totally different electoral scenarios. The 1990 municipal elections in the state of Mexico that were widely regarded as fraudulent, and the 1997 mid-term elections where the PRI lost for the first time in 68 years its majority in

Letter to Scott Koch
January 27, 2006

the lower house in Congress, and Cuauhtémoc Cárdenas from the Democratic Revolution Party emerged victorious in Mexico City's mayoral race.

Last, we are requesting documents related to the Partido Verde Ecologista de México. This party has been controlled since its founding in 1991 by the Martinez Torres family. The party has faced several corruption scandals which include: The ruling of Mexico's top electoral court that dictated that the party's statues violated the Constitution because they allowed an inner circle of members to select the party's candidates and officials. (September 3rd, 2003); The fine imposed by the Federal Electoral Institute for campaign finance offences during the 2000 presidential race. (October 10th, 2003); And the video in which Jorge Emilio González Martínez is being offered 2 million dollars for his assistance in facilitating land use permits for real estate development in Cancun, a city governed by a PVEM mayor. (February 2004).

Documents related to the Partido Verde are crucial at this time given the upcoming elections. The PVEM allied itself with the PRI and is supporting the candidacy of Roberto Madrazo Pintado in what has been denominated "Alianza por México."

Records declassified in response to these requests will contain invaluable information about Mexico's democratic transition and efforts to confront corruption that will shed new light on the country's current struggles with the same issues. As the presidential election approaches, public U.S. and Mexican interest in democratic reform in Mexico is at an all-time high. U.S. documents concerning past patterns and practices of these critical issues will enhance the public's understanding of how U.S. policy is crafted in response.

The National Security Archive considers dissemination to be the core of our work. We make the declassified records we obtain under FOIA available through our comprehensive published collections (distributed digitally and on microfiche to university libraries), frequent postings on our Web site (www.nsarchive.org/mexico), publications in the U.S. and international media, participation in academic associations, and through our Washington-based reading room, open to the general public.

SUBJECT: Indigenous/Peasant Communities and relationship with Mexican Government
**F-2006-00083** Archive 20051545CIA195
El Bosque Military Operation (Chiapas)
**F-2006-00084** Archive 20051541CIA194
Acteal Massacre (Chiapas)
**F-2006-00114** Archive 20051582CIA207
El Charco Incident (Guerrero)
**F-2006-00127** Archive 20051598CIA212
Ejército Popular Revolucionario
**F-2006-00194** Archive 20051632CIA218
Military Harassment of Indigenous Communities
**F-2006-00195** Archive 20051629CIA217
Aguas Blancas Massacre (Guerrero)
**F-2006-00202** Archive 20051652CIA222
EZLN Crackdown

This set of requests is related to indigenous/peasant communities in Mexico and their relationship with the Mexican government. Indigenous and peasant communities have endured marginalization, poverty and

9

Letter to Scott Koch
January 27, 2006

discrimination accentuated by a lack of adequate policies addressing their needs. Indigenous and peasant communities have been subject to military harassment and in some cases violence that has resulted in brutal massacres. Some of these communities have organized themselves in armed movements (e.g. the Ejército Zapatista de Liberación Nacional based in the state of Chiapas and the Ejército Popular Revolucionario from the state of Guerrero).

Declassified U.S. records on these issues are particularly relevant today due to the political campaign recently launched by the EZLN. "La Otra Campaña" is an attempt by the Zapatistas to draw attention to the struggle faced by 50 million Mexicans living in poverty. The campaign is a six-month road trip, from Mexico's southernmost state to the border with the U.S., and is headed by Zapatista leader Subcomandante Marcos, and has been the focus of articles and analyses both in Mexico and abroad.

Moreover with leftist trends sweeping through Latin America and the election of the first Indian president of Bolivia, the status of these communities across the continent has acquired even more relevance, and might require a reshaping of American foreign policy. The documents we are requesting will enhance the public understanding of the operations of the U.S. government in response to questions of poverty, indigenous activism and human rights, and will provide valuable background to current events in Latin America.

The National Security Archive considers dissemination to be the core of our work. We have published documents concerning issues related to the current requests on both our website and in the Mexican newsweekly Proceso. An article written by Senior Analyst and Mexico Project Director Kate Doyle about the Zapatista uprising (Rebellion in Chiapas and the Mexican Military, available at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB109) made headlines in Mexico and contributed to the understanding of the situation in Chiapas. An accompanying posting in our website contained 41 related documents, including several declassified by the CIA.

SUBJECT: Pertamina and Pertamina President Ibnu Sutowo - Indonesia state-owned oil company
**F-2006-00286** Archive 20051686CIA225

As part of its effort to help document abuse that took place during the thirty-two year reign of Suharto, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate the history of U.S.-Indonesian relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

The corruption scandal in the mid 1970s at Pertamina, the Indonesian national oil company (of which Ibnu Sutowo was director) was a central economic and political event which left Indonesia with nearly ten billion dollars in external debt and symbolized the growing corruption of the Suharto regime. This corruption scandal also erupted as the U.S. was increasing its military and economic aid to Indonesia and as Indonesia was preparing to invade the territory of East Timor. Documents pertaining to this issue will thus offer a crucial window into the workings and activities of the U.S. government at a crucial time in its relationship with Indonesia, in particular the degree to which U.S. officials were aware of ongoing corruption and raised them with Indonesian officials.

10

Letter to Scott Koch
January 27, 2006

Corruption continues to plague Indonesian politics and business and serves as a chief barrier to the democratization process underway in the world's fourth largest country. As the below article details, Indonesia is regularly ranked among the most corrupt countries in Asia. This issue is thus of clear relevance and public interest both to Indonesian and American audiences seeking to understand the historical roots of one of the most important phenomenon of Indonesian political and economic life.

For Questions Regarding Public Interest and Current Events, Please See:
*Agence France Press, December 5, 2005*
***Corruption seen as most serious in Asia's developing economies: PERC***

*Corruption is the major obstacle to investment and business growth in Asia's developing economies with Indonesia suffering the most, according to a poll of foreign executives.*

*In contrast, Hong Kong and Singapore -- two of the most developed Asian economies -- are rated as the places where graft is most under control, the Political and Economic Risk Consultancy (PERC) said.*

*Singapore topped the survey of 96 leading foreign executives based in the region with a score of 0.89 where the best grade is zero and the worst is 10.*

*Arch economic rival Hong Kong was second at 1.22 while Indonesia was the worst with a score of 9.44, PERC said in its survey of 12 regional economies.*

*Japan was third, followed by South Korea, Malaysia, Taiwan, Thailand, China, India, the Philippines and Vietnam.*

*The gradings by Singapore and Hong Kong reflect confidence in the judiciary system which is why the former British colonies have remained big recipients of foreign investment despite lower labour costs elsewhere, PERC said.*

*"Labor is usually much less expensive in neighboring countries, and except for the excellent harbors, world class physical infrastructure facilities and educated labor forces, neither Hong Kong nor Singapore has many natural resources to draw investors," it said.*

*"However, foreign companies find it easier and more straightforward to do many types of business in Asia's two island economies, which is one of the main reasons they have attained "regional business center" status.*

*"The low level of corruption and victims' ability to seek legal redress though the local legal system when they do encounter graft are major attributes of Hong Kong and Singapore that enhance the quality of the overall business environment."*

*In Indonesia, graft is seen a major drawback for foreign investors but they are encouraged by President Susilo Bambang Yudhoyono's drive to stamp out corruption, the survey showed.*

*"The legal system in that country remains highly suspect, but President Susilo Bambang Yudhoyono has stepped up the fight against graft," PERC said, "There have been a few high profile examples of officials being arrested and prosecuted, and these anecdotes are raising hopes that one of the biggest barriers to doing business in Indonesia, namely, corruption, is being reduced."*

11

Letter to Scott Koch
January 27, 2006

*Similarly in China, investors like efforts by Beijing to punish corrupt government officials, PERC said, adding that being a member of the World Trade Organisation (WTO) has helped the anti-graft drive.*

*"China stands out as the country where the trend seems to be improving the most," it said.*

*In Malaysia, graft is seen as a problem but it is not as severe as in most neighbouring economies, like the Philippines where the problem is not improving and the government is seen as nothing about it, the survey said.*

*Meanwhile, executives recognise Thai authorities have changed laws and regulations but consider it to benefit large businesses, many of which have close links with influential politicians, the survey said.*

SUBJECT: President Reagan and Secretary Shultz to Indonesia 1986
**F-2006-00293** Archive 20051693CIA226

In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth and Reconciliation Commission charged with investigating human rights abuses during the "New Order" period of President Suharto from 1966 to 1998. Such efforts in Indonesia to document past human rights abuses and the historical context of political conflict are crucial to its ongoing democratic transition and thus of clear interest to both the Indonesian and U.S. general public.
As part of this process, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government
(http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

The visit to Indonesia of a high ranking official, especially the Secretary of State or the President of the United States, is an inherently significant political event and thus of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context. As the CIA is aware, the agency regularly provides analyses of significant events and trends for high-ranking officials visiting other countries. These visits were significant because they took place at a time when the Indonesian armed forces were escalating military operations and repressive activities against pro-independence activists in the territory of West Papua.

Documents pertaining to this visit will thus offer a crucial window into the workings and activities of the U.S. government at a crucial time in its relationship with Indonesia, in particular the degree to which U.S. officials were aware of ongoing human rights abuses in West Papua or elsewhere and raised them with Indonesian officials. CIA briefing papers and materials for the President and Secretary of State offer insight into the awareness of the U.S. government at the highest levels of these issues.

SUBJECT: Riot in Ujung Pandang, Sulawesi, Indonesia 1987
**F-2006-00296** Archive 20051700CIA227

12

Letter to Scott Koch
January 27, 2006

In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth and Reconciliation Commission charged with investigating human rights abuses during the "New Order" period of President Suharto from 1966 to 1998. Such efforts in Indonesia to document past human rights abuses and the historical context of political conflict are crucial to its ongoing democratic transition and thus of clear interest to both the Indonesian and U.S. general public.

As part of this process, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

During the New Order period, riots served as a potent expression of popular discontent with the Suharto regime. The May, 1998, protests which brought down the Suharto regime, for example, included widespread rioting, some of which was orchestrated by Indonesian military units. As such, efforts to document the history of such events and official responses to them are of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context.

A crucial component of the National Security Archive's efforts to support the Truth Commission process underway in Indonesia involves establishing the international context in which New Order era human rights abuses took place, such as the awareness of foreign governments of such abuses. Documents concerning U.S. government knowledge of the causes and consequences of popular protest against the Suharto regime will thus help increase public understanding of the workings and activities of the U.S. government, in particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses.

---

In a democracy the public acts as a check on government conduct. As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment." The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate information to the public. Again, in the Supreme Court's words: "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). In carrying out its civic role in our society, the public is entitled to the wide range of information that can be useful to inform debate, to act as a check against abuse, and to impact government policy.

Furthermore, if you decide to deny news media status for any of the above-listed requests or any other requests that the Archive has filed, please specifically indicate which of the criteria in 32 C.F.R. Sec. 1900.02 you have determined is not met. Your failure to specify which criterion has not been satisfied will be viewed by the Archive, as well as by the news media organizations that have been briefed, as further evidence of your effort to interfere with the Archive's legitimate FOIA activities. As

13

Letter to Scott Koch
January 27, 2006

you noted in a previous letter on the issue (dated November 25, 2005), it would assist the CIA if the Archive addresses these factors on its initial request. Our ability to do so would be enhanced by an understanding of which criteria the CIA believes are not met.

Please feel free to contact me by telephone if you wish to discuss this further. I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

# EXHIBIT 8

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**

**Phone: 202/994-7000**
**Fax: 202/994-7005**
**nsarchiv@gwu.edu**
**www.nsarchive.org**

May 8, 2006

<u>**Letter by Facsimile and First Class Mail**</u>

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC  20505

RE:    Fee Categorization Determination for FOIA Requests F-2006-00622 - 20060134CIA012
                                                                              F-2006-00623 - 20060132CIA011

Dear Mr. Koch:

This is in response to your letters of April 5, 2006 (**Enclosure A**) in which you question the categorization of the National Security Archive (the "Archive") as a "representative of the news media" with respect to the two FOIA requests listed above submitted by Mr. Michael Evans on February 3, 2006. The April 5, 2006 letters request the National Security Archive address the third issue in the criteria specified in 32 C.F.R. § 1900.02 (3). In order to qualify as a representative of the news media, the requests must "enhance the public understanding of the operations or activities of the U.S. Government."

As background, the agencies should be aware that these requests were filed on behalf of the National Security Archive's Colombia Documentation Project, which seeks to assemble a collection of primary source declassified material on the making of United States policy toward Colombia, including support for counterdrug and counterguerrilla operations, security assistance and military training programs, petroleum sector security, trade policy, and human rights issues. The overarching goal of the project to enhance the public understanding of U.S. policy by making these documents available to the public through the National Security Archive Web site, books, articles, and other publishing outlets.

It is thus important to have access to a broad range of declassified documents, including reports, memoranda and other analytical documents produced by the CIA and other members of the U.S. intelligence community. These documents provide the evaluations and judgments of trained intelligence professionals that policymakers rely upon in making decisions about how to approach policy matters. As such, it is critical that the project have access to properly declassified CIA material, so that students, scholars and journalists have a complete picture of the policymaking process.

## F-2006-00622 - 20060134CIA012

*Request enhances the public understanding of the operations or activities of the U.S. Government:*
In December 2005, the Colombian government and the National Liberation Army (ELN) guerrillas opened peace talks in Cuba aimed at negotiating an end to 40 years of conflict between the government and the rebel group. I expect that the declassification of CIA records pertaining to these talks, and the potential for the demobilization of the ELN's 4,000-man guerrilla fighting force, would significantly

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
May 2, 2006

enhance public understanding of how these developments would impact U.S. security initiatives in Colombia.

The ELN is one of three Colombian groups listed as a State Department-designated Foreign Terrorist Organization (FTO) and is also heavily involved in the drug trade. In 2002, the U.S. Congress and President Bush significantly enhanced the U.S. role in Colombia's counter-terrorism efforts by approving legislation allowing the use of U.S. military equipment and training in operations against Colombian terrorist organizations including the ELN, superseding previous requirements that such assistance be tied specifically to anti-narcotics operations. Also approved at that time was funding for the training and equipping of a new Colombian military unit established to protect a vital oil pipeline owned in part by a U.S. company that is frequently the target of sabotage attacks by ELN rebels.

In November 2005, President Bush signed legislation authorizing U.S. assistance to help disarm, demobilize and re-train former members of Colombian terrorist groups (including the ELN). According to media sources, the decision came after more than two years of legal debate between the Departments of State and Justice over whether such assistance would violate a ban on providing "material support" to Foreign Terrorist Organizations.

It is thus clear that the negotiations between the ELN and the Colombian government have a direct impact on U.S. policy in Colombia, with serious implications for U.S. counter-narcotics and counter-terrorism programs. The possibility of a peace agreement with one of Colombia's main terrorist groups would no doubt impact decisions on how these programs are designed and funded. For these reasons, we strongly believe that the declassification of CIA material on the subject would significantly enhance public understanding of the operations and activities of the U.S. government.

**F-2006-00623 - 20060132CIA011**

*Request enhances the public understanding of the operations or activities of the U.S. Government:*
This FOIA request asked for records pertaining to a December 2005 agreement between the Venezuelan and Colombian governments on the construction of a gas pipeline from the Paraguana Refinery Complex in Venezuela to the Colombian port at Punta Ballenas on the Pacific coast, and the potential for similar pipeline projects extending to other parts of South America.

The pipeline agreement between Colombia and Venezuela has been widely viewed as a kind of rapprochement for the two countries after a recent period of political and ideological estrangement. The agreement unites Colombian President Alvaro Uribe, a strong U.S. ally, and Venezuelan President Hugo Chavez, whose policies and rhetoric have often been at odds with U.S. objectives in the region and around the world.

The pipeline project has significant implications for U.S. energy policy. Venezuela is the world's fifth-largest oil exporter and the third-largest foreign supplier of oil to the U.S.—supplying around 10 percent of U.S. oil imports. Recently, Venezuela's oil minister warned the U.S. that Venezuela may choose to shift its oil exports away from the U.S. and toward other markets, particularly China, while supplying discounted fuel to other countries around Latin American and the Caribbean. Complaining about U.S. "aggression," President Chavez himself has warned that "ships filled with Venezuelan oil, instead of going to the United States, could go somewhere else."

The construction of a pipeline to a port on the Pacific is seen as a signal that Venezuela is serious about finding new markets for its petroleum exports. There is no doubt that such developments have serious

2

Letter to Scott Koch
May 2, 2006

implications for U.S. energy policy and for U.S. relations with both Venezuela and Colombia. Surely the CIA has been called upon to analyze the issue and its implications for U.S. policy. As oil prices continue to climb higher and higher in the U.S., there is little doubt that the declassification of CIA records on this issue would enhance the public's understanding of how political and ideological differences affect the global energy market and the supply of fuel to the U.S. market.

As previously clarified for your agency, in *National Security Archive v. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), the D.C. Circuit held that the National Security Archive is entitled to a waiver of all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The D.C. Circuit's decision was based on the fact the Archive had published one book and intended to publish document sets in the future. The now-Chief Judge of the D.C. Circuit, Judge Ginsburg, writing for a unanimous court, explained: "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.* Since the time of the court decision, the Archive's publication activity has expanded dramatically. Moreover, the Archive's journalistic work has received numerous awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.

In a democracy the public acts as a check on government conduct. As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment." The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate information to the public. Again, in the Supreme Court's words: "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). In carrying out its civic role in our society, the public is entitled to the wide range of information that can be useful to inform debate, to act as a check against abuse, and to impact government policy.

I hope to receive your response granting news media fee status related to FOIA requests F-2006-00622 and F-2006-00623.

Please feel free to contact me by telephone if you wish to discuss this further. I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

3

Central Intelligence Agency



Washington, DC 20505

5 April 2006

Mr. Michael Evans
The National Security Archive
Gelman Library, Suite 701
2130 H Street, NW
Washington, DC 20037

Reference: F-2006-00623 / Archive # 20060132CIA011

Dear Mr. Evans:

The office of the Information and Privacy Coordinator received your 3 February 2006 Freedom of Information Act (FOIA) request for records pertaining to:

1. The agreement between President Alvaro Uribe of Colombia and President Hugo Chavez of Venezuela authorizing the construction of a 215-kilometer gas pipeline between the Paraguana Refinery Complex in Venezuela and Punta Ballenas in Colombia, signed on or about November 24, 2005;
2. Further discussions concerning a possible extension of the pipeline to other Andean countries; and
3. The agreement to create a Binational Border Development Fund to improve living conditions along the Colombian-Venezuelan border.

We assigned your request the number referenced above. Please use the number when corresponding with us so that we can easily identify the request.

Your letter states that the National Security Archive qualifies for a waiver of search and review fees as a representative of the news media. Your request, however, does not appear to satisfy all the criteria our published regulations require to receive preferential fee treatment as a representative of the news media. You may find these criteria at 32 C.F.R. § 1900.02 (h)(3), which specifies that "news" must:

20060132CIA011          CIA
RECNO:32634       SBQCOR:120230
4/12/2006          FOISG: Evans, Michael
Colombia-Venezuela pipeline construction

- concern current events;
- interest the general public;
- enhance the public understanding of the operations or activities of the U.S. Government; and
- be disseminated to a significant element of the public at minimal cost.

Please specifically address the third point, how the documents you request will enhance the public understanding of the operations or activities of the U.S. Government. Your thorough response will help ensure we place your request in the most appropriate and favorable fee category possible.

We will hold your request in abeyance for 45 days from the date of this letter, pending your clarification of the third point, above. If we do not hear from you within that time, we will close your request.

Sincerely,

Scott Koch
Information and Privacy Coordinator

Central Intelligence Agency



Washington, DC 20505

5 April 2006

Mr. Michael Evans
The National Security Archive
Gelman Library, Suite 701
2130 H Street, NW
Washington, DC 20037

Reference:  F-2006-00622 / Archive # 20060134CIA012

Dear Mr. Evans:

The office of the Information and Privacy Coordinator received your 3 February 2006 Freedom of Information Act (FOIA) request for records pertaining to:

> **The December 2005 peace negotiations between the government of Colombia and the Ejercito de Liberacion Nacional (National Liberation Army, or ELN).  The talks were held in Cuba and were mediated by facilitators from Spain, Norway and Switzerland.**

We assigned your request the number referenced above.  Please use the number when corresponding with us so that we can easily identify the request.

Your letter states that the National Security Archive qualifies for a waiver of search and review fees as a representative of the news media.  Your request, however, does not appear to satisfy all the criteria our published regulations require to receive preferential fee treatment as a representative of the news media.  You may find these criteria at 32 C.F.R. § 1900.02 (h)(3), which specifies that "news" must:

- concern current events;
- interest the general public;
- enhance the public understanding of the operations or activities of the U.S. Government; and
- be disseminated to a significant element of the public at minimal cost.

20060134CIA012
RECNO:32636
4/12/2006
Demobilization Peace Talks in Cuba

CIA
SEQCCRC:120232
FOISO: Evans, Michael

Please specifically address the third point, how the documents you request will enhance the public understanding of the operations or activities of the U.S. Government. Your thorough response will help ensure we place your request in the most appropriate and favorable fee category possible.

We will hold your request in abeyance for 45 days from the date of this letter, pending your clarification of the third point, above. If we do not hear from you within that time, we will close your request.

Sincerely,

Scott Koch
Information and Privacy Coordinator

# EXHIBIT 9

Central Intelligence Agency



Washington, D.C. 20505

25 November 2005

Meredith Fuchs
General Counsel
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Re:  National Security Archive Freedom of Information Act Requests F-2005-
     01773, F-2005-01811, F-2006-00039, F-2006-00052, F-2006-00057

Dear Ms. Fuchs:

        We have received your letter and supporting documentation of 10
November 2005 explaining why you believe the Freedom of Information Act
requests below meet the criteria for "news media" status warranting
preferential fee treatment.

        You are correct in acknowledging that our regulations require us to
make fee determinations on a case-by-case basis.  Using that standard, the
facts you have provided, and after fully considering the arguments you set
forth in your letter, I have made the following determinations in my capacity
as CIA Information and Privacy Coordinator.

   •   F-2005-01773, request for biographical material from 1 January 1985
       through 1 July 2005 on Taliban officials Mullah Mohammad Omar and
       Mullah Mohammad Rabbani.  I deny your request for news media
       status in this case because it does not meet each of the criteria defining
       news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

   •   F-2005-01811, request for biographical material from 1 January 1985
       through 1 July 2005 on Taliban officials Maulawi Wakil Mutawakil
       and Mullah Abdul Jalil.  I deny your request for news media status in
       this case because it does not meet each of the criteria defining news
       our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

20051224CIA157          CIA
RECNO:31804           SEQCOR:118112
11/30/2005            FOISG: Elias, Barbara
Taliban Members (Omar, Rabbani)

Meredith Fuchs                          2                    25 November 2005
General Counsel

- F-2006-00039, request for documents relating to the 12-14 May 1973 meetings between US Secretary of State William Rogers, Mexican President Luis Echeverria, and Mexican Foreign Minister Emilio Rabasa. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

- F-2006-00052, request for documents from 1 October through 31 December 1994 related to the APEC Economic Leaders' Meeting, official meetings between US and Indonesian officials, the occupation of the US Embassy in Jakarta in November 1994, and November-December 1994 protests in East Timor and the Indonesian government's reaction thereto. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

- F-2006-00057, request for documents created between October 1976 and June 1977 related to Muslim extremist activities in Indonesia and the Indonesian government's reaction thereto. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

I therefore place these requests in the "all other" category, which means that the Archive will be responsible for charges associated with searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction. Copies beyond the first 100 pages are ten cents per page. The first two hours of search time for each request will be free. In accordance with Section (a) of the fee schedule enclosed, search fees are assessable even if we find no records or, if we find any, we determine that they are not releasable. This means we will charge you even if our search results are negative or if we determine that we cannot release any information under the FOIA. In accordance with the provisions of the FOIA, you have the right to seek judicial review of these decisions in a United States district court.

Before our office can begin processing these requests, we must receive the Archive's commitment to pay fees incurred under the conditions stated above. The search fees for each item in a request are usually about $150. We will hold these requests in abeyance for 45 days pending our receipt of the Archive's commitment to pay fees. So as not to disadvantage the Archive pending our receipt of its fee commitment, we will not move these five

Meredith Fuchs                     3                    25 November 2005
General Counsel

requests to the end of the line, but will process them as of the date we
received the initial request.

My decision in these cases is limited to the facts of each request. You
should not conclude that every Archive request will have the same result. If
future requests meet the criteria, they will warrant preferential news media
status. Your initial explanation why each request meets the criteria will
eliminate our need to ask for further clarification and will help make
processing as efficient as possible.

Sincerely,

Scott A. Koch, Ph.D.
CIA Information and Privacy Coordinator

# EXHIBIT 10

Central Intelligence Agency



Washington, D.C. 20505

8 February 2006

Ms. Barbara Elias
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Re:  National Security Archive Freedom of Information Act Requests

F-2006-00051 20051502CIA190
F-2006-00058 20051505CIA191
F-2006-00083 20051545CIA195
F-2006-00084 20051541CIA194
F-2006-00087 20051562CIA199
F-2006-00088 20051564CIA200
F-2006-00104 20051576CIA204
F-2006-00105 20051574CIA203
F-2006-00114 20051582CIA207
F-2006-00116 20051580CIA206
F-2006-00121 20051593CIA210
F-2006-00122 20051591CIA209
F-2006-00126 20051595CIA211
F-2006-00127 20051598CIA212
F-2006-00194 20051632CIA218
F-2006-00195 20051629CIA217
F-2006-00198 20051655CIA223
F-2006-00199 20051658CIA224
F-2006-00202 20051652CIA222
F-2006-00286 20051686CIA225
F-2006-00293 20051693CIA226
F-2006-00296 20051700CIA227

Dear Ms. Elias:

    We have received via facsimile your letter of 27 January 2006 and supporting
documentation explaining why you believe the Agency should place the National
Security Archive in the "representative of the news media" fee category for purposes of
the Freedom of Information Act requests referenced above.   Using the standards for

Ms. Barbara Elias                    Page 2                    8 February 2006

defining "news" the CIA makes publicly available at 32 C.F.R § 1900.02 (h)(3), and after fully considering the facts and comprehensive arguments you set forth in your letter, I have made the following determinations in my capacity as CIA Information and Privacy Coordinator.

- F-2006-00051 20051502CIA190: request for "any and all documents related in whole or in part to the assassination of Jose Francisco Ruiz Massieu, secretary-general of the Institutional Revolutionary Party (PRI), on September 28, 1994 in downtown Mexico City." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00058 20051505CIA191: request for "any and all documents related in whole or in part to the assassination of Mexican presidential candidate from the ruling Institutional Revolutionary Party (PRI), Luis Donaldo Colosio Murrieta, on March 23rd 1994 at a campaign rally in Lomas Taurinas, a poor neighborhood in Tijuana." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00083 20051545CIA195: request for "any and all documents related in whole or in part to the joint police-military operation in the municipality of El Bosque in the Mexican state of Chiapas on June 10, 1998. The purpose of this operation was to recover a building controlled by independent Zapatista authorities which housed the offices of the autonomous municipal council of San Juan de la Libertad and serve 15 arrest warrants." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00084 20051541CIA194: request for "Any and all documents related in whole or in part to the massacre by paramilitary forces of 45 people (including a baby, children and women) in the village of Acteal (part of the municipality of Chenalho) in the Mexican state of Chiapas on December 22, 1997." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00087 20051562CIA199: request for "any and all documents related in whole or in part to the Ecologist Green Part of Mexico or Partido Verde Ecologista de Mexico (PVEM) and the Martinez Torres family that controls it. [I]

am also interested in any documents that discuss the corruption scandals that the PVEM has faced included [sic] . . . ." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00088 20051564CIA200: request for "the reaction to the July 1997 mid-term elections in Mexico . . . ." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00104 20051576CIA204: request for "any and all documents related in whole or in part to the announcement of the candidacy of Ernesto Zedillo as Mexico's Institutional Revolutionary Part (PRI) candidate after the assassination of Luis Donaldo Colosio in March 1994, including the US assessment on why Zedillo was selected by President Carlos Salinas as the PRI presidential candidate." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00105 20051574CIA203: request for "any and all documents related in whole or in part to the 1995 unsuccessful candidacy of former Mexican President Carlos Salinas de Gortari to head the World Trade Organization and US support to his candidacy." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00114 20051582CIA207: request for "any and all documents related in whole or in part to the June 7th, 1998 shooting of 11 persons by members of the Mexican army in an incident which occurred in and around the 'Caritino Maldonado Perez' school in the village of El Charco in the State of Guerrero." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00116 20051580CIA206: request for "any and all documents related in whole or in part to the May 1984 visit of Mexican President Miguel de la Madrid to Washington. During this visit de la Madrid met with President Reagan, among topics discussed were the Contadora negotiation process in Central America and Mexico's economic crisis." I deny your request for news media status in this case

because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00121 20051593CIA210: request for "any and all documents related in whole or in part to the tenure of Joaquin Hernandez Galicia ('La Quina') as head of the Mexican Oil Workers' Union." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00122 20051591CIA209: request for "any and all documents related in whole or in part to the 36-hour hunger strike that former Mexican President Carlos Salinas began on February 28, 1995 to protest the arrest of his brother Raul Salinas in connection with the assassination of Jose Francisco Ruiz Massieu, rumors that his administration was involved with the assassination of presidential candidate Luis Donaldo Colosio, and accusations that he was directly responsible for the 1994 peso crisis." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00126 20051595CIA211: request for "any and all documents related in whole or in part to Mario Villaneuva Madrid's tenure as governor of the Mexican State of Quintana Roo (1993-1999)." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00127 20051598CIA212: request for "any and all documents related in whole or in part to the Popular Revolutionary Army or Ejercito Popular Revolucionario (EPR), a leftist guerrilla movement that operates in the Mexican states of Guerrero and Oaxaca." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00194 20051632CIA218: request for "any and all documents related in whole or in part to police and military harassment of indigenous communities in the state of Chiapas in 1993, including the May 24,1993 occupation of the village of Patate Viejo, municipio of Ocosingo, state of Chiapas, by hundreds of soldiers, who searched residents' houses and accused them of harboring guerrillas [and] the Spring 1993 repeated harassment of residents of San Isidro el Ocotal after the presumed murder of two soldiers in the area." I deny your request for news media

Ms. Barbara Elias                    Page 5                    8 February 2006

status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00195 20051629CIA217: request for "any and all documents related in whole or in part to the killing of 17 peasants at the Aguas Blancas ford in the Mexican state of Guerrero on June 28, 1995." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00198 20051655CIA223: request for "any and all documents related in whole or in part to accusations that the Mexican ruling Institutional Revolutionary Party (PRI) committed electoral fraud in November 1990 municipal elections in the state of Mexico, and responses by both civil society and government in both Mexico and the United States to these charges." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00199 20051658CIA224: request for "any and all documents related in whole or in part to reforms to Mexico's electoral system made by Mexican President Carlos Salinas de Gortari in August 1990." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00202 20051652CIA222: request for "any and all documents related in whole or in part to the crackdown on the Zapastista National Liberation Army (EZLN) ordered by Mexican president Ernesto Zedillo Ponce de Leon on 9 February 1995." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00286 20051686CIA225: request for "all documents issued between June 1, 1974, and May 31, 1976, relating in whole or in part to Pertamina, Indonesia' state-owned oil company, and/or Ibnu Sutowo, Pertamina's president-director from 1967 to 1976. I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

- F-2006-00293 20051693CIA226: request for "all documents issued between February 1 and May 31, 1986, relating in part or in whole to the visit of US President Ronald Reagan and Secretary of State Shultz to Indonesia in April and May 1986 and any official meetings or appearances made by them and other American officials accompanying them during the visit, including but not limited to Reagan's meeting with Indonesian President Suharto (also spelled as Soeharto)." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it does not concern a current event.

- F-2006-00296 20051700CIA227: request for "all documents issued between November 1, 1987, and March 31, 1988, relating in part or in whole to the riot in Ujung Pandang, Sulawesi, Indonesia in November 1987." I deny your request for news media status in this case because it does not meet the criteria outlined in Agency regulations. For example, it neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.

I therefore place these requests in the "all other" category, which means that the Archive will be responsible for charges associated with searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction. Copies beyond the first 100 pages are ten cents per page. The first two hours of search time for each request will be free. In accordance with Section (a) of the fee schedule enclosed, search fees are assessable even if we find no records or, if we find any, we determine that they are not releasable. This means we will charge you even if our search results are negative or if we determine that we cannot release any information under the FOIA.

In accordance with the provisions of the Administrative Procedures Act, you have the right to seek judicial review of these decisions in a United States district court. Agency regulations do not provide a right of administrative appeal for a fee categorization decision. The applicable provision of 32 C.F.R. § 1900.42 (a) limits administrative appeals to three circumstances: denial of access to records or any portion thereof; searches that locate no records; and denial of requests for fee *waivers*.

Because we estimate fees to exceed $100, our regulations require that we receive the Archive's commitment to pay fees incurred before our office can begin processing these requests. The search fees for each item in a request are usually about $150. We will hold these requests in abeyance for 45 days pending our receipt of the Archive's commitment to pay fees. Upon our receipt of the Archive's fee commitment, we will place these twenty-two requests in the processing queue using the date of the initial request letter.

Agency regulations require us to make fee category decisions on a request-by-request basis. Therefore, we will determine your fee category for future requests based

Ms. Barbara Elias                    Page 7                    8 February 2006

on the facts of each case and the criteria outlined in Agency regulations.  A detailed initial explanation why each request meets the criteria of a particular fee category may eliminate our need to ask for further clarification and will help make processing as efficient as possible.

                                        Sincerely,

                                        Scott A. Koch, Ph.D.
                                    CIA Information and Privacy Coordinator