**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
THE NATIONAL SECURITY ARCHIVE,  )
                                )
        Plaintiff,              )
                                )
v.                              )      No. 06-CV-1080 (GK)
                                )
CENTRAL INTELLIGENCE AGENCY,    )
        et al.,                 )
                                )
        Defendants.             )
_____)
```

**PLAINTIFF NATIONAL SECURITY ARCHIVE'S**
**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Patrick Carome (D.C. Bar No. 385676)
David S. Mendel (D.C. Bar No. 470796)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000 (t)
(202) 663-6363 (f)

Meredith Fuchs (D.C. Bar No. 450325)
General Counsel
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037
(202) 994-7000 (t)
(202) 994-7005 (f)

*Counsel for Plaintiff National Security Archive*

September 8, 2006

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... iii

STATEMENT OF FACTS ............................................................................................3

    FOIA's Fee Provisions ............................................................................................3

    The D.C. Circuit and District Court's Recognition of the Archive as a Representative
    of the News Media ...................................................................................................5

    CIA and OMB Regulations Regarding FOIA Processing Fees ...........................6

    The CIA's Unlawful Refusal Since October 2005 to Treat the Archive as a
    Representative of the News Media ........................................................................8

        1.    The CIA's Demand That The Archive Specifically Justify Preferential
            Fee Treatment for Each Request ...............................................................8

        2.    The Archive's Objections to the CIA's Demands and Explanations of
            Its Publishing Activities and the "Newsworthiness" of Its Requests ..........9

        3.    The CIA's Denial of Preferential Fee Treatment for the Individual
            Requests ...................................................................................................12

ARGUMENT ...............................................................................................................14

I.    The CIA Violated the FOIA by Refusing To Treat the Archive as a "Representative
    of the News Media" ...............................................................................................15

    A.    Standard of Review ...............................................................................................15

    B.    Binding Circuit Precedent Obligates the CIA To Treat the Archive as a
        "Representative of the News Media" .....................................................................16

    C.    Issue Preclusion Bars the CIA from Relitigating the Archive's Entitlement to
        News Media Status ................................................................................................18

    D.    The Archive in Any Event Remains Entitled to Preferred Treatment as a
        Representative of the News Media ........................................................................20

II.    The CIA's Regulation Defining "Representative of the News Media" Is Invalid.............21

    A.    The CIA's Interpretation of the FOIA Is Not Entitled to Deference ....................22

B.      The CIA Impermissibly Construed the FOIA to Require a Case-by-Case
        Determination of the Archive's Fee Status...........................................................24

C.      The CIA Has Applied an Improper Definition of "News" ...................................28

III.    The CIA Acted Arbitrarily and Capriciously in Refusing To Treat the Archive as a
        Representative of the News Media for the Requests at Issue .............................................33

A.      The CIA Inexplicably Departed from Past Practice and Treated Similar
        Requests Disparately..........................................................................................34

B.      The CIA's Denials of Preferential Fee Treatment Were Plainly Erroneous
        Under Its Regulations .......................................................................................37

CONCLUSION.......................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Airmark Corp. v. FAA*, 758 F.2d 685 (D.C. Cir. 1985) ...............................................34, 37

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001) .................................................................22

*Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) ..........18

*American Trading Transport Co. v. United States*, 791 F.2d 942 (D.C. Cir. 1986)..........27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................14

*ANR Pipeline v. FERC*, 71 F.3d 897 (D.C. Cir. 1995) ..................................................34, 37

*Association of America Physicians & Surgeons v. Clinton*, 997 F.2d 898 (D.C.
Cir. 1993) ........................................................................................................................22

*Association of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047 (D.C. Cir. 2000)...............23

*AT&T v. FCC*, 974 F.2d 1351 (D.C. Cir. 1992) ...........................................................38, 40

*Bates v. Unites States*, 522 U.S. 23 (1997) ........................................................................29

*Bowen v. America Hospital Association*, 476 U.S. 610 (1986) ..........................................22

*Cellular Telecomm. & Internet Association v. FCC*, 330 F.3d 502 (D.C. Cir.
2003) ...............................................................................................................................27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................14

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council*, 467 U.S. 837 (1984) ..............22

*Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995).......................................40

*Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d
5 (D.D.C. 2003) ..............................................................................................................16

*Fina Oil & Chemical Co. v. Norton*, 332 F.3d 672 (D.C. Cir. 2003) ................................38

*Government of Rwanda v. Johnson*, 409 F.3d 368 (D.C. Cir. 2005).................................18

*Green County Mobilephone, Inc. v. FCC*, 765 F.2d 235 (D.C. Cir. 1985)........................37

*Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248 (D.C.
Cir. 1996) ........................................................................................................................34

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004).................................................................27

*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ....................................27

*Judicial Watch, Inc. v. U.S. Department of Justice*, 122 F. Supp. 2d 5 (D.D.C. 2000) ....................................................................................................................16

*Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp. 2d 52 (D.D.C. 2000) ....................................................................................................................15

*Judicial Watch, Inc. v. U.S. Department of Justice*, 185 F. Supp. 2d 54 (D.D.C. 2002) ....................................................................................................................15

*Kutler v. Carlin*, 139 F.3d 237 (D.C. Cir. 1998).............................................................23

*Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992) ...............................................................23

*Maislin Industrial v. Primary Steel*, 497 U.S. 116 (1990)..........................................23, 24

*Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ..............................................................................37

*National Cable & Telecommunications Association v. Brand X Internet Services*, 125 S. Ct. 2688 (2005)...............................................................................................24

* *National Security Archive v. CIA*, No. 88-0501 (D.D.C. Jan. 30, 1990).....1, 2, 5, 6, 18, 19

* *National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), *cert. denied*, 494 U.S. 1029 (1990) ......1, 4, 5, 6, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 28, 29, 31

*Neal v. United States*, 516 U.S. 284 (1996) ....................................................................23

*Ortiz v. Secretary of Defense*, 41 F.3d 738 (D.C. Cir. 1994)..........................................38

*Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552 (1990)...........29

*Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994).......................33

*Raton Gas Transmission Co. v. FERC*, 852 F.2d 612 (D.C. Cir. 1988) ..........................27

*Reporters' Committee for Freedom of the Press v. Department of Justice*, 816 F.2d 730 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989)..................22

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997)........................................................22

*United States v. Mendoza*, 464 U.S. 154 (1984)..................................................18

*Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738 (D.C. Cir. 2001)............34, 37

**STATUTES**

Freedom of Information Reform Act of 1986 ("FIRA"), Pub. L. No. 99-570,
    § 1801-1804, 100 Stat. 3207-48, 48-50 ........................................................3

5 U.S.C. § 552(a)(4)(A) ...............................................................................4

5 U.S.C. § 552(a)(4)(A)(i) .....................................................................4, 26, 32

5 U.S.C. § 552(a)(4)(A)(ii) .........................................................................1, 25

5 U.S.C. § 552(a)(4)(A)(ii)(I) .........................................................................4

5 U.S.C. § 552(a)(4)(A)(ii)(II) ...................................................................4, 6, 8

5 U.S.C. § 552(a)(4)(A)(iii) ........................................................................4, 25

5 U.S.C. § 552(a)(4)(A)(vii) ...........................................................................15

22 C.F.R. § 171.22(o) .................................................................................32

32 C.F.R. § 286.28(e)(7) ..............................................................................32

32 C.F.R. § 1900.02(h)(3)........................2, 3, 8, 15, 21, 24, 26, 28, 29, 33

52 Fed. Reg. 10,012 (Mar. 27, 1987)..........................................................7, 26, 31

62 Fed. Reg. 32,479 (June 16, 1997) ...........................................................8, 27

52 Fed. Reg. 46,456 (Dec. 8, 1987) ................................................................7

**ADDITIONAL SOURCES**

Restatement (Second) of Judgments § 27 (2006) ................................................18

Merriam Webster Online Dictionary ................................................................30

Webster's Third New International Dictionary 1524 (Unabridged 2002)........................29

\* Authorities upon which The National Security Archive chiefly relies upon are marked
with asterisks.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

)
THE NATIONAL SECURITY ARCHIVE,　)
)
　　　　Plaintiff,　　　　　　　　　　)
)
v.　　　　　　　　　　　　　　　　　)　　　No. 06-CV-1080 (GK)
)
CENTRAL INTELLIGENCE AGENCY,　)
　　*et al.*,　　　　　　　　　　　　　　)
)
　　　　Defendants.　　　　　　　　　)
)

---

**PLAINTIFF NATIONAL SECURITY ARCHIVE'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

In 1989, in *National Security Archive v. United States Department of Defense*, 880 F.2d

1381 (D.C. Cir. 1989), *cert. denied*, 494 U.S. 1029 (1990) ("*Archive v. DOD*"), the D.C. Circuit

held that the National Security Archive ("Archive") — the plaintiff in this action — qualifies as

a "representative of the news media" under the fee provisions of the Freedom of Information Act

("FOIA"). *See* 5 U.S.C. § 552(a)(4)(A)(ii). Under this ruling, United States government

agencies are forbidden from charging the Archive for costs attributable to the agencies' searches

for records requested by the Archive under the FOIA so long as those requests do not serve a

commercial purpose, absent a "change in circumstances" with respect to the Archive's

publication activity. *See Archive v. DOD*, 880 F.2d at 1383-88. In 1990, in a separate lawsuit,

this Court recognized the precedential effect of the D.C. Circuit's decision and reached the same

conclusion specifically with respect to FOIA requests submitted by the Archive to the Central

Intelligence Agency ("CIA"), a defendant in this action. *See National Security Archive v. CIA*,

1

Civ. No. 88-0501 (D.D.C. Jan. 30, 1990) ("1990 Memorandum and Order") ("*Archive v. CIA*") **(Ex. A hereto)**.

Blatantly disregarding these binding precedents, the CIA suddenly began refusing in October 2005 to treat the Archive as a "representative of the news media" and has insisted that the Archive agree to pay search fees for some 42 FOIA requests submitted to the agency. The CIA took this stance notwithstanding the fact that, since the *Archive* decisions, the Archive has become even more established as a regular publisher and disseminator of news.[1] Although the Archive supplied the CIA with extensive evidence of its recent publishing activity, the CIA refused to accord news media status to the Archive because, according to the CIA, the *subject matters* of the Archive's requests do not meet the CIA's definition of "news" that is included in a regulation that the agency adopted in 1997. The CIA's actions violate the FOIA as authoritatively construed by the D.C. Circuit in *Archive v. DOD*, contravene this Court's order in *Archive v. CIA*, and are contrary to law under the Administrative Procedure Act ("APA").

The CIA's regulation, 32 C.F.R. § 1900.02(h)(3), also violates the FOIA. As the CIA has applied it, this regulation illogically and impermissibly calls for the CIA to determine whether a FOIA requester is a "representative of the news media" by evaluating the content of each request under an unduly narrow definition of "news," rather than by assessing the requester's overall publication activities as required by *Archive v. DOD*. The net unlawful effect is to slow down and make more costly the FOIA disclosure process for requester and taxpayer alike, or to curtail

---

[1]    The Archive is a not-for-profit research institution located at George Washington University in Washington, D.C. It was established in 1985 to promote research and public education on U.S. governmental and national security decision-making and to promote and encourage openness in government and government accountability. The Archive collects, analyzes, and publishes declassified documents acquired through the FOIA. *See* Decl. of Thomas S. Blanton ("Blanton Decl.") ¶ 2 **(Ex. B hereto)**.

the process altogether.  The regulation also illegally purports to bestow upon the CIA broad

discretion to decide, on a case-by-case basis, what information constitutes "news," impermissibly

displacing the judgments of news reporters and editors on this issue.

Even assuming the "newsworthiness" criteria set forth in the CIA's regulation were valid

— which they are not — the CIA applied these criteria arbitrarily and capriciously to the 42

FOIA requests at issue.  The CIA provided no reasoned explanations for its denials of

preferential fee treatment, acted inconsistently, and unreasonably concluded that the topics of the

Archive's requests—which include, among others, the development of United States policy in

Afghanistan, biographies of certain Taliban members, meetings between United States

government officials and their counterparts in Indonesia and Mexico, and past instances of

political conflict in Mexico and Indonesia — did not constitute "news" even under the CIA's

own constricted criteria.

This Court should grant the Archive's motion for summary judgment and provide the

Archive with declaratory and injunctive relief ensuring that the CIA grants it preferential fee

treatment, based on the Archive's status as a representative of the news media, for all of the

FOIA requests at issue and all of the Archive's future requests that are not made for a

commercial purpose.  In addition, this Court should declare invalid and enjoin enforcement of 32

C.F.R. § 1900.02(h)(3), which the CIA purportedly has relied on to determine that the Archive is

not a "representative of the news media" under the FOIA.

## STATEMENT OF FACTS

### FOIA's Fee Provisions

Through the Freedom of Information Reform Act of 1986 ("FIRA"), Pub. L. No. 99-570,

§ 1801-1804, 100 Stat. 3207-48, 48-50, Congress amended the FOIA to provide detailed rules

governing the fees that federal agencies may charge to recover the costs of processing FOIA

requests. *See* 5 U.S.C. § 552(a)(4)(A); *Archive v. DOD*, 880 F.2d at 1382. These rules "var[y] an agency's ability to charge fees depending both upon whether a requester has a particular status and upon whether the specific request is for a commercial or a non-commercial purpose." *Archive v. DOD*, 880 F.2d at 1382.

Specifically, when "records are requested for commercial use," the FOIA allows agencies to collect fees for "reasonable standard charges for document search, duplication, and review." 5 U.S.C. § 552(a)(4)(A)(ii)(I). However, when "records are not sought for commercial use" and the requester is a "representative of the news media" or another favored type of requester identified by the statute, the FOIA allows agencies to charge only duplication fees. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).[2] Requesters who do not fall into one of the categories identified in section 552(a)(4)(A)(ii)(II), but who nevertheless seek documents not for commercial use, may be assessed search and duplication fees, but not review fees.[3]

The FOIA authorizes federal agencies to promulgate regulations specifying the schedule of applicable processing fees and establishing procedures and guidelines for determining when those fees should be waived or reduced. *See* 5 U.S.C. § 552(a)(4)(A)(i). The FOIA requires that such regulations "shall conform" to guidelines promulgated by the Office of Management and

---

[2]    Similarly, agencies may impose only duplication costs on "an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research." 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[3]    Apart from limiting the types of fees that agencies may charge certain types of requesters, the FOIA also instructs agencies to furnish records at no charge (or reduced rates) under particular circumstances dependent upon the request itself. Specifically, a request qualifies for a waiver of all fees "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The Archive did not seek a so-called "public interest" waiver for any of its FOIA requests at issue in this case.

Budget ("OMB"), which is authorized to establish guidelines and a uniform schedule of fees for all agencies. *Id.*

### The D.C. Circuit and District Court's Recognition of the Archive as a Representative of the News Media

In 1989 in *Archive v. DOD*, the D.C. Circuit held that "the [FIRA], read in light of the legislative history, is clear:  Congress intended that an organization like the Archive qualify as a representative of the news media," and, therefore, is entitled to preferential fee treatment for its FOIA requests.  880 F.3d at 1383.  Thus, for purposes of non-commercial requests, federal agencies could impose on the Archive "only the cost of duplicating the records [they] release[]." *Id.*

The Court of Appeals rested its decision not on the nature of the Archive's FOIA requests, but on the Archive's publication and dissemination activities, which at the time of the decision consisted of one previously published book and a "firm intention" to publish "document sets" in the future. *Id.* at 1386.[4]  Based on these activities, the Court concluded that "[a]bsent . . . a change in circumstances, . . . the Archive is entitled to preferred status." *Id.* at 1388.

While the Archive's case against the Department of Defense was pending before the D.C. Circuit, the Archive separately sued the CIA in this Court, seeking a declaratory judgment that the Archive *per se* is entitled to waiver of all search and review fees based on its status as a "representative of the news media." *See* 1990 Memorandum and Order at 2.  After the D.C. Circuit's decision in *Archive v. DOD*, this Court determined that the issues before it were

---

[4]    Each such document set was to "be devoted to a particular topic of current interest, including current United States policies toward various countries and regions," and would be compiled from a variety of sources, including documents obtained through FOIA requests. *Archive v. DOD*, 880 F.2d at 1386.  The court held that the Archive's intention to sell its document sets did not constitute a "commercial use" for purposes of preferred fee status under the FOIA. *Id.* at 1387-88.

"identical to those addressed" by the Court of Appeals "and need[ed] no further elaboration." 1990 Memorandum at 4. As in *Archive v. DOD*, this Court's decision in *Archive v. CIA* did not turn in any way on the nature of either the Archive's FOIA request or the records being sought. Accordingly, this Court reversed the CIA's "determination that plaintiff [the Archive] is not entitled to a fee waiver under 5 U.S.C. 552(a)(4)(A)(ii)(II)," and "ORDERED that defendant [CIA] must treat plaintiff as a 'representative of the news media,' within the meaning of" the statute. 1990 Order at 1, 2.

In the 15 years following the courts' decisions, the Archive submitted hundreds of FOIA requests to the CIA seeking information to support the Archive's ongoing publication activities. *See* Blanton Decl. ¶ 10. With few exceptions, the CIA abided by the decision in *Archive v. DOD*, as well as the Order specifically directed to the CIA in *Archive v. CIA*, and recognized the Archive as a "representative of the news media" for purposes of waiving search and review fees associated with these requests. The Archive is unaware of any occasion between 1991 and October 2005 on which the Archive paid search or review fees to the CIA or any other agency, or between May 1992 and October 2005 on which the CIA tried to assess such fees. *See* Blanton Decl. ¶ 10.

### CIA and OMB Regulations Regarding FOIA Processing Fees

Because the D.C. Circuit held that the FIRA's provision of favorable fee treatment to representatives of the news media "unambiguously" encompassed the Archive, *see Archive v. DOD*, 880 F.2d at 1385, the District Court in *Archive v. CIA* had no reason to address the regulations the CIA promulgated in 1987 regarding assessment of fees for processing FOIA

requests.  *See* 52 Fed. Reg. 46,456 (Dec. 8, 1987).[5]  As relevant, the CIA's 1987 regulations were very similar to regulations issued that same year by the OMB.  The OMB regulations, which remain in force, define "representative of the news media" to mean "any *person* actively gathering news for an entity that is organized and operated to publish or broadcast news to the public."  52 Fed. Reg. 10,012, 10,018 (Mar. 27, 1987) (emphasis added).  They further define the term "news" to mean "information that is about current events *or* that would be of current interest to the public."  *Id.* (emphasis added).  In issuing these regulations, OMB asserted that its fee guidelines applied to all federal agencies.  *See id.* at 10,016.[6]

In 1997, the CIA revised its FOIA fee regulations.  Rather than defining "representative of the news media" in terms of the activities in which the requester generally engages, the revised regulations awkwardly and illogically define it as a type of *request*.  Specifically, the revised regulations provide:

> Representative of the news media means *a request from* an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public and pursuant to their news dissemination function and not their commercial interests; the term news means information which concerns current events, would be of current interest to the general public, *would enhance the public understanding of the operations or activities of the U.S. Government, and* is in fact disseminated to a significant element of the public at minimal cost . . . . "

---

[5]    Nor did the CIA address its own regulations in its briefing to the District Court in *Archive v. CIA*.

[6]    The 1987 CIA regulations defined "[r]epresentative of the news media" to mean "any person actively gathering news for a United States entity that is organized and operated to publish or broadcast news in the United States to the general public."  52 Fed. Reg. at 46,458. The regulations defined the term "news" to mean "information that is about current events or that would be of current interest to the general public."  *Id.*

*See* 32 C.F.R. § 1900.02(h)(3) (emphasis added). In issuing these revised regulations, the CIA stated in the Federal Register that these changes would "not alter substantially any existing rights of members of the public," and that the revisions were intended "to expand" the definition of news media. 62 Fed. Reg. 32,479, 32,480 (June 16, 1997).

### The CIA's Unlawful Refusal Since October 2005 to Treat the Archive as a Representative of the News Media

The events giving rise to this lawsuit began in October of 2005, when the CIA abruptly departed from its prior 15-year practice of treating the Archive as a representative of the news media under 5 U.S.C. 552(a)(4)(A)(ii)(II). The facts regarding the CIA's unlawful actions, as to which there can be no genuine dispute, are as follows.

> 1.   The CIA's Demand That The Archive Specifically Justify Preferential Fee Treatment for Each Request

Until October 2005, the CIA routinely processed the Archive's numerous FOIA requests without assessing search fees or asking the Archive to establish its fee status under section 552(a)(4)(A)(ii)(II). Starting in late October 2005, in connection with 42 separate requests for records submitted by the Archive, the CIA halted its presumptive treatment of the Archive as a representative of the news media, and instead demanded that the Archive prove its news media status for *each particular request*.[7] In a paradigmatic response, the CIA stated that the Archive's "request . . . does not appear to satisfy the criteria our published regulations require to receive preferential fee treatment as a representative of the news media," and asked the Archive to

---

[7]    The Archive submitted these 42 requests to the CIA between August 10, 2005 and March 7, 2006. *See* Blanton Decl. ¶ 12. A list of these requests, with descriptions of the documents sought, is set forth in Attachment 3 to Mr. Blanton's declaration ("List of Requests"). Each request stated that the Archive qualified for waiver of search and review fees as a representative of the news media and that the request was made as part of a scholarly and news research project and not for commercial use. *See* Blanton Decl. ¶ 13 & Attach. 4.

provide, "pursuant to 32 C.F.R. § 1900.02(h), additional information on why and how the documents you seek . . . concern current events," "interest the general public," and "enhance the public understanding of the operations or activities of the U.S. Government"; and "how you plan to disseminate the information to a significant element of the public at minimal cost."[8]

> 2.  The Archive's Objections to the CIA's Demands and Explanations of Its Publishing Activities and the "Newsworthiness" of Its Requests

In response to the CIA's demands for additional information justifying favorable fee treatment on a request-by-request basis, the Archive wrote letters to the CIA protesting the agency's actions as contrary to the D.C. Circuit's decision in *Archive v. DOD*.[9]  The Archive also provided a detailed explanation of how, since that court's decision, it had dramatically expanded its publication activities and, therefore, possessed an even *stronger* entitlement to preferential fee treatment under the Court of Appeal's reasoning.[10]  In particular, the Archive noted:

- The Archive's journalistic work has received numerous awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.[11]

---

[8]  *See* Letter from Koch to Elias dated Oct. 28, 2005, regarding F-2005-01773, included in compilation of CIA demand letters (Blanton Attach. 5); Blanton Decl. ¶ 14.

[9]  Each Archive letter addressed a different sub-group of the 42 requests.  *See* Blanton Decl. ¶ 15; Letter from Fuchs to Koch dated November 10, 2005 ("Nov. 10 Fuchs Letter") (Blanton Attach. 6); Letter from Fuchs to Koch dated December 22, 2005 ("Dec. 22 Fuchs Letter") (Blanton Attach. 7); Letter from Fuchs to Koch dated January 27, 2006 ("Jan. 27 Fuchs Letter") (Blanton Attach. 8); and Letter from Fuchs to Koch dated May 8, 2006 ("May 8 Fuchs Letter") (Blanton Attach. 9).

[10]  *See* Dec. 22 Fuchs Letter at 1; Jan. 27 Fuchs Letter at 2 (Blanton Attachs. 7, 8).

[11]  *See* Dec. 22 Fuchs Letter at 1-2; Jan. 27 Fuchs Letter at 2 (Blanton Attachs. 7, 8); Blanton Decl. ¶ 3.

- The Archive has produced over 40 books, including: *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 2003), *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow*, by William Burr (New York: The New Press, 1999), *Bay of Pigs Declassified: The Secret CIA Report* by Peter Kornbluh (New York: The New Press, 1998), *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940*, by Stephen I. Schwartz, with Thomas S. Blanton, William Burr, *et al.* (Washington, D.C.: Brookings Institution Press, 1998).[12]

- The Archive's most recent document sets, which publish documents obtained through the FOIA, along with commentary, indexes and finding aids, included: *U.S. Policy in the Vietnam War, Part I, 1954-1968; U.S. Policy in the Vietnam War, Part II: 1969-1975; Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992;* and *Guatemala and the United States, 1954-1999*. The Archive provided the CIA with a list of 26 document sets that it has published, and noted that the sets are available digitally and on microfiche; are distributed to a broad range of libraries, universities, and research institutes; and are available to the public for free in the Archive's reading room.[13]

- Articles written by National Security Archive analysts have appeared in *The Washington Post, The New York Times, The Wall Street Journal, Congressional Quarterly, The LA Times, Harpers Magazine, The Miami Herald, The Nation, The Guardian, Vanity Fair, The Bulletin of the Atomic Scientists, World Policy Journal, Foreign Affairs, Foreign Policy, Newsweek, The International Journal of Intelligence and Counterintelligence, International Security, Intelligence and National Security* and other publications.[14]

- The Archive actively distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently

---

[12]      *See, e.g.*, Nov. 10 Fuchs Letter at 2 and enclosures (Blanton Attach. 6). Other recently published titles include *Spying on the Bomb: American Nuclear Intelligence from Nazi Germany to Iran and North Korea*, by Jeffrey T. Richelson (W.W. Norton Mar. 13, 2006); *Cardboard Castle: An Inside History of the Warsaw Pact, 1955-1991*, by Malcolm Byrne, *et al.* (Central European University Press, June 30, 2005); and *The 1956 Hungarian Revolution: A History in Documents*, edited by Malcolm Byrne (Central European University Press, Jan. 1 2003). *See* Blanton Decl. ¶ 4. The Archive attached a list of its books to its correspondence to the CIA. *See, e.g.*, Website lists included in enclosures to Nov. 10 Fuchs Letter (Blanton Attach. 6).

[13]      *See, e.g.*, Nov. 10 Fuchs Letter at 2, and website lists included in enclosures to this letter (Blanton Attach. 6); Blanton Decl. ¶ 5.

[14]      *See* Nov. 10 Fuchs Letter at 3; Dec. 22 Fuchs Letter at 4; Jan. 27 Fuchs Letter at 4 (Blanton Attachs. 6-8); Blanton Decl. ¶ 6.

released through the Archive's FOIA requests, or update the public on issues pertaining to the operations and activities of the U.S. government.[15]

- The Archive has published "electronic briefing books" on subjects related to the FOIA requests at issue, and the Archive intends to publish additional briefing books on related subjects. The Archive noted that a complete list of its electronic briefing books was available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.[16]

The Archive's detailed explanation of its publishing activities in its letters to the CIA actually *understated* those activities.[17] In any event, the Archive argued that its substantial publishing activities clearly qualified it for preferential fee treatment under the standards set forth by the D.C. Circuit in *Archive v. DOD*, as well as by the OMB regulations.

Notwithstanding the Archive's objections to the CIA's departure from past practice and the Archive's detailed description of its ongoing publishing activities, the Archive also provided information about individual requests as requested by the CIA. Broadly speaking, the 42 requests at issue sought information falling into one of four geographic subject areas: (i)

---

[15]    *See* Nov. 10 Fuchs Letter at 3; Dec. 22 Fuchs Letter at 4; Jan. 27 Fuchs Letter at 4 (Blanton Attachs. 6-8); Blanton Decl. ¶ 7.

[16]    *See* Nov. 10 Fuchs Letter at 3; Dec. 22 Fuchs Letter at 4; Jan. 27 Fuchs Letter at 4 (Blanton Attachs. 6-8); Blanton Decl. ¶ 7.

[17]    While the Archive provided the CIA with a list of 26 document sets that it had published, in fact the Archive has published 27 such document sets. Recently published document sets include *The Cuban Missile Crisis Revisited: An International Collection of Documents from the Bay of Pigs to the Brink of Nuclear War* (forthcoming 2006); *The Kissinger Transcripts: A Verbatim Record of U.S. Diplomacy 1969-1977* (2005); and *Terrorism and U.S. Policy: 1968-2002* (2002). *See* Blanton Decl. ¶ 5.

    In addition, as of the filing of the Complaint in this matter, the number of electronic briefing books published by the Archive had reached 190. Updated frequently, these briefing books represent a small sample of the documents in the Archive's published and unpublished collections, and provide online access to important declassified records on issues including United States national security, foreign policy, diplomatic and military history, and intelligence policy. *See id.* ¶ 7. Moreover, the Archive's website attracts well over one million successful visits per month, with visitors downloading an estimated 300,000 pages per day of declassified documents from these electronic books. *See id.*

Afghanistan, including biographies of certain Taliban members and memoranda from 1979

regarding the United States' policy of aiding the Mujahadeen; (ii) Mexico, including meetings

between United States and Mexican officials about NAFTA and other matters, specific events

related to the Salinas administration and his role as ex-President, particular elections and efforts

toward electoral reform, and specific instances of political corruption, conflict, or violence; (iii)

Indonesia, including visits by United States and Indonesian officials to each others' countries,

events related to the resurgence of Muslim extremist activities, political uprisings, and alleged

acts of political repression during the Suharto regime; and (iv) Colombia, including peace

negotiations between the government and the National Liberation Army and authorization for the

Colombia-Venezuela pipeline.[18]  For each of its requests, the Archive provided an exhaustive

explanation of how each of the CIA's regulatory criteria were met.[19]

> 3.    The CIA's Denial of Preferential Fee Treatment for the Individual
>        Requests

In response to the Archive's detailed explanations, the CIA sent the Archive boilerplate

notifications stating that it refused to treat the Archive as a representative of the news media and

therefore denied preferential fee treatment for each of the 42 requests.  The CIA did not contend

that any of the requests were for commercial use.  For each request, the CIA simply listed one or

two criteria from its regulation that it contended the Archive failed to meet, or blanketly asserted

that the Archive failed to meet the agency's criteria without identifying any of those criteria in

---

[18]    *See* Blanton Attachs. 3 & 4.

[19]    *See* Nov. 10 Fuchs Letter, Dec. 22 Fuchs Letter, Jan. 27 Fuchs Letter, and May 8 Fuchs
Letter (Blanton Attachs. 6-9); Blanton Decl. ¶ 15.

particular.[20]  For all 42 of the requests, the CIA told the Archive that it would not process the

requests unless the Archive agreed to pay search costs.[21]  In addition, the CIA informed the

Archive that it was not treating the Archive as a representative of the news media for a request

originally submitted in 1999, even though seven years earlier CIA had told the Archive that it

was entitled to such status.[22]

On December 22, 2005, the Archive administratively appealed the CIA's refusal to treat

the Archive as a representative of the news media in connection with some of the 42 requests.[23]

On February 8, 2006, the CIA told the Archive that it had no right to administratively appeal the

agency's refusal to treat the Archive as a representative of the news media, but that the Archive

had a right to seek judicial review of the CIA's determinations.[24]  The CIA similarly informed

---

[20]      *See* Letter from Koch to Fuchs dated Nov. 25, 2005 ("Nov. 25 Koch Letter") (Blanton
Attach. 10); Letter from Koch to Fuchs dated Feb. 8, 2006 ("Feb. 8 Koch Letter") (Blanton
Attach. 11); Letter from Koch to Elias dated Feb. 8, 2006 ("Second Feb. 8 Koch Letter")
(Blanton Attach. 12); Letter from Koch to Fuchs dated May 31, 2006 ("May 31 Koch Letter")
(Blanton Attach. 13); Second Letter from Koch to Fuchs dated May 31, 2006 ("Second May 31
Koch Letter") (Blanton Attach 14); Blanton Decl. ¶ 16.

[21]      *See* Blanton Attachs. 10-14.  The CIA informed the Archive that it would waive search
fees for three requests after October 2005, without seeking additional information from the
Archive for these requests.  These three requests concerned NAFTA and illegal Mexican
immigration (F-2006-00203), weapons of mass destruction in Iraq (F-2006-00667), and
Ayatollah Ali Sistani's July 2003 fatwa concerning Iraqi elections  (F-2006-00728).  *See* Blanton
Decl. ¶ 25 & Attachs. 3, 22-24.  In addition, from August 10, 2005 through mid-October 2005,
during which time the Archive submitted some of the 42 requests for which the CIA
subsequently sought written justifications, the Archive submitted over 30 other requests for
which the CIA decided not to assess search fees.  *See* Blanton Decl. ¶ 25.

[22]      *See* CIA Letter dated Mar. 9, 2006 regarding F-1999-00850 (Blanton Attach. 26); CIA
Letter dated Oct. 27, 1999 regarding F-1999-00850 (Blanton Attach. 25); Blanton Decl. ¶ 26.

[23]      Letter from Fuchs to Agency Release Panel, c/o Koch, dated Dec. 22, 2005 (Blanton
Attach. 15); Blanton Decl. ¶ 17.

[24]      CIA Letter dated Feb. 8, 2006 (Blanton Attach. 16); Blanton Decl. ¶ 18.

the Archive in its initial denials of the rest of the 42 requests that there was no right of

administrative appeal, but that the Archive could seek judicial review of the CIA's fee

determinations.[25] This lawsuit followed.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(c), the Archive is entitled to summary

judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *See also Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52

(1986). In this case, the dispositive issues are purely legal in nature, and summary judgment is

therefore appropriate if the Archive shows as a matter of law that the CIA violated the FOIA or

the APA by refusing to recognize the Archive as a "representative of the news media" for the 42

requests at issue,[26] or is violating these statutes on an ongoing basis with respect to other

requests.

---

[25]    *See* Feb. 8 Koch Letters (Blanton Attachs. 11, 12); Blanton Decl. ¶ 18. In subsequent correspondence, the CIA informed the Archive that it would close the 42 requests for which it had refused to treat the Archive as a representative of the news media unless the Archive committed to paying the processing fees. *See* Letter from Koch to Elias dated Apr. 10, 2006; Letter from Koch to Fuchs dated May 1, 2006; Letters from Koch to Evans dated May 31, 2006 (Blanton Attachs. 17, 19-21); Blanton Decl. ¶¶ 19, 21, 23. In response, the Archive reasserted its objections to the CIA's actions, *see* Letter from Fuchs to Koch dated April 21, 2006 (Blanton Attach. 18); Blanton Decl. ¶ 20, and informed the CIA that it would pay the assessed fees (up to $250 per request) only under protest and without prejudice to the Archive's legal rights and remedies, and for the purpose of maintaining its place in the FOIA processing queue, *see* Blanton Decl. ¶¶ 22, 24.

[26]    The Archive challenges the CIA's refusal to accord it news media status with respect to the 42 requests for which the CIA issued denial letters after October 2005, except that the Archive has withdrawn one of these requests. *See* Blanton Decl. ¶¶ 12, 13 & Attach. 3 (List of Requests). The Archive also challenges the CIA's attempted revocation of news media status with respect to the 1999 request (F-1999-00850), *see* Blanton Decl. ¶ 26 — bringing the total

The Archive is entitled to summary judgment because the CIA's refusal to treat the Archive as a representative of the news media violates both the FOIA as authoritatively construed by the D.C. Circuit and this Court's order in *Archive v. CIA*. The CIA cannot legitimately rely on 32 C.F.R. § 1900.02(h)(3) to justify its actions, because that regulation is also invalid under the FOIA. Even assuming the CIA's regulation passes muster under the FOIA, the CIA applied it arbitrarily and capriciously to the requests at issue.

## I.  The CIA Violated the FOIA by Refusing To Treat the Archive as a "Representative of the News Media"

It is well settled — under both binding precedent of the D.C. Circuit and a judgment of this Court directed specifically at the CIA — that the Archive is entitled to preferential fee treatment under the FOIA as a "representative of the news media." In refusing to accord the Archive the fee status to which it is entitled, the CIA violated the FOIA and the APA, and acted directly contrary to settled law of the Court of Appeals and an Order of this Court.

### A.  Standard of Review

This Court reviews the Archive's challenge to the CIA's refusal to accord it news media status *de novo*, based on the record before the agency. *See* 5 U.S.C. § 552(a)(4)(A)(vii) ("In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.").[27] Under any standard, however, the CIA's refusal to treat the Archive as a

---

number of requests at issue and referenced in the Complaint to 42. In addition, the Archive seeks relief for any requests regarding which the CIA determined after the filing of the Complaint in this matter not to accord the Archive news media status, including a request for certain government memoranda from 1979. *See* Blanton Decl. ¶ 27 (discussing F-2006-00119).

[27]    *See also Judicial Watch, Inc. v. United States Dep't of Justice*, 185 F. Supp. 2d 54, 59 (D.D.C. 2002) (reviewing *de novo* whether plaintiff was entitled to be classified as representative of the news media); *Judicial Watch, Inc. v. United States Dep't of Justice*, 133 F. Supp. 2d 52,

"representative of the news media" in connection with the 42 requests at issue here is directly

contrary to the FOIA, as interpreted by the D.C. Circuit and this Court, and cannot be sustained.

**B.    Binding Circuit Precedent Obligates the CIA To Treat the Archive as a "Representative of the News Media"**

The D.C. Circuit's decision in *Archive v. DOD* requires reversal of the CIA's actions in

this case. In holding that the Archive qualifies as a "representative of the news media," the court

emphasized that an agency's assessment of news media "status," 880 F.2d at 1382, depended on

"the nature . . . *of the requester*," rather than on the nature of the specific request, *id.* at 1383

(emphasis added). The court further observed, based on the statute's legislative history, that,

"because one of the purposes of FIRA is to encourage the dissemination of information in

Government files . . . '[i]t is critical that the phrase "representative of the news media" be

broadly interpreted if the act is to work as expected. In fact, *any person or organization which*

*regularly publishes or disseminates information to the public should qualify for waivers as a*

*'representative of the news media.'"* *Id.* at 1386 (quoting 132 Cong. Rec. S14298 (daily ed.

Sept. 30 1986) (statement of Sen. Leahy)) (emphasis added by court). The court accordingly

construed the statute to mean that "[a] representative of the news media is, in essence, a person

or entity that gathers information of potential interest to a segment of the public, uses its editorial

skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.*

at 1387.

---

53 (D.D.C. 2000) (same); *cf. Electronic Privacy Information Ctr.  v. Dep't of Defense*, 241 F.
Supp. 2d 5, 8-9 (D.D.C. 2003) (noting disagreement as to applicability of *de novo* standard to
determination of fee category and declining to resolve the question). *But see Judicial Watch,*
*Inc. v. United States Dep't of Justice*, 122 F. Supp. 2d 5, 11-12 (D.D.C. 2000) (holding that the
*de novo* standard applies only to review of agency denial of public-interest fee waiver and that
fee category determinations are reviewed under the arbitrary-and-capricious standard).

The Court of Appeals found that the Archive satisfied this definition, based on the Archive's activities as a publisher and disseminator of information to the public. *See id.* at 1386. The record before the D.C. Circuit in 1989 showed that the Archive had published only one book. *See id.* However, because the Archive had expressed a "firm intention" to publish document sets — groups of documents organized according to topics of current interest, including documents obtained through the FOIA, with indices and other finding aids — the court found that the Archive's activities were "within the range Congress ascribed to a representative of the news media." *Id.* Thus, the court held that the term "representative of the news media" "*clearly* encompasse[d] the Archive." *Id.*; *see also id.* at 1385 (FIRA's sponsors "*unambiguously* envisioned that an organization such as the Archive comes within the term" (emphasis added)). Although the court noted that, if the Archive ultimately did not carry out its intended publication activities the government could argue that the Archive was no longer a representative of the news media, the court emphasized that, "[a]bsent such a change in circumstances, . . . the Archive is entitled to preferred status." *Id.* at 1388.

*Archive v. DOD* controls this case. In none of its letters to the Archive — or anywhere else in the administrative record — did the CIA point to a "change of circumstances" that justified its refusal since October 2005 to accord news media status to the Archive. As explained above, *supra* at 10-11 & n.17, the Archive has published 27 document sets and numerous books, articles, and briefing books. *Archive v. DOD* requires the CIA presumptively to grant preferential fee treatment to the Archive, based on the Archive's status as a representative of the news media, for the 42 requests at issue here and for future requests that do not serve a commercial purpose. The CIA's actions thus violated the FOIA as construed in binding D.C. Circuit precedent.

C.    **Issue Preclusion Bars the CIA from Relitigating the Archive's Entitlement to News Media Status**

This Court should order the CIA to treat the Archive as a representative of the news

media for the additional reason that, under traditional principles of issue preclusion, the District

Court's prior judgment in *Archive v. CIA* precludes the CIA from relitigating the issue. The

doctrine of issue preclusion (or collateral estoppel) "bars parties from relitigating any issue

contested by the parties and submitted for judicial determination in [a] prior case, so long as the

issue [was] actually and necessarily determined by a court of competent jurisdiction in that prior

case and preclusion in the second case [would] not work a basic unfairness to the party bound by

the first determination." *Government of Rwanda v. Johnson*, 409 F.3d 368, 374 (D.C. Cir. 2005)

(citation and internal quotation marks omitted); *see also* Restatement (Second) of Judgments §

27 (2006).[28]

In resolving the Archive's previous suit against the CIA, this Court held that the Archive

was a "representative of the news media" for purposes of FOIA requests that it submitted to the

CIA. This Court found the issues before it to be "identical" to those addressed by the D.C.

Circuit in *Archive v. DOD*, and noted that the Archive had stated an intention to use the

information it requested from the CIA to publish indexed, cross-referenced document sets, which

was "precisely the type of activity which the court in [*Archive v. DOD*] found sufficient to

qualify the Archive as a representative of the news media." 1990 Memorandum at 4. This Court

therefore found the D.C. Circuit's decision in *Archive v. DOD* to be "controlling and

---

[28]    "Preclusion principles . . . unquestionably do apply against the United States, its agencies
and officers." *Alaska Dept. of Envt'l Conservation v. EPA*, 540 U.S. 461, 490 n.14 (2004)
(citing *Montana v. United States*, 440 U.S. 147 (1979)). Although issue preclusion will not
apply against the United States where there is no mutuality of parties, *see United States v.
Mendoza*, 464 U.S. 154, 162-63 (1984), the mutuality requirement is satisfied in this case,
because the present action is between the same parties as the District Court's 1990 judgment.

dispositive," *id.*, and "ORDERED that [the CIA] must treat [the Archive] as a 'representative of the news media,' within the meaning of 5 U.S.C. § 552(a)(4)(A)(ii)(II)." 1990 Order at 2.

   The elements of issue preclusion are clearly met here.  In the earlier action, the question whether the Archive qualifies as a "representative of the news media" undeniably was "contested by the parties and submitted for judicial resolution" and "actually and necessarily determined" by this Court in the Archive's favor.  The CIA could not plausibly contend that the application of issue preclusion in this case would "work a basic unfairness" to the CIA.  The CIA for 15 years abided by the decisions of the D.C. Circuit and this Court and recognized the Archive's entitlement to news media status in connection with hundreds of FOIA requests.  *See* Blanton Decl. ¶ 10.  As noted, the CIA has not attempted to show (nor could it) that the Archive's ongoing publication activities — the focal point of the D.C. Circuit's analysis in determining news media status — had diminished or otherwise were no longer "within the range Congress ascribed to a representative of the news media."  880 F.2d at 1386.  Nor does any aspect of the course of the prior litigation and judgment suggest that it would be unfair to hold the CIA to the result in that case.  To the contrary, it is the CIA's abrupt departure from settled precedent that has worked a basic unfairness to the Archive in this case, preventing it from exercising its rights under the FOIA and disrupting its ability to use the FOIA to monitor the CIA at a time of utmost public concern about the federal government's intelligence activities.  The CIA is therefore precluded from relitigating the Archive's status as a "representative of the news media" under the statute, and this Court should once again enter summary judgment in favor of the Archive on this issue.

**D.    The Archive in Any Event Remains Entitled to Preferred Treatment as a Representative of the News Media**

Even if this Court's prior judgment did not preclude relitigation of the Archive's status, and even if binding circuit precedent did not dispose of the question, the Archive would remain entitled to preferred treatment as a "representative of the news media." Indeed, the record evidence of the Archive's publication activities today makes it even more clear now than at the time of the D.C. Circuit's 1989 *Archive* decision that the Archive qualifies for news media status. The Court of Appeals based its determination principally on the Archive's activities as a publisher and disseminator of information to the public. *Archive v. DOD*, 880 F.2d at 1386-87. In particular, the court noted that the Archive had previously published one book and had "expressed a firm intention" to publish a number of "document sets." *Id.* at 1386. On the basis of those activities alone, the court found that the term "representative of the news media . . . clearly encompasses the Archive." *Id.*

Since that decision, the Archive's publication activities have expanded dramatically. As the Archive explained to the CIA in its letters objecting to the CIA's refusal to recognize the Archive's news media status, the Archive has produced over 40 books and 27 document sets on topics pertaining to U.S. government operations, foreign relations, and national security. *See supra* at 10-11. Articles written by analysts at the Archive have appeared in numerous major newspapers and periodicals, and the Archive also actively publishes "electronic briefing books" and distributes electronic newsletters to over 7,000 subscribers. *Id.* The Archive's journalistic work has been recognized through numerous awards, including the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research. *Id.* Indeed, the evidence in the administrative record of the Archive's publication and dissemination activities actually

understates the Archive's extensive activities as a member of the news media. *See supra* at 11 & n.17.

Given these undisputed — and undisputable — facts, it is clear that the Archive regularly "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience" and is therefore a "representative of the news media" within the clear meaning of the FOIA. *Archive v. DOD*, 880 F.2d at 1387.

\* \* \*

For all of these reasons, this Court should grant the Archive's motion for summary judgment as to Counts I and II of its Complaint. The CIA's refusal to treat the Archive as a representative of the news media violates the FOIA, and its refusal to process the Archive's requests until the Archive agrees to pay search fees constitutes a wrongful withholding of requested agency records under the statute (Count I). Additionally, the actions of the CIA and individual defendants are contrary to law and must be set aside under the APA (Count II).

## II.    The CIA's Regulation Defining "Representative of the News Media" Is Invalid

In refusing to acknowledge the Archive's status as a "representative of the news media" for the 42 requests at issue here, the CIA, relying on its own FOIA fee regulation, 32 C.F.R. § 1900.02(h)(3), improperly conducted a case-by-case analysis of the perceived newsworthiness of the Archive's requests and, in so doing, applied an unduly constricted definition of "news." These errors reflect an unreasonable construction of the FOIA that cannot be reconciled with the statute or binding precedent. The construction of the FOIA set forth in the CIA's fee regulation and applied in this case must be declared invalid and set aside as contrary to law.

**A.    The CIA's Interpretation of the FOIA Is Not Entitled to Deference**

This Court reviews the CIA's construction of the FOIA *de novo*.  In general, courts do

not defer to an agency interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense*

*Council*, 467 U.S. 837 (1984), if the agency has construed a general statute that no single agency

is charged with interpreting.  *See Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 n.30 (1986)

(where twenty-seven agencies had promulgated regulations under a particular statute, "[t]here is .

. . not the same basis for deference predicated on expertise as we found . . . in [*Chevron*]"); *Ass'n*

*of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 913 (D.C. Cir. 1993) ("As we have so

often noted, we do not defer to an agency's construction of a statute interpreted by more than one

agency, . . . let alone one applicable to all agencies.") (citation omitted).

The D.C. Circuit has specifically discussed the application of this rule in the FOIA

context.  In *Tax Analysts v. IRS*, the court noted that it "will not defer to an agency's view of

FOIA's meaning."  117 F.3d 607, 613 (D.C. Cir. 1997).  The court explained that because the

FOIA mandates uniformity among all government agencies, the need for consistency across

agencies outweighed the usual reasons for deferring to the views of any one agency:  "The

meaning of FOIA should be the same no matter which agency is asked to produce its records.

One agency's interpretation of FOIA is therefore no more deserving of judicial respect than the

interpretation of any other agency." *Id.*[29] This Court therefore owes no deference to the CIA's

interpretation of the term "representative of the news media" under the FOIA.

---

[29]    *See also Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001) ("Indeed, it is precisely
because FOIA's terms apply government-wide that we generally decline to accord deference to
agency interpretations of the statute, as we would otherwise do under [*Chevron*]."); *Reporters'*
*Comm. for Freedom of the Press v. Dept. of Justice*, 816 F.2d 730, 734 (D.C. Cir. 1987), *rev'd*
*on other grounds*, 489 U.S. 749 (1989) ("FOIA . . . is an unusual statute; it applies to all
government agencies, and thus no one executive branch entity is entrusted with its primary
interpretation.").

22

Moreover, even if the CIA's interpretation of the FOIA were otherwise subject to *Chevron* deference, the Court still should not defer to the CIA's construction of "representative of the news media" in this case because the CIA's interpretation conflicts with a prior judicial construction of the statute's clear meaning. Once a court has "determined a statute's clear meaning," the court "adhere[s] to that determination under the doctrine of *stare decisis*," and the court "judge[s] an agency's later interpretation of the statute against [that] prior determination of the statute's meaning." *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990). In *Maislin*, the Supreme Court reasoned that because Congress had not altered the Court's longstanding interpretation of the statute at issue, the Court would not revisit that interpretation, even in light of a new agency policy. *Id.*; *see also Neal v. United States*, 516 U.S. 284, 295 (1996) ("Absent . . . changes or compelling evidence bearing on Congress's original intent, . . . our system demands that we adhere to our prior interpretations of statutes."); *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992) ("Before we reach any issue of deference to the [agency,] . . . we must first determine whether [the agency's interpretation of the statute] . . . is consistent with our past interpretation . . . ."); *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1051-52 (D.C. Cir. 2000); *Kutler v. Carlin*, 139 F.3d 237, 247 (D.C. Cir. 1998).

Here, the D.C. Circuit concluded in 1989 that "the [FOIA] . . . is clear: Congress intended that an organization like the Archive qualify as a representative of the news media." *Archive v. DOD*, 880 F.2d at 1383. Because the D.C. Circuit has "determined [the] statute's clear meaning," *Maislin*, 497 U.S. at 131, *stare decisis* requires that this Court review the CIA's

construction of "representative of the news media" against that prior determination, without deferring to the CIA's construction.[30]

### B.  The CIA Impermissibly Construed the FOIA to Require a Case-by-Case Determination of the Archive's Fee Status

Contrary to the language of the FOIA, the holdings of the *Archive* cases, and its prior 15-year practice of granting preferential fee treatment to the Archive, the CIA impermissibly determined that the Archive failed to qualify as a representative of the news media for the 42 requests at issue, by purporting to evaluate the newsworthiness *of each particular request*. The CIA initially demanded that the Archive justify its assertion of news media status by demonstrating that each request met the criteria set forth in the agency's regulation.[31]  The CIA then purported to determine the Archive's fee status separately for each request on the basis of these criteria. For each request, the CIA informed the Archive that the agency "den[ied the Archive's] request for news media status in this case" because the particular request did not meet each of the agency's criteria.[32]

---

[30]     The Supreme Court's recent holding in *National Cable & Telecommunications Association v. Brand X Internet Services*, 125 S. Ct. 2688 (2005), supports this conclusion. There, the Supreme Court reaffirmed the rule that a court's prior interpretation of a statute trumps an agency's subsequent construction, but emphasized that this was so "only if the prior court holding 'determined a statute's clear meaning.'" *Id.* at 2701. That is, "a court's prior interpretation of a statute . . . override[s] an agency's interpretation only if the relevant court decision held the statute unambiguous." *Id.* In this case, the D.C. Circuit's prior construction of "representative of the news media" found the statute to be "clear," *Archive v. DOD*, 880 F.2d at 1383, 1386, 1387, and the court held that the Archive "unambiguously" fell within the meaning of that phrase, *id.* at 1385. That prior construction therefore controls the meaning of the FOIA fee provision at issue here, leaving no gap in statutory meaning for the CIA's interpretation to fill and no occasion for deference to the CIA's views.

[31]     *See* CIA letters compiled in Blanton Attach. 5; *see also* 32 C.F.R. § 1900.02(h)(3).

[32]     *See, e.g.*, Nov. 25 Koch Letter (Blanton Attach. 10).

The case-by-case approach set forth in the CIA's regulation and applied to the requests at issue here violates the FOIA and the prior decisions of the D.C. Circuit and this Court. Under the FOIA, the fees an agency may charge a requester depend on whether the request was made for a commercial purpose and on whether the requester falls into a certain category — as pertinent here, whether the requester is a "representative of the news media." *See* 5 U.S.C. § 552(a)(4)(A)(ii). Only the first of those two criteria could require an agency to examine the purpose of a particular request.[33]

Accordingly, in *Archive v. DOD*, the D.C. Circuit evaluated the Archive's status as a "representative of the news media" by focusing on the Archive's character and activities, not the content or perceived newsworthiness of any particular request. Notably, the court's opinion does not describe the specific requests at issue, but instead points out that the "real ground for debate" in determining whether the Archive qualified for preferred fee treatment was "whether *its activities* qualify as those of a representative of the news media." 880 F.2d at 1385 (emphasis added). Because a "representative of the news media" is a "*person or entity*" that gathers information of potential interest to the public and disseminates the resulting work to an audience, *id.* at 1387 (emphasis added), eligibility for news media status depends solely on the activities of the requester, not the nature of the request.

The CIA's case-by-case evaluation of each of the Archive's requests at issue here, based on the subject matters of those requests, violates the FOIA as interpreted by the D.C. Circuit in

---

[33]    A comparison of section 552(a)(4)(A)(ii)(II) with other FOIA fee provisions underscores this point. Section 552(a)(4)(A)(iii) — which the Archive did not invoke with respect to any of the 42 requests — requires agencies to reduce or eliminate all fees where "disclosure of the *information* is in the public interest." 5 U.S.C. § 552(a)(4)(A)(iii) (emphasis added). By conditioning the fee waiver on the type of information sought, this provision, unlike section 552(a)(4)(A)(ii)(II), expressly contemplates an evaluation of each particular request.

*Archive v. DOD*.  Although the CIA justified its case-by-case approach by reference to its FOIA regulations,[34] those regulations are themselves invalid and, therefore, could not legitimate the CIA's actions.  The CIA's regulations define "[r]epresentative of the news media" to mean "*a request* from an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public and pursuant to their news dissemination function and not their commercial interests." 32 C.F.R. § 1900.02(h)(3) (emphasis added).  This regulation is unreasonable on its face.  A particular FOIA "request" can never, as a matter of logic, be a representative of the news media — only the *requester* can carry that status.  Moreover, the CIA's regulation fails to "conform," 5 U.S.C. § 552(a)(4)(A)(i), to the OMB's guidelines, which defines "representative of the news media" to be "any *person* actively gathering news for an entity that is organized and operated to publish or broadcast news to the public." 52 Fed. Reg. 10,012, 10,018 (Mar. 27, 1987) (emphasis added).  The OMB regulation thus appropriately looks to the character and activities of the *person* making the request, rather than the subject-matter of the request itself, to determine whether preferred fee treatment is appropriate.

The CIA's regulation also contradicts the D.C. Circuit's holding in *Archive v. DOD* that a "representative of the news media" is a "person or entity" that gathers and publishes information of potential interest to the public, and that the focus is properly on the person or entity's "activities" in determining its status under the FOIA. *Archive v. DOD*, 880 F.2d at 1385, 1387.

---

[34]    *See, e.g.*, Nov. 25 Koch Letter (Blanton Attach. 10).

Because the D.C. Circuit already has "determined [the] statute's clear meaning," this Court should declare invalid the CIA's contrary interpretation and enjoin its enforcement.[35]

The CIA's misguided case-by-case approach, if allowed to stand, surely would thwart FOIA's purpose of "ensur[ing] an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978))). This approach, embodied in the CIA's regulation and applied to the 42 Archive requests at issue here, would provide the CIA with broad discretion to decide what qualifies as "news," a determination that is properly left to journalists and members of the news media. Moreover, by requiring requesters to demonstrate the "newsworthiness" of each request to the satisfaction of the agency, the CIA's approach would cause intolerable delay in the FOIA disclosure process — delay that Congress specifically intended to minimize by enacting the procedural reforms of the FIRA in the first place. The

---

[35]    Although the CIA adopted this regulation in 1997, the Archive's present challenge to that regulation is appropriate because the regulation was never enforced in an adverse manner against the Archive before the CIA's abrupt reversal of practice in October 2005. An aggrieved party may appropriately challenge an underlying agency regulation in the context of a suit seeking to set aside agency action that purported to be authorized or compelled by that regulation. *See, e.g., Jifry v. FAA*, 370 F.3d 1174, 1178-79 (D.C. Cir. 2004); *Cellular Telecommc'ns. & Internet Ass'n v. FCC*, 330 F.3d 502, 508 (D.C. Cir. 2003). Moreover, when the CIA promulgated the regulation in 1997, it stated that its new rules "do not alter substantially any existing rights of members of the public," and that the regulation was intended "to expand the definition of news media." 62 Fed. Reg. 32,479, 32,480 (June 16, 1997). The Archive therefore could not have anticipated that the CIA would rely on this regulation to conduct an impermissible case-by-case analysis of the newsworthiness of its requests and refuse to treat the Archive as a "representative of the news media." *See, e.g., American Trading Transp. Co. v. United States*, 791 F.2d 942, 950 n.11 (D.C. Cir. 1986) ("No time limit bars appellants from challenging a regulation that, they allege, is currently being used in a particular proceeding to harm them in a way they could not have anticipated at the time the rule was adopted."); *accord, Raton Gas Transmission Co. v. FERC*, 852 F.2d 612, 615 (D.C. Cir. 1988).

CIA's case-by-case analysis of news media status thus rests on an impermissible interpretation of the FOIA.

### C.    The CIA Has Applied an Improper Definition of "News"

Even if it were appropriate for the CIA to determine the fees applicable to a particular request by examining the subject-matter and perceived "newsworthiness" of each request, rather than the character and activities of the requester, the CIA has conducted that analysis of the requests at issue here on the basis of an inappropriately narrow definition of "news." The CIA required the Archive to explain why each of its requests "concern[ed] current events," was of "interest to the general public," would "enhance the public understanding of the operations or activities of the U.S. Government," *and* would be "disseminated to a significant element of the public at minimal cost." *Supra* at 8-9. In imposing these criteria, the CIA relied on the definition of "news" set forth in its regulations. *See* 32 C.F.R. § 1900.02(h)(3). The CIA refused to accord news media status to the Archive for any request that, in the CIA's view, failed to satisfy even one of these criteria.

The CIA's constricted definition of news defies common sense and conflicts with the D.C. Circuit's holding in *Archive v. DOD* that a "representative of the news media" was a person or entity that gathers and disseminates "*information of potential interest to a segment of the public*." 880 F.2d at 1387 (emphasis added); *see also id.* at 1386 (noting that the Archive's proposed document sets would each concern a "particular topic of current interest"); *id.* (describing a representative of the news media as an entity in the business of "publishing or otherwise disseminating *information*" (emphasis added)). Finding it sufficient for news media status that an entity regularly publish and disseminate "information," the D.C. Circuit did not impose any particular requirements as to the subject matter of the information. It had only to be of potential interest to a segment of the public. *Id.* That broad approach was consistent with

FIRA's purpose of "encourag[ing] the dissemination of information in Government files." *Id.*; *see also id.* ("It is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected" (quoting 132 Cong. Rec. S14298 (Sep. 30, 1986) (statement of Sen. Leahy))).

The CIA's narrow definition conflicts with the D.C. Circuit's broad approach, and the statute itself, in several ways. First, by requiring that information "enhance the public understanding of the operations or activities of the U.S. Government" to qualify as "news," the CIA improperly imported into the news media standard a requirement that the statute imposes only in the *public-interest waiver* standard set forth in 5 U.S.C § 552(a)(4)(A)(iii). That provision is entirely separate from the FOIA's definition of "representative of the news media" and is not at issue in this case. By adopting the statutory criteria for the public-interest waiver for the purpose of assessing news media status, the CIA effectively read FOIA's provision for a waiver of search fees based on that status out of the statute. *See Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted)); *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.").

Just as problematic, the CIA's definition requires that news *both* "concern[] a current event[]" *and* be of "interest to the general public." 32 C.F.R. § 1900.02(h)(3). This cannot be squared with the ordinary meaning of the term "news." *See, e.g.*, Webster's Third New International Dictionary 1524 (Unabridged. 2002) (defining news to mean, *inter alia*, "a report of

a recent event" or "new information"); Merriam-Webster Online Dictionary (defining news to

mean, *inter alia*, "a report of recent events" *or* "previously unknown information").  In common

parlance, the revelation of previously unknown information that is of interest to a portion of the

public is frequently treated as "newsworthy."  One need only think of a few examples — the

recent uncovering of "Deep Throat's" true identity and his role at the Federal Bureau of

Investigation, recent revelations concerning the CIA's awareness of the whereabouts of Adolf

Eichmann in the 1950s, or the Chicago Tribune's recent investigation into whether the state of

Texas executed an innocent man in 1989 — to see that the reporting of information of interest to

the public can constitute "news" (and grab front-page headlines) even if it does not concern

"current events" in the narrowest sense of that phrase.[36]  Here, for example, the Archive has

requested documents pertaining to the United States' policy of aid to the Mujahadeen in

Afghanistan in 1979.[37]  In the context of the current war on terror and the United States'

occupation of Afghanistan, any documents enlightening the public on U.S. policy towards the

Mujahadeen in Afghanistan, many of whom later became members of the Taliban, are of critical

importance and obvious interest.  Any reasonable definition of "news" should be broad enough

to encompass issues such as this and the other subjects of the Archive's 42 requests.[38]

---

[36]  *See, e.g.*, Bob Woodward, *How Mark Felt Became 'Deep Throat'*, Wash. Post, June 2, 2005, at A1; Todd S. Purdum, *'Deep Throat' Unmasks Himself: Ex-No. 2 at F.B.I.*, N.Y. Times, May 31, 2005, at A1; Scott Shane, *C.I.A.  Knew Where Eichmann Was Hiding, Documents Show*, N.Y. Times, June 7, 2006, at A3; Maurice Possley & Steve Mills, *Did One Man Die For Another Man's Crime?* Chi. Trib., June 27, 2006, at 1 **(Ex.  C hereto)**.

[37]  *See* List of Requests (description of F-2006-00107) (Blanton Attach. 3).

[38]  The harm caused by the CIA's "current event" requirement is exacerbated by the likelihood that many of the agency's records requested through the FOIA will be unavailable for disclosure until after they have been declassified, a process that may take years.  Under the CIA's definition of "news," newly declassified materials virtually never could be the subject of a

The CIA's definition is also flawed because it requires that news be "in fact disseminated to a significant element of the public at minimal cost." This requirement lacks any basis in the FOIA and theoretically puts members of the news media in the impossible position of proving that they will disseminate information before even learning what it is or exercising editorial control over it. For this same reason, the requirement conflicts with the definition of "representative of the news media" adopted by the D.C. Circuit. *See Archive v. DOD*, 880 F.2d at 1387 ("A representative of the news media is, in essence, a person or entity that gathers information of *potential interest to a segment of the public* . . . ." (emphasis added)).

In all of these respects, comparison of the CIA's standard to the OMB's fee regulation highlights the CIA's improper definition. The OMB regulation defines "news" to mean "information that is about current events *or* that would be of current interest to the public." 52 Fed. Reg. 10,012, 10,018 (Mar. 27, 1987) (emphasis added). The OMB's regulation, unlike the CIA's rule, comports with the ordinary meaning of "news" because it recognizes that new information about events that might no longer be considered "current" under a narrow view of that term can nevertheless be of vital importance to the public and therefore newsworthy. The OMB regulation also does not artificially narrow the definition of "representative of the news media" by imposing additional criteria that do not appear in the relevant provision of the FOIA or judicial constructions of that provision.[39] At a minimum, FOIA's requirement that the CIA's

---

request by a "representative of the news media," because newly declassified materials inevitably involve events that took place long before their release.

[39]    Indeed, the OMB has made clear that "[i]t was not the OMB's intention in providing a definition of 'news' to put agencies in this position of deciding whether the information sought by the representatives of the news media was, in fact, newsworthy. That is the job of the media." *See* Letter from James B. MacRae, Jr., OMB, to Ted M. Chaskelson, Federal Mediation and Conciliation Service, April, 10 [year illegible]. **(Ex. D hereto).**

regulation "shall conform" to OMB's rule, *see* 5 U.S.C. § 552(a)(4)(A)(i), forbids the CIA from

adopting a more restrictive definition of "news" than the one the OMB has adopted. Because the

CIA's definition of news imposes requirements that appear in neither the FOIA nor the D.C.

Circuit's authoritative construction of that statute, it must be set aside.[40]

\*       \*       \*

For all of these reasons, in addition to those set forth in Part I *supra*, this Court should

grant the Archive's motion for summary judgment as to Counts I and II of its Complaint. The

CIA's approach to determining news media status, as embodied in its regulations and applied to

the 42 Archive requests at issue in this case, is unlawful under the FOIA and violates an existing

order of this Court by failing presumptively to treat the Archive as a "representative of the news

media" for the 42 requests at issue, by evaluating those requests on a case-by-case basis, and by

applying an overly restrictive definition of "news." There can be no genuine dispute of any

material fact on these issues, and this Court should therefore order the CIA to treat the Archive

as a "representative of the news media" for purposes of the pending requests at issue here and

enjoin the CIA to continue to accord to the Archive the status to which it is entitled for all future

requests not made for commercial use. Additionally, this Court should grant the Archive's

motion for summary judgment as to Count III of its Complaint, and, accordingly, declare the

CIA's regulation defining "representative of the news media" to be invalid and enjoin its

application in future cases.

---

[40]    As far as the Archive knows, no other federal agency has adopted a regulation regarding preferential fee treatment for representatives of the news media under FOIA similar to the CIA's. *See, e.g.*, 22 C.F.R. § 171.11(o) (Department of State); 32 C.F.R. § 286.28(e)(7) (Departments of Defense, Army, Navy, Air Force, Defense Intelligence Agency, National Geospatial Intelligence Agency, National Security Agency, and National Reconnaissance Office). Rather, these other agencies' regulations substantially replicate those of the OMB.

III.    **The CIA Acted Arbitrarily and Capriciously in Refusing To Treat the Archive as a Representative of the News Media for the Requests at Issue**

This Court should grant the Archive's motion for summary judgment without considering the CIA's denial of preferential fee treatment for any particular FOIA request at issue, because — as already explained, *see supra* Argument Parts I and II — it was unlawful for the CIA to engage in this case-by-case analysis in the first place, rather than presumptively to treat the Archive as a "representative of the news media" based on the organization's publication activity and binding court precedent.   Nevertheless, an examination of the CIA's particularized handling of each of the 42 requests only further illustrates the wrongheadedness of the CIA's illegal approach.   As the CIA's own arbitrary and capricious actions confirm, it is virtually impossible for an agency to decide on any principled basis which subject matters constitute "news."

The record regarding the 42 requests at issue shows that the CIA compounded its legal error through its handling of these requests.   Even assuming for the sake of argument, and (contrary to fact) that the CIA did not violate the FOIA and binding court precedent in refusing to treat the Archive as a representative of the news media and in issuing and enforcing its regulation, 32 C.F.R. § 1900.02(h)(3), the CIA violated the APA by arbitrarily and capriciously applying its regulations to each of the FOIA requests at issue in determining that the Archive did not qualify for preferential fee treatment as a representative of the news media with respect to each request.

Under the arbitrary and capricious standard of review, a reviewing court must "intervene to ensure that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'"   *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).   "Deference to agency authority or expertise . . . is not a license to

33

treat like cases differently." *Airmark Corp. v. FAA*, 758 F.2d 685, 691 (D.C. Cir. 1985) (internal

citation and quotation marks omitted).  Indeed, it is fundamental to review under the arbitrary

and capricious standard that agencies must treat like cases alike.  *See, e.g., Independent*

*Petroleum Ass'n of Am.  v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) (consistency is the

"very meaning of the arbitrary and capricious standard").  Each of the CIA's adverse

determinations must be set aside under these principles.

### A.    The CIA Inexplicably Departed from Past Practice and Treated Similar Requests Disparately

The CIA acted arbitrarily and capriciously with respect to the requests at issue because it

departed from past practice without explanation and failed to give similar requests similar

treatment.  If an agency is going to depart from its practice, it must provide a principled

explanation.  *See Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C.Cir.

2001); *ANR Pipeline v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *Airmark Corp.*, 758 F.2d at

691-92.  Here, the CIA acted inconsistently in violation of the APA in at least three ways.  First,

for 15 years (eight of which followed the CIA's issuance of the challenged regulation), the CIA

had routinely processed the Archive's FOIA requests without charging search fees or otherwise

challenging the Archive's news media status.  The CIA did not even attempt to explain why in

October 2005 it suddenly started requiring the Archive to justify its news media status for each

individual request based on the information sought by those requests.

Second, the requests at issue in this suit — those for which the CIA, starting in October

2005, denied preferential fee treatment based on the Archive's status as a representative of the

news media — are indistinguishable from many of Archive's earlier requests under the

"newsworthiness" criteria set forth in the CIA's regulation.  For example:

- One request at issue seeks documents relating to a 1978 session of Indonesia's legislature, including documents relating to that year's reelection of President Suharto as president of Indonesia. The CIA found that the request neither concerned a current event nor enhanced the public's understanding of the operations or activities of the U.S. Government.[41] But in 2005 the CIA accorded news media status for a request seeking documents relating to President Suharto's 1976 retirement from the Indonesian Armed Forces.[42]

- Another contested request seeks documents related to the crackdown on the Zapatista National Liberation Army (EZLN) ordered by Mexican President Zedillo in 1995. The CIA found that the request neither concerns a current event nor enhances the public's understanding of the operations or activities of the U.S. Government.[43] But in 2002 the CIA accorded news media status for a request for records related to the emergence of the EZLN in the Mexican state of Chiapas, and the EZLN's clashes with the Mexican Army in 1994.[44]

In none of its correspondence with the Archive did the CIA try to explain its manifestly incongruous determinations for these and other requests. Moreover, in at least one instance the

---

[41]    Feb. 8 Koch Letter (Blanton Attach. 11) (addressing request No. F-2006-00100); List of Requests (Blanton Attach. 3).

[42]    *See* Letter from Koch to Simpson dated Aug. 19, 2005 discussing F-2005-01799 (Blanton Attach. 1); Blanton Decl. ¶ 11.

[43]    Second Feb. 8 Koch Letter (Blanton Attach. 12) (addressing request No. F-2006-00202); List of Requests (Blanton Attach. 3).

[44]    Letter from Dyer to Doyle dated June 11, 2002 (discussing F-2002-00486) (Blanton Attach. 2); Blanton Decl. ¶ 11.

CIA changed its mind regarding *the same request*.  With respect to a 1999 Archive request for

certain CIA bulletins concerning military, diplomatic, or aid matters involving India and

Pakistan, the CIA first told the Archive that it accepted this request "[b]ased on The National

Security Archive's agreement to pay copying costs as a requester in the category of

'representative of the news media.'"[45]  Seven years later, in March 2006, the CIA revoked its

earlier determination without explanation and informed the Archive that it was subject to search

fees for this request.[46]

Finally, the CIA's determinations after October 2005 regarding whether to grant

preferential fee treatment to the Archive's requests were inconsistent with *each other*.  After that

date, the CIA determined *not* to assess search fees for three Archive requests that concerned,

respectively, NAFTA and illegal Mexican immigration, weapons of mass destruction in Iraq, and

Ayatollah Ali Sistani's July 2003 fatwa concerning Iraqi elections.[47]  The CIA did not explain

how three these requests differed from the 42 requests for which preferential fee treatment, based

on the Archive's status as a representative of the news media, was denied.  While the three

requests for which fees were waived concerned events that took place in the last ten to fifteen

years, some of the requests for which preferential fee treatment was denied also took place in this

---

[45]    *See* Letter from Dyer to Battle dated Oct. 27, 1999 (discussing F-1999-00850) (Blanton Attach. 25); Blanton Decl. ¶ 26.

[46]    *See* Letter from Koch to Battle dated March 9, 2006 (discussing F-1999-00850) (Blanton Attach. 26); Blanton Decl. ¶ 26.  In other correspondence the CIA essentially admitted that it had changed its policy with respect to according news media status to the Archive.  In a June 14, 2006 letter, the CIA stated that four requests from 2000 fell into the "news media" fee category "based on similar cases that we processed for the National Security Archive in 2000," thus implying that if the Archive had submitted the requests on a later date they would have been treated differently.  Letter from Koch to Kornbluh dated June 14, 2006 (Blanton Attach. 28); Blanton Decl. ¶ 28.  The CIA did not attempt to explain the reasons for this change.

[47]    *See* Blanton Decl. ¶ 25 & Attachs. 22-24.

time frame.  For example, the CIA granted preferential fee treatment for a request for all records

dating back to 1990 discussing any aspect of NAFTA with regard to illegal migration from

Mexico into the United States, but denied preferential fee treatment for a request concerning

President Clinton's 1993 meetings with President Salinas where they would have discussed

NAFTA.[48]

The CIA's "sometimes-yes, sometimes-no, sometimes-maybe policy" of according news

media status to the Archive for requests seeking similar types of information, without providing

any reasoned explanation for this inconsistency, "cannot be squared with [this Court's]

obligation to preclude arbitrary and capricious management of an agency's mandate."  *Green*

*County Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985) (citation and internal

quotation marks omitted) (reversing FCC's inconsistent application of a rule).  The CIA has

acted arbitrarily and capriciously both by failing to "treat[] similar cases similarly," *id.* at 237,

and "changing its course [without] supply[ing] a reasoned analysis," *Airmark Corp.*, 758 F.2d at

692 (citation omitted); *see also Wisconsin Valley*, 236 F.3d at 748; *ANR Pipeline Co.*, 71 F.3d at

901.

**B.      The CIA's Denials of Preferential Fee Treatment Were Plainly Erroneous Under Its Regulations**

The CIA also acted arbitrarily and capriciously because its denials are "so implausible

that [they] could not be ascribed to a difference in view or the product of agency expertise."

*State Farm*, 463 U.S. at 43.  If an agency's decision fails to demonstrate "a rational connection

between the facts found and the choice made," *id.* (internal quotation marks and citation

omitted), or "if the record lacks 'substantial evidence' to support its conclusion considering the

---

[48]      *See* List of Requests (descriptions for Nos. F-2006-00203 and F-2006-00098) (Blanton
Attach. 3).

'whole record,'" *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (internal citations omitted), then it has acted arbitrarily and capriciously and must be reversed. Moreover, although an agency's interpretation of its own regulations is normally entitled to deference under the APA, an interpretation will not stand if it is "'plainly erroneous or inconsistent with the regulation.'" *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Ortiz v. Sec'y of Defense*, 41 F.3d 738, 742 (D.C. Cir. 1994) (reversing agency's interpretation of its regulation). All of the CIA's denials at issue fail even this deferential standard.

In refusing to treat the Archive as a representative of the news media for purposes of the requests at issue, the CIA, to the extent it gave reasons at all, issued boilerplate denials stating that the requests either do not concern current events, or do not enhance the public's understanding of the operations or activities of the U.S. government.[49] These "findings" are plainly erroneous, because, as the Archive already explained in extensive correspondence to the CIA, each of the requests seeks information which, although historical in nature, is obviously relevant to important, ongoing, world events, and the responses of the United States government. These events include, among others, the war against terrorism;[50] efforts in Indonesia and Mexico to come to terms with alleged past human rights violations and political corruption or repression

---

[49]     *See* Nov. 25, Feb. 8, and May 31 Koch Letters (Blanton Attachs. 10-14).

[50]     This is true not only with respect to the Archive's request for information about the development of United States policy in Afghanistan during five months in 1979 (F-2006-00107), but also with respect to the Archive's other Afghanistan requests, which included requests for information about prominent Taliban members (F-2005-01773 and F-2005-01811), and certain of the Indonesia requests, which included requests for information on the rise of Muslim extremism (F-2006-00057). *See* List of Requests (Blanton Attach. 3).

and to advance further these countries' transitions to democracy;[51] and ongoing negotiations of a Central American free trade agreement and a broader pact that would cover the entire hemisphere.[52]

In any event, each Archive request meets the CIA's regulatory criteria regardless of whether it is linked to a separate, specific activity that is deemed independently newsworthy. Today's headlines are filled with examples of new information on historical topics that interest the public, such that the very dissemination of the information constitutes a "current event." *See supra* Argument Part II (noting revelation of "Deep Throat" and other examples). Indeed, virtually any release by the U.S. Government of official information in its possession about the types of subjects at issue "concern current events," because such information tends to help the American public understand what the Government knew and when, how it used such information, and why it pursued particular policies. For the same reasons, the Government's release of these types documents almost always will "enhance the public's understanding of the operations or activities of the U.S. Government."

Finally, the CIA erred by providing *no* explanations whatsoever for its decisions. A reviewing court must reject an agency's "conclusory assertions [that] do not answer the strong

---

[51]    Approximately nine requests seek information related to visits by government officials of Mexico or Indonesia to the United States, and by United States officials (including Presidents Reagan, H.W. Bush, and Clinton) to one of those countries. *See, e.g.*, List of Requests (descriptions for F-2006-00052, F-2006-00099, and F-2006-00187) (Blanton Attach. 3). Approximately seventeen requests seek information related to past alleged incidents of political corruption and/or repression in Mexico. *See, e.g. id.* (descriptions for F-2006-00084 and F-2006-00198). Approximately five requests seek information related to alleged human rights violations in Indonesia. *See, e.g,. id.* (descriptions for F-2006-00296 and F-2006-00081).

[52]    *See* Dec. 22 Fuchs Letter at 7-8 (Blanton Attach. 7) (discussing requests F-2006-00098 and F-2006-00099, regarding discussions between United States and Mexican officials about NAFTA).

arguments raised" by parties affected by the agency's conduct. *AT&T v. FCC*, 974 F.2d 1351,

1355 (D.C. Cir. 1992); *see also Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1405 (D.C. Cir.

1995) (rejecting agency's "boilerplate" rejection of a waiver request). Here, at the CIA's

request, the Archive submitted four detailed letters in which it painstakingly addressed how the

criteria in 32 C.F.R § 1900.02(h)(3) were satisfied for each of 42 FOIA requests.[53] The CIA

responded to these lengthy explanations by issuing generic, untailored, and summary statements

denying preferential fee treatment for all of the requests for which it had sought additional

information. For these reasons as well, this Court should reverse and remand the CIA's denials

of preferential fee treatment for the 42 requests at issue as arbitrary and capricious.

---

[53]    *See* Nov. 10, Dec. 22, Jan. 27, and May 8 Fuchs Letters (Blanton Attachs. 6-9) . For
example, the Archive explained that documents it requested pertaining to U.S. policy in
Afghanistan in 1979 were essential to obtaining "insight into how the [Special Coordinating
Committee] at the [National Security Council] made the decision to aid the Mujahadeen — a
decision which continues to have tremendous ramifications for the safety and security of the U.S.
public today, as many of these same Mujahadeen fighters currently now advocate and participate
in terrorist activities against U.S. interests and the U.S. public. Dec. 22 Fuchs Letter at 10
(Blanton Attach. 7) (discussing F-2006-00107). Additionally, the Archive confirmed that it
would disseminate the requested information through its normal channels; moreover, the
information would be included in a "briefing book" containing recently released documents on
U.S. aid to the Mujahadeen between January 1979 and January 1992, which was then being
prepared by the Archive analyst who made the FOIA request. *See id.* at 11.

## CONCLUSION

For all of the foregoing reasons, the Court should grant the Archive's motion for

summary judgment and grant all of the relief set forth in the Archive's complaint.

Respectfully submitted,

_David S. Mendel_____
Patrick Carome (D.C. Bar No. 385676)
David S. Mendel (D.C. Bar No. 470796)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000 (t)
(202) 663-6363 (f)

Meredith Fuchs (D.C. Bar No. 450325)
General Counsel
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037
(202) 994-7000 (t)
(202) 994-7005 (f)

*Counsel for Plaintiff National Security Archive*

September 8, 2006