# EXHIBIT A

REPRODUCED AT THE NATIONAL ARCHIVES

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

        Plaintiff,

    v.                     Civil Action No. 88-0501

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

**FILED**

**JAN 3 0 1990**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

<u>MEMORANDUM</u>

This case is before the Court on the parties' cross motions for summary judgment. After careful consideration of the motions, the oppositions thereto, and the entire record in the case, the Court concludes that plaintiff's motion for summary judgment must be granted in part and denied in part and defendant's motion for summary judgment must be denied.

The facts may be briefly stated. Plaintiff, the National Security Archive ("Archive"), is a nonprofit public interest scholarly research institute and library in Washington, D.C. The purpose of the Archive is to collect and disseminate comprehensive government documentation pertaining to selected issues of major public concern in the areas of foreign, defense, intelligence, and international economic policy. This case arises from the denial by defendant, the Central Intelligence Agency ("CIA"), of the Archive's request under the Freedom of Information Reform Act of 1986 ("FIRA"), Pub. L. No. 99-570, §§ 1802, 1803, 100 Stat. 3207-48, 3207-49 (1986), for a waiver of fees pertaining to its Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552(a)(4) (West Supp. 1989), request for certain CIA

REPRODUCED AT THE NATIONAL ARCHIVES

2

records.

FIRA amends FOIA by providing for reduced fees for certain types of document requests made by any entity that qualifies as an educational institution or as a representative of the news media. In its view, the Archive was eligible for this preferred fee status based on its status as either an educational institutional or a representative of the news media. The CIA, however, disagreed and instead categorized the Archive as a commercial requester subject to fees for search, review and copying of requested records. The Archive seeks declaratory and injunctive relief to enjoin the CIA from denying its pending fee waiver requests on the ground that the Archive is a commercial requester. Additionally, the Archive seeks a reversal of the CIA determination that it is ineligible for waiver of search, review, and copying fees. Finally, the Archive requests the entry of a declaratory judgment that plaintiff is per se eligible for, and entitled to waiver of all search and review fees based on its status as a "noncommercial educational institution" and "representative of the news media".

This case turns on the interpretation and application of FIRA's fee limitation provisions, i.e. whether the Archive is a "commercial use" requester subject to denial of its public interest fee waiver request. Subsequent to the parties' briefing of their cross motions for summary judgment, the Court of Appeals for the District of Columbia Circuit decided National Security Archive v. U.S. Dept. of Defense, 800 F.2d 1381 (D.C. Cir. 1989).

3

In <u>National Security Archive</u>, the Archive similarly challenged the Department of Defense's denial of its request for preferential pricing under the FOIA and sought to have itself classified as an educational institution or a representative of the news media. Moreover, the Department of Defense advanced the same argument the CIA asserts herein, i.e. that the Archive is a commercial user not entitled to a fee waiver. In considering the FIRA, the court examined its text and conducted an exhaustive analysis of the statute's legislative history. The court held that the Archive was not an educational institution, <u>id</u>. at 1385, but agreed with the Archive's alternative contention that it is entitled to preferred fee status under the FIRA as a representative of the news media. <u>Id</u>. at 1387.

In so holding, the court viewed the Archive as a representative of the news media by reason of its publication activities. <u>Id</u>. at 1388. The court noted that the Archive does not simply "make information available" as would a data broker. <u>Id</u>. at 1386. Rather, the Archive "gets the [FOIA requested] documents for its own purpose, which is to assemble them, along with documents for other sources, into an encyclopedic work that it will then offer to the public." <u>Id</u>. at 1387. Thus, the court associated the publication activities carried out by the Archive with its intended distribution of these document sets. <u>Id</u>. at 1386. The court further held that when the Archive's intention is to publish such works, or document sets, from the documents it requests, it is not a commercial requester within the meaning of

4

FOIA's fee waiver provisions.  Id. at 1388.

The issues to be decided in this case are identical to those addressed in National Security Archive and need no further elaboration.   In addition, the facts of this case are substantially identical to those underlying the National Security Archive opinion.   Most importantly, in the instant case the Archive has also stated an intention to use the information it requests for publication of indexed, cross-referenced "document sets".   This is precisely the type of activity which the court in National Security Archive found sufficient to qualify the Archive as a representative of the news media.   The rulings set forth in National Security Archive are, therefore, controlling and dispositive of the issues currently before this Court. Accordingly, under the reasoning set forth in National Security Archive, this Court concludes that the Archive is a representative of the news media within the meaning of FIRA by reason of its publication activities.   Thus, the Archive is entitled to preferred fee status.   On the other hand, the Archive is not an educational institution.   Thus, the Archive's motion for summary judgment must be granted in part and denied in part, and the CIA's motion for summary judgment must be denied.

An appropriate Order accompanies this Memorandum.

DATE: _____                  _____
                                          JOHN GARRETT PENN
                                          UNITED STATES DISTRICT JUDGE

REPRODUCED AT THE NATIONAL ARCHIVES

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,

               Plaintiff,

       v.                     Civil Action No. 88-0501

CENTRAL INTELLIGENCE AGENCY,

               Defendant.

**FILED**

**JAN 3 0 1990**

### O R D E R

**CLERK, U.S. DISTRICT COURT**
**DISTRICT OF COLUMBIA**

    Upon consideration of the parties' cross motions for summary judgment, the oppositions thereto, and the record in this case, the Court concludes for the reasons discussed in an accompanying Memorandum, it is hereby

    ORDERED that plaintiff's motion for summary judgment is granted in part and denied in part; and it is further

    ORDERED that judgment is entered in favor of plaintiff; and it is further

    ORDERED that defendant's motion for summary judgment is denied; and it is further

    ORDERED that defendant's determination that plaintiff is not entitled to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(ii)(II) is reversed; and it is further

    ORDERED that defendant is hereby enjoined from denying plaintiff's pending fee waiver requests on the ground that plaintiff is a "commercial requester" under 5 U.S.C. §552(a)(4)(A)(ii) ; and it is further

23

REPRODUCED AT THE NATIONAL ARCHIVES

**ORDERED** that defendant must treat plaintiff as a "representative of the news media," within the meaning of 5 U.S.C. 552(a)(4)(A)(ii)(II).

DATE:    JAN 3 0 1990


JOHN GARRETT PENN
UNITED STATES DISTRICT JUDGE

2

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,   )
                             )
              Plaintiff,     )
                             )
        v.                   )          No. 06-CV-1080 (GK)
                             )
CENTRAL INTELLIGENCE AGENCY, )
*et al.*,                    )
                             )
              Defendants.    )
                             )
                             )

## DECLARATION OF THOMAS S. BLANTON

I, Thomas S. Blanton, declare as follows:

1.      I am the Executive Director of the National Security Archive ("Archive").  I served as the Archive's first Director of Planning & Research beginning in 1986, became the Archive's Deputy Director in 1989, and have served as Executive Director since 1992.  As Executive Director I am responsible for all aspects of the Archive's management and activities, including oversight of its research projects and publications, as well as requests by the Archive and its analysts for agency records under the Freedom of Information Act ("FOIA").

2.      The National Security Archive is a not-for-profit research institution located at the George Washington University in Washington, D.C.  The Archive was established in 1985 to promote research and public education on U.S. governmental and national security decision-making and to promote and encourage openness in government and government accountability.  To advance these purposes, the Archive regularly collects, analyzes, and publishes declassified

documents acquired through the Freedom of Information Act ("FOIA").  Access to documents

under the FOIA is therefore vital to the Archive's publication activities.

       3.       The Archive has an extensive history of publishing and disseminating

information, including the publication of books; numerous extensive document sets in paper,

microfiche, and electronic formats; articles appearing in a wide range of national and specialist

periodicals and journals; and "electronic briefing books" which consist of narrative and

analytical descriptions of important events related to U.S. foreign, intelligence, and military

policy, along with the original documents illustrating the events and U.S. government activities.

The Archive has also consulted on a number of documentary films.  The Archive's journalistic

work has received numerous awards, including most recently the 2005 Emmy Award for

Outstanding Achievement in News and Documentary Research.

       4.       Staff and fellows of the Archive have published over 40 books, including:  *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 2003), *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by William Burr (New York: The New Press, 1999), *Bay of Pigs Declassified: The Secret CIA Report*, by Peter Kornbluh (New York: The New Press, 1998), and *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940*, by Stephen I. Schwartz, with Thomas S. Blanton, William Burr, *et al.* (Washington, D.C.: Brookings Institution Press, 1998). Other recently published titles include *Spying on the Bomb: American Nuclear Intelligence from Nazi Germany to Iran and North Korea*, by Jeffrey T. Richelson (W.W. Norton, March 13, 2006); *Cardboard Castle: An Inside History of the Warsaw Pact, 1955-1991*, by Malcolm Byrne, *et al.* (Central European University Press, June 30, 2005); and *The 1956 Hungarian Revolution:*

*A History in Documents*, edited by Malcolm Byrne (Central European University Press, Jan. 1 2003).

5.     In addition to books, the Archive also produces document sets, which include documents obtained through the FOIA along with commentary, indexes, and finding aids created by Archive analysts.  The Archive has produced 27 such document sets.  The document sets, published by Proquest/Chadwyck, are available digitally and on microfiche, are distributed to a broad range of libraries, universities, and research institutes, and are available to the public for free in the Archive's reading room.  Recent Archive document sets include: *U.S. Policy in the Vietnam War, Part I, 1954-1968*; *U.S. Policy in the Vietnam War, Part II: 1969-1975*; *Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992*; and *Guatemala and the United States, 1954-1999*.  Other recent document sets include: *The Cuban Missile Crisis Revisited: An International Collection of Documents from the Bay of Pigs to the Brink of Nuclear War* (forthcoming 2006); *The Kissinger Transcripts: A Verbatim Record of U.S. Diplomacy 1969-1977* (2005); and *Terrorism and U.S. Policy: 1968-2002* (2002).

6.     Articles written by Archive analysts based on records obtained from the CIA through the FOIA have appeared in *The Washington Post*, *The New York Times*, *The Wall Street Journal*, *Congressional Quarterly*, *The LA Times*, *Harpers Magazine*, *The Miami Herald*, *The Nation*, *The Guardian*, *Vanity Fair*, *The Bulletin of the Atomic Scientists*, *World Policy Journal*, *Foreign Affairs*, *Foreign Policy*, *Newsweek*, *The International Journal of Intelligence and Counterintelligence*, *International Security*, *Intelligence and National Security*, and other publications.

7.     In addition to these publication activities, the Archive also distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers.  These newsletters

directly link to documents recently released to the Archive through its FOIA requests and update

the public on issues pertaining to the operations and activities of the U.S. Government. The

Archive also publishes "electronic briefing books" using materials obtained through the FOIA.

Updated frequently, these briefing books represent a small sample of documents in the Archive's

published and unpublished collections, and they provide online access to important declassified

records on issues such as U.S. national security, foreign policy, diplomatic and military history,

and intelligence policy. Approximately 190 of those electronic briefing books are available at

the Archive's website (http://www.gwu.edu/~nsarchive/NSAEBB/index.html). The Archive's

website attracts well over one million successful visits per month, and visitors to the site

download an estimated 300,000 pages per day of declassified documents. The Archive intends

to publish additional briefing books on related subjects.

8.    In 1986, the Archive sued the U.S. Department of Defense, arguing, among other

things, that the Archive was entitled to preferred fee treatment under the FOIA as a

"representative of the news media." In 1989, the United States Court of Appeals for the D.C.

Circuit ruled in the Archive's favor and held that the Archive qualifies as a "representative of the

news media" under the FOIA, based on its publication activities and its gathering and

dissemination of information to the public. *See Nat'l Sec. Archive v. U.S. Dept. of Defense*, 880

F.2d 1381 (D.C. Cir. 1989), *cert. denied*, 494 U.S. 1029 (1990).

9.    In 1988, the Archive sued the Central Intelligence Agency ("CIA"), seeking,

among other things, a declaration that the Archive qualifies as a "representative of the news

media" and is therefore entitled to preferred fee treatment under the FOIA. In 1990, the United

States District Court for the District of Columbia entered judgment in favor of the Archive and

ordered the CIA to treat the Archive as a "representative of the news media" under the FOIA.
*See Nat'l Sec. Archive v. CIA*, No. 88-501 (D.D.C. Jan. 30, 1990).

10.    In the 15 years following the decisions of the Court of Appeals and the District
Court, the Archive submitted hundreds of FOIA requests to the CIA seeking information for
non-commercial purposes to support the Archive's ongoing activities of gathering and
disseminating information related to government operations and national security.  Until October
2005, the CIA with few exceptions recognized the Archive as a "representative of the news
media" and processed the Archive's numerous FOIA requests without assessing fees for
document search or review and without requiring the Archive to reestablish its fee status as a
"representative of the news media."  The Archive is unaware of any occasion between 1991 and
October 2005 on which the Archive paid search or review fees to the CIA or any other federal
agency.  In addition, the Archive is unaware of any occasion between May 1992 and October
2005 on which the CIA tried to assess such fees.

11.    Among the requests for which the CIA recognized the Archive's news media
status after the court decisions and prior to October 2005 were a request seeking documents
relating to Indonesian President Suharto's 1976 retirement from the armed forces and a request
for records relating to 1994 events in Mexico involving the Zapatista National Liberation Army.
**Attachments 1** and **2** hereto are true and correct copies of letters dated August 19, 2005 and
June 11, 2002 from the CIA to the Archive recognizing the Archive's news media status in
connection with these two requests.

12.    Beginning in late October 2005, the CIA ended its longstanding treatment of the
Archive as a "representative of the news media" and instead adopted a practice of demanding
that the Archive prove its news media status with respect to each particular request.  Specifically

5

the CIA has refused to recognize the Archive's status as a "representative of the news media" in

connection with 42 FOIA requests that the Archive submitted to the CIA between August 10,

2005, and March 7, 2006.  **Attachment 3** hereto is an accurate list of these 42 requests (and three

others), identified by the processing numbers assigned by the Archive and the CIA, with

verbatim (or near-verbatim) descriptions of the documents sought by each request.  True and

correct copies of each of the 42 FOIA requests are compiled in **Attachment 4** hereto.

13.     Each of the 42 requests stated that the Archive qualified for a waiver of search

and review fees as a "representative of the news media" and explained that the request was made

as part of a scholarly and news research project and not for commercial use.  The Archive

subsequently withdrew one of the 42 requests (No. F-2006-00173).

14.     In response to these 42 requests, the CIA demanded that the Archive justify its

news media status separately for each particular request.  In particular, the CIA required the

Archive to explain whether and how each request satisfied the criteria set forth in a CIA

regulation defining "representative of the news media," including why and how the documents

concern current events, interest the general public, and enhance the public understanding of the

operations or activities of the U.S. Government, as well as how the Archive planned to

disseminate the information to a significant element of the public at minimal cost.  The CIA

further informed the Archive that it would not process the 42 requests unless the Archive agreed

to pay search costs under the FOIA.  True and correct copies of the CIA's letters demanding that

the Archive justify its news media status for particular requests are compiled in **Attachment 5**

hereto.

15.     In response to the CIA's demands for additional information justifying favorable

fee treatment on a request-by-request basis, the Archive objected to the CIA's actions as contrary

to the D.C. Circuit's 1989 decision that the Archive is a "representative of the news media." The Archive presented these objections in four separate letters, each addressing a sub-group of the 42 disputed requests. In the letters, the Archive also provided detailed information demonstrating that each of the 42 disputed requests satisfied the CIA's criteria. **Attachments 6, 7, 8, and 9** hereto are true and accurate copies of the four letters sent by the Archive to the CIA, dated November 10, 2005, December 22, 2005, January 27, 2006, and May 8, 2006, along with the enclosures that accompanied the first of those letters.

16.     By letter dated November 25, 2005, two letters dated February 8, 2006, and two letters dated May 31, 2006, the CIA summarily refused to recognize the Archive as a "representative of the news media" in connection with the 42 disputed requests. The CIA did not contend that any of the 42 requests were made for commercial use, but instead asserted that each request failed to satisfy the CIA's criteria for defining "representative of the news media." The CIA informed the Archive that the Archive would be required to pay the costs of searching for and reproducing the requested documents, and that the CIA would not begin processing the requests until the Archive committed to pay the assessed fees. **Attachments 10, 11, 12, 13,** and **14** hereto are true and correct copies of the CIA letters.

17.     By letter to the Agency Review Panel dated December 22, 2005, the Archive administratively appealed the CIA's refusal to treat the Archive as a "representative of the news media" in connection with five requests. **Attachment 15** hereto is a true and correct copy of the Archive's December 22, 2005 letter to the Agency Review Panel.

18.     By letter dated February 8, 2006, the CIA informed the Archive that it had no right to administratively appeal the CIA's refusal to recognize the Archive as a "representative of the news media," but that the Archive could seek judicial review of the CIA's determinations.

7

**Attachment 16** hereto is a true and correct copy of the CIA's February 8, 2006 letter. The CIA similarly informed the Archive in its initial denials of 35 other requests in dispute (including the withdrawn request) that no administrative appeal was available, but that the Archive could seek judicial review of the CIA's fee determinations. *See* Attachs. 11 and 12.

19.     By letter dated April 10, 2006, the CIA informed the Archive that it would close 40 of the requests for which the CIA had refused to recognize the Archive's news media status unless the Archive agreed by April 21, 2006, to pay search fees for those requests. **Attachment 17** hereto is a true and correct copy of the CIA's April 10, 2006 letter.

20.     By letter dated April 21, 2006, the Archive reasserted its objections to the CIA's actions and requested an additional 45 days to consider its options. **Attachment 18** hereto is a true and correct copy of the Archive's April 21, 2006 letter.

21.     By letter dated May 1, 2006, the CIA informed the Archive that it would close the 40 requests unless the Archive committed within 14 days to pay all processing fees. **Attachment 19** hereto is a true and correct copy of the CIA's May 1, 2006 letter.

22.     On or about May 12, 2006, the Archive informed the CIA that it would pay the assessed fees (but asked the CIA to inform the Archive before it incurred costs above $250 for any individual request). The Archive stated that its commitment to pay fees was made under protest and without prejudice to the Archive's legal rights and remedies, and for the purpose of maintaining its place in the FOIA processing queue.

23.     By letters dated May 31, 2006, the CIA informed the Archive of its denial of favorable fee treatment for the remaining two requests and told the Archive that it would close the requests if the Archive failed to commit within 45 days to pay search fees. **Attachments 20** and **21** hereto are true and correct copies of the CIA's two May 31, 2006 letters.

24.    On or about June 27, 2006, the Archive similarly agreed, under protest, to pay processing fees associated with the other two requests for which the CIA had refused to recognize the Archive's news media status, which the CIA had similarly threatened to close unless the Archive agreed to pay the assessed fees.

25.    By letters dated December 15, 2005, March 14, 2006, and March 22, 2006, the CIA informed the Archive that it would waive search fees for three requests the Archive submitted between August 2005 and March 2006 without seeking additional information from the Archive concerning those requests. **Attachments 22, 23,** and **24** hereto are true and correct copies of the CIA's letters waiving search fees for these three requests. These requests concerned NAFTA and illegal immigration from Mexico (No. F-2006-00203), weapons of mass destruction in Iraq (No. F-2006-00667), and Ayatollah Ali Sistani's July 2003 fatwa concerning Iraqi elections (No. F-2006-00728). These three requests are also included on the list of requests set forth as **Attachment 3**, for a total of 45 requests included on that list. The CIA has not explained how these three requests differ from the 42 requests for which the CIA denied preferential fee treatment. In addition, from August 10, 2005 through mid-October 2005, the period in which the Archive submitted some of the 42 requests for which the CIA sought written justifications and refused to waive search fees, the Archive submitted over 30 other requests for which the CIA decided not to assess search fees.

26.    In March 2006, the CIA also revoked its previous determination that a request the Archive had submitted in 1999 qualified for preferred fee treatment (No. F-1999-00850). **Attachments 25** and **26** hereto are true and correct copies of the CIA's letters of October 27, 1999 and March 9, 2006 regarding this request.

9

27.     By letter dated June 14, 2006, the CIA asserted, with respect to a request for documents pertaining to certain 1979 memoranda from National Intelligence Officer for Soviet Affairs Arnold Horelick to CIA Director Admiral Stansfield Turner (No. F-2006-00119), that the Archive had agreed to pay fees attendant to the request in the "all other" fee category.  In fact, the Archive had never indicated such agreement.  **Attachment 27** hereto is a true and correct copy of the Archive's June 14, 2006 letter regarding this request.

28.     By letter dated June 14, 2006, the CIA informed the Archive, with respect to four FOIA requests submitted by the Archive in 2000, that "your request, based on similar cases that we processed for The National Security Archive in 2000, falls into the 'news media' fee category."  **Attachment 28** hereto is a true and correct copy of the Archive's June 14, 2006 letter regarding these requests.

29.     The CIA's refusal to recognize the Archive's news media status and its consequent withholding of responsive documents is irreparably injuring the Archive's publication activities and its ability to collect and disseminate government documents pertaining to issues of major public concern in the areas of foreign policy, national defense and intelligence policy, and international economic policy.  The CIA's treatment of the Archive has also disrupted the Archive's ability to monitor the operations of the CIA and the federal government's intelligence activities, and it is significantly interfering with the public's right to information about these activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September **7** , 2006

THOMAS S. BLANTON

# ATTACHMENT 1

Central Intelligence Agency



Washington, D.C. 20505

19 August 2005

Mr. Brad Simpson
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Reference: F-2005-01799 (Archive # 20051162CIA146)

Dear Mr. Simpson:

The office of the Information and Privacy Coordinator has received your 11 August 2005 Freedom of Information Act (FOIA) request for:

> **"All documents from 1 May 1976 to 1 January 1977 relating in whole or in part to Indonesian President Suharto's (Soeharto) retirement from the Indonesian Armed Forces on 8 June 1976."** You ask us to **"include a search of the records of the U.S. embassy and consulates in Indonesia."**

We have assigned your request the reference number above. Please use the number when corresponding with us so that we can easily identify the request.

Based on the National Security Archive's agreement to pay copying costs as a requester in the "representative of the news media" fee category, we have accepted your request; it will be processed in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 431. Unless you object, we will limit our search to **CIA-originated records** existing through the date of this acceptance letter.

Please be aware that "records of the U.S. embassy and consulates in Indonesia" would be under the auspices of the U.S. Department of State. The CIA is not authorized to release records originated by other government agencies even if we were to locate any. Therefore, you should contact the State Department for those records.

20051162CIA146          CIA
RECNO:31728          SEQCOR:116240
8/23/2005          FOISG: Simpson, Brad
Suharto retires from the military, 1976

The large number of FOIA requests CIA receives has created unavoidable delays, making it unlikely that we can respond within the 20 working days the FOIA requires. You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel. A more practical approach would permit us to continue processing your request and respond to you as soon as we can. You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish. We will proceed on that basis unless you tell us that you object.

Sincerely,

Scott Koch
Information and Privacy Coordinator