# ATTACHMENT 8

# The National Security Archive

**The George Washington University**
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Phone: 202/994-7000
Fax: 202/994-7005
nsarchiv@gwu.edu
www.nsarchive.org

January 27, 2006

<u>Letter by Facsimile</u>
<u>Letter and Attachments by First Class Mail</u>

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC   20505

RE:     Fee Categorization Determination for FOIA Requests F-2006-00051 20051502CIA190
F-2006-00058 20051505CIA191
F-2006-00083 20051545CIA195
F-2006-00084 20051541CIA194
F-2006-00087 20051562CIA199
F-2006-00088 20051564CIA200
F-2006-00104 20051576CIA204
F-2006-00105 20051574CIA203
F-2006-00114 20051582CIA207
F-2006-00116 20051580CIA206
F-2006-00121 20051593CIA210
F-2006-00122 20051591CIA209
F-2006-00126 20051595CIA211
F-2006-00127 20051598CIA212
F-2006-00194 20051632CIA218
F-2006-00195 20051629CIA217
F-2006-00198 20051655CIA223
F-2006-00199 20051658CIA224
F-2006-00202 20051652CIA222
F-2006-00286 20051686CIA225
F-2006-00293 20051693CIA226
F-2006-00296 20051700CIA227

Dear Mr. Koch:

This is in response to your letters of December 13, 14, 20 and 22, 2005 (Enclosure A) in which you question the categorization of the National Security Archive (the "Archive") as a "representative of the news media" with respect to the 22 FOIA requests listed above. This letter concerns all 22 of your responses to these requests and any similar responses to other requests.

## Federal Recognition of the Archive as a Representative of the News Media

In *National Security Archive v. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), the D.C. Circuit held that the National Security Archive is entitled to a waiver of

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
January 27, 2006

all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The D.C. Circuit's decision was based on the fact the Archive had published one book and intended to publish document sets in the future. The now-Chief Judge of the D.C. Circuit, Judge Ginsburg, writing for a unanimous court, explained: "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.* As is discussed in greater detail in the next section of this letter, since the time of the court decision, the Archive's publication activity has expanded dramatically. Moreover, the Archive's journalistic work has received numerous awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.

In the *National Security Archive* decision, the D.C. Circuit also held that FOIA requests submitted by the National Security Archive in furtherance of its publication activities are not for a "commercial use," *Id.* at 1388. Each of the FOIA requests referenced above is for documents that will directly further the publication activities of the National Security Archive.

Further, the D.C. Circuit held that "[a]bsent [] a change in circumstances … the Archive is entitled to preferred [news media] status." The *National Security Archive* decision was based on a full consideration of the statute and the legislative history. The language of the FOIA prohibiting search and review fees for representatives of the news media is no different today than it was at the time of the *National Security Archive* decision. Moreover, as explained in the next section of this letter, the facts today are even more supportive of the Archive's news media status than they were at the time of the decision.

And, in fact, the D.C. Circuit is bound by that decision. As the Supreme Court has frequently explained, considerations of *stare decisis* are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades. With respect to the FOIA there is no argument that the CIA is entitled to deference, as the statute and legislative history makes clear that this is not an area of statutory interpretation that is within the particular expertise of the CIA or that has been delegated to the agencies. Recently, Justice Scalia explained how this works: "The Court's unanimous holding in *Neal v. United States*, 516 U.S. 284 (1996), plainly rejected the notion that any form of deference could cause the Court to revisit a prior statutory-construction holding: 'Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law.' *Id.*, at 29."

Moreover, the CIA – and indeed every other federal agency – has for 15 years abided by the *National Security Archive* decision and recognized the National Security Archive as a "representative of the news media" for similar FOIA requests based on our continuing publication of articles and books. This includes the Department of Defense and all of its component agencies, every other intelligence agency, and the Department of State. The CIA's sudden change in policy, without any explanation, is arbitrary and capricious, and appears that way to all the news media organizations we have spoken with. An agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so. "Indeed, where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *see also Wisconsin Valley Improvement Company v. FERC*, 236 F.3d 738 (D.C. Cir. 2001) (finding sudden imposition of fees on a

2

Letter to Scott Koch
January 27, 2006

licensee that was not previously subject to fees arbitrary and capricious and vacating the fees); *AT & T v. FCC*, 974 F.2d 1351, 1355 (D.C. Cir. 1992) (faulting the FCC for failing to explain why it "changed the original price cap rules" and concluding that the Commission's "Reconsideration Order is arbitrary and capricious for want of an adequate explanation"). As the Supreme Court has put it, "an agency changing its course must supply a reasoned analysis...." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (citation omitted). It is hard to imagine, under the circumstances presented here, that the CIA will be able to come anywhere close to meeting this standard.

Given this overwhelming precedent, I am troubled that in your recent letter of November 25, 2005, rejecting news media status for five other FOIA requests, you invite the Archive to address your denial of news media status in court. Under the provisions of the FOIA and the CIA's FOIA regulations, the Archive has a right to an administrative appeal before the CIA Agency Release Panel. *See, e.g.*, 32 C.F.R. Sec. 1900.42 ("A right of administrative appeal exists whenever ... a request for a fee waiver is denied."). We intend to exercise that right for the requests denied on November 25, 2005, and – if you reject these requests or any others – we will appeal those as well to the CIA Agency Release Panel. As a matter of good government, it does not appear sensible to use taxpayer money to clog up the CIA's administrative appeal process or cause frivolous legal defenses to be litigated through three courts.

Moreover, I direct you to the Conference Report on the 1974 amendments to the FOIA, which was approved by both houses of Congress when the news media provisions were enacted into law. There Congress cautioned: "The conferees intend that fees should not be used for the purpose of discouraging requests for information or as obstacles to disclosure of requested information.". S. Rep. No. 93-1200, Conference Report on the 1974 Amendments to the FOIA.

### The Archive's News Media Activities

The regulation cited in your above-referenced letters, 32 C.F.R. § 1900.02 (3), states "[r]epresentative of the news media means a request from an individual actively gathering news for an entity that is organized and operated to publish and broadcast news to the American public pursuant to their news dissemination function and not commercial interests." That language is drawn from Office of Management and Budget ("OMB") guidelines that all agencies subject to the FOIA are mandated by Congress to follow. 5 U.S.C. Sec. 552(a)(4)(A)(i) (agency fee schedules should "conform to the guidelines ... promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget."). OMB has indicated that news media be "defined generically as "an entity that is organized and operated to publish or broadcast news to the public."" See Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,012, 10,012-17 (1987). Furthermore, when establishing qualification as a member of the "news media," OMB advised, "a history of continuing publication... would suffice." *Id.*

Here, the National Security Archive unquestionably qualifies for "news media" status. The National Security Archive has an extensive publication history, including the production of over 40 books. These include: *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (New York: The New Press, 551 pp.), *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* by William Burr (New York: The New Press, 515 pp.), *Bay of Pigs Declassified: The Secret CIA Report* by Peter Kornbluh (New York: The New Press, 340 pp), *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons since 1940* by Stephen I. Schwartz with Thomas S. Blanton, William Burr et al. (Washington, D.C.: Brookings Institution Press, 680 pp.) A more complete list of books by Archive analysts is attached. (**Enclosure B**)

3

Letter to Scott Koch
January 27, 2006

The decision to recognize the Archive as a representative of the news media in the *National Security Archive* case was based on the Archive's intention to publish document sets, along with indexes and finding aids. Our most recent document sets, which publish documents obtained through the FOIA, along with commentary, indexes and finding aids, include *U.S. Policy in the Vietnam War, Part I, 1954-1968, U.S. Policy in the Vietnam War, Part II: 1969-1975, Japan and the United States: Diplomatic, Security, and Economic Relations, Part II, 1977-1992* and *Guatemala and the United States, 1954-1999*. A list of our 26 published document sets is attached as well. (Enclosure C) These sets are available digitally and on microfiche, and are distributed to a broad range of libraries, universities, research institutes, and the like. In addition, any member of the public is able to access these for free in our own public reading room.

Articles written by National Security Archive analysts have appeared in *The Washington Post, The New York Times, The Wall Street Journal, Congressional Quarterly, The LA Times, Harpers Magazine, The Miami Herald, The Nation, The Guardian, Vanity Fair, The Bulletin of the Atomic Scientists, World Policy Journal, Foreign Affairs, Foreign Policy, Newsweek, The International Journal of Intelligence and Counterintelligence, International Security, Intelligence and National Security* and other publications.

Additionally, the National Security Archive actively distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently released through the National Security Archive's FOIA activities or update the public on issues pertaining to the operations and activities of the U.S. government. A complete list of our electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

### Archive's Satisfaction of CIA's Additional Criteria for News Media Status

The CIA's definition of "news media" contains additional requirements not found anywhere in the OMB Fee Guidelines or in other agencies' FOIA regulations. Although Congress, in the FOIA, directed that agency fee schedules should "conform to the guidelines ... promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget," 5 U.S.C. Sec. 552(a)(4)(A)(i), the CIA's regulations do not meet this standard. Interestingly, when the CIA added additional criteria to its regulations in an Interim Regulation published in the Federal Register eight years ago, it stated that the revised regulations would "not alter substantially any existing rights of members of the public." 62 C.F.R. 32479 (June 16, 1997).[1] We and the other news media organizations believe that the new interpretation that the CIA is applying to its regulations does just the opposite. Of course, many of the other news media outlets are profoundly interested in definitions of news media because they have been actively pursuing an expansion of news media definitions to include non-traditional news media, such as the definition in the OPEN Government Act proposed by Senators Cornyn and Leahy.

Since you request a thorough response detailing how each of these requests concerns current events, interests the general public, and enhances public understanding of the operations or activities of the U.S. Government, and since you ask how we plan to disseminate the information to a significant

---

[1]     The CIA's additional criteria appear to be drawn from the FOIA's definition of what would qualify for a public interest fee waiver, and the cases decided under that provision. The Archive is requesting news media status and is not requesting a public interest fee waiver. Congress was well aware of how to limit applicability of a fee waiver to information meeting content criteria, as demonstrated by its definition of the standard for a public interest fee waiver. Under elementary principles of statutory construction, it is clear that Congress declined to impose such content criteria for the news media fee waiver.

4

Letter to Scott Koch
January 27, 2006

element of the public at minimal cost, the following sections clarify how each of these requests satisfies all of these criteria. Although we feel that we meet these standards, it is the Archive's position that these standards are not the appropriate ones by which to judge whether a FOIA requester is a representative of the news media.

In general, when new information concerning important events is released it is "news" even if the underlying events took place long ago so long as it is of "current interest to the public." *See* OMB Guidelines ("The term 'news' means information that is about current events **or** that would be of current interest to the public.") (emphasis added); 32 C.F.R. 1900.02 ("the term news means information which … would be of current interest to the general public"). That is the case with many of the requests described below. The public's desire for knowledge is not satisfied with the mere passage of time. For example, a few weeks ago *The New York Times* published a story about the 1964 Gulf of Tonkin incident and the role intelligence failures at the National Security Agency's played in that incident. Just this week recently uncovered documents from Guatemala's civil war in the late 1970s and 80s made major news, including an Associated Press story "Official Says Guatemala Killed Leftists," from December 14, 2005, which was reproduced in over twenty print publications. New, definitive or official information on these events, some of which took place decades ago, are still some of today's most important news stories because the information is revelatory for the public's understanding of their own histories, and of events that have changed the course of history and that impact current events.

In addition, as to how the Archive will disseminate the information to a significant element of the public at minimal cost, the same response applies to every one of the Archive's FOIA requests. As the National Security Archive has repeatedly done in the past, publication and public dissemination of these documents will be accomplished by one or more methods, all with the explicit goal of reaching the largest audience possible at the lowest cost possible. If the document is released and contains new information not previously widely known to the public, or policy not previously widely documented in the public record, we will immediately publish a briefing book explaining the significance of the document and providing relevant historical background with the document. We also publish short electronic briefing books (collections of 5-50 documents that describe a specific event or a specific U.S. government policy). These are circulated at no cost to our over 7000 subscribers and made available at no cost on our Web site for all members of the public. *See* www.nsarchive.org. The documents themselves will be available on our Web site, at no cost, indefinitely, for anyone with Internet access to view, copy, download, disseminate and further utilize. We provide a comprehensive full-text keyword search so that people can locate documents related to their research even if they don't know exactly what document they are looking for.

In addition, the Archive's centerpiece publications are its document sets. If the requested documents contain substantive information, they will be included in a published document set. These document collections are published in microfiche (available at any of the hundreds of libraries that purchase access to our sets), paper copies of documents (available in our reading room to anyone present or via mail to anyone who sends an inquiry), or through the Digital National Security Archive, a database that contains full-text searchable and chronologically organized images of released government documents. For these published sets, the National Security Archive will take between 2-5 years to gather all recently declassified documents on a particular issue. Each set focuses on specific U.S. government policies on a region or an issue and provides an unparalleled resource of declassified government documents to the public.

5

Letter to Scott Koch
January 27, 2006

SUBJECT: U.S.-Mexico Relations
F-2006-00116 Archive 20051580CIA206
Miguel de la Madrid Visit to Washington 1984

This Freedom of Information Act request concerns the visit of Mexican president Miguel de la Madrid to Washington on May 1984. Documents related to meetings between American and Mexican officials provide a unique opportunity to study how the relationship between the United States and Mexico has evolved over the past decades. These documents allow scholars, government officials, journalists and the general public on both sides of the border to evaluate how key bilateral issues were handled in the past and use that understanding to bear on contemporary diplomatic, political and economic relations and current events.

In 1984, the United States and Mexico were engaged in vehement debate over bilateral topics ranging from illegal immigration and border issues, to economic and trade concerns. Tensions were at a peak because of the financial crisis faced by Mexico from 1982 to 1984. The U.S. government and private sector feared that Mexico would be unable to service payments on its 96 million dollar foreign debt. The early 1980s also saw a 40% increase of illegal migration of Mexicans to the United States. These concerns strained relations between the two countries and were certainly discussed during de la Madrid's visit to Washington in May 1984.

More than twenty years later, public interest in Mexican immigration and trade, among other key bilateral issues, continues to be very strong, as evidenced by the debate that rages in the U.S. Congress and the press about them. President George W. Bush is currently proposing major changes in U.S. immigration law. Declassified records about discussions between a former Mexican President and U.S. officials on these same issues would enhance the public's understanding on how the United States crafts policy and negotiates with Mexico on such sensitive areas of bilateral concern.

The National Security Archive considers dissemination to be the core of our work. We make the declassified records we obtain under FOIA available through our comprehensive published collections (distributed digitally and on microfiche to university libraries), frequent postings on our Web site (www.nsarchive.org/mexico), publications in the U.S. and international media, participation in academic associations, and through our Washington-based reading room, open to the general public.

SUBJECT: Carlos Salinas' Administration and role as ex-President
F-2006-00051 Archive 20051502CIA190
Francisco Ruiz Massieu's Assassination
F-2006-00058 Archive 20051505CIA191
Colosio Assassination
F-2006-00104 Archive 20051576CIA204
Ernesto Zedillo Presidential Candidacy
F-2006-00122 Archive 20051591CIA209
Salinas Hunger Strike
F-2006-00105 Archive 20051574CIA203
Salinas' WTO Candidacy

These Freedom of Information Act requests concern developments that marked the last year of Carlos Salinas' six-year term as president of Mexico (1994), his pick for a successor, and two controversial events that followed after he left office (1995). Salinas's presidency was a turning point for Mexican

6

Letter to Scott Koch
January 27, 2006

domestic and international policies, and profoundly affected U.S. policy in Mexico. Documents related to this critical time period will shed light on many pressing questions about his administration that have yet to be answered, but will also enhance public understanding of the crisis that these events created for U.S.-Mexico relations.

What seemed to be a successful term that brought political and economic stability to the country was overshadowed in 1994 by a series of events that started with the Zapatista uprising in the state of Chiapas in January. Later that year in March, Luis Donaldo Colosio Murrieta presidential candidate from the ruling Institutional Revolutionary Party (PRI) was assassinated during a campaign rally (request 20051505CIA191). Salinas handpicked his successor Ernesto Zedillo Ponce de León shortly afterwards (request 20051576CIA204).

Another turning point was the assassination of José Francisco Ruiz Massieu, secretary general of the PRI on September 28, 1994 (20051502CIA190). There were convictions on both assassination cases, but both cases have remained in the public spotlight. Last year, Raúl Salinas, brother of the ex-president Salinas was acquitted for the murder of Ruiz Massieu.

Mexico suffered an economic crisis that led to the collapse of the peso in December 1994, weeks after Salinas left office. Although the press and public opinion blamed his administration, Salinas accused Zedillo of responsibility for the crisis. Salinas started a hunger strike to demand the government to stop blaming him for the country's economic problems. In a later interview Salinas said he had made that move after hearing from a close Zedillo aide that he would be arrested. Salinas left Mexico shortly afterwards on a self-imposed exile in Ireland.

Mounting public anger about his role in the economic crisis, as well as the murder conviction of his brother Raúl, led Salinas to retire his bid to head the World Trade Organization in March 1995 (20051574CIA203). Initially, the Clinton administration had backed Salinas's candidacy, but revelations about corruption and fraud in his government caused the U.S. to pressure him to withdraw.

Before his demise in 1994, Carlos Salinas was one of the most loved and powerful presidents in Mexican history. As an economist trained in the United States, he also managed to forge a uniquely close relationship to his American counterparts, George H. Bush and Bill Clinton. He has remained a controversial figure and is still seen by many – including front-running presidential candidate, Andres Manuel López Obrador – as being a key player in Mexican politics. Records declassified in response to this request will help illuminate not just U.S. policy toward Salinas in the past, but how the United States may judge Salinas's current and future influence on Mexican politics.

The Archive's Mexico Project, which has existed since 1994, has a variety of means for sharing the information we obtain through our Freedom of Information Act requests. We disseminate declassified documents through frequent postings on our Web Site (www.nsarchive.org/mexico), publish them in the mainstream media in both Mexico and the United States (see, for example, our monthly series in the well-known Mexican newsweekly Proceso), write for scholarly journals (see, for example, "Forgetting Is Not Justice" the World Policy Journal, Summer 2003), speak at conferences and teach classes on both sides of the border.

SUBJECT: Corruption and Democratic Transition in Mexico
F-2006-00087 Archive 20051562CIA199
Partido Verde Ecologista de Mexico

Letter to Scott Koch
January 27, 2006

F-2006-00088 Archive 20051564CIA200
1997 Elections
F-2006-00198 Archive 20051655CIA223
1990 Elections
F-2006-00199 Archive 20051658CIA224
Salinas' Electoral Reform
F-2006-00121 Archive 20051593CIA210
Corruption in the Oil Worker's Union Under Joaquín Hernández Galicia "La Quina"
F-2006-00126 Archive 20051595CIA 211
Corruption at the State Level: Mario Villanueva Madrid

These of Freedom of Information Act requests are related to corruption and democratic transition in Mexico. Two of the requests focus on corrupt practices at the federal and state level. Another request is related to a political party that was accused of nepotism and receiving bribes. One of the requests concerns electoral reform in 1990. Two of the requests are related to elections: one that was plagued by fraud allegations in 1990, and the other in 1997 which was broadly considered legitimate.

Mexico has evolved dramatically during the last decades. In 2000, the 70 years of one-party rule of the Institutional Revolutionary Party ended peacefully and democratically with the election of Vicente Fox. Before and after the election there have been a series of reforms and changes within Mexican society that are transforming Mexico from a semi-authoritarian regime to a full democracy.

This year Mexico is holding presidential elections that are putting these reforms to the test. Issues such as corruption, electoral reform and democratic transition are being closely followed by political and economic analysts in the United States. Moreover, given the commitment the U.S. has to promoting democracy in the world, understanding the experiences its southern neighbor has had in this respect will be valuable for U.S. government officials and scholars alike.

Joaquín Hernández Galicia "La Quina" was a powerful and untouchable labor leader of the Mexican Oil Worker's Union who was closely allied with the Institutional Revolutionary Party (PRI). His dishonest management of the union was characteristic of Mexico's old regime. La Quina's corruption practices were widely known and he was arrested in 1989 and later sentenced to 35 years in prison. He was liberated in 1997.

Mario Villanueva Madrid is another classic example of corruption in Mexico. He is currently imprisoned accused of 28 charges related to organized crime, drug trafficking, money laundering and using his authority as governor of the state of Quintana Roo (1993-1999) to protect and promote drug trafficking activities of the Juarez Drug Cartel. The fact that once such powerful men were convicted on corruption charges sent a message to Mexican officials, investors and foreign governments that serious anti-corruption measures would be taken.

Another sphere where corruption was evident was in the electoral realm. During Carlos Salinas's term the electoral system was reformed making it independent from the government, and establishing anti-fraud measures like a voter's id card. The National Security Archive has published documents related to electoral fraud and democracy in Mexico on our website and in the Mexican newsweekly Proceso. In two of the aforementioned requests we are specifically asking for documents related to totally different electoral scenarios. The 1990 municipal elections in the state of Mexico that were widely regarded as fraudulent, and the 1997 mid-term elections where the PRI lost for the first time in 68 years its majority in

8

Letter to Scott Koch
January 27, 2006

the lower house in Congress, and Cuauhtémoc Cárdenas from the Democratic Revolution Party emerged victorious in Mexico City's mayoral race.

Last, we are requesting documents related to the Partido Verde Ecologista de México. This party has been controlled since its founding in 1991 by the Martinez Torres family. The party has faced several corruption scandals which include: The ruling of Mexico's top electoral court that dictated that the party's statues violated the Constitution because they allowed an inner circle of members to select the party's candidates and officials. (September 3rd, 2003); The fine imposed by the Federal Electoral Institute for campaign finance offences during the 2000 presidential race. (October 10th, 2003); And the video in which Jorge Emilio González Martínez is being offered 2 million dollars for his assistance in facilitating land use permits for real estate development in Cancun, a city governed by a PVEM mayor. (February 2004).

Documents related to the Partido Verde are crucial at this time given the upcoming elections. The PVEM allied itself with the PRI and is supporting the candidacy of Roberto Madrazo Pintado in what has been denominated "Alianza por México."

Records declassified in response to these requests will contain invaluable information about Mexico's democratic transition and efforts to confront corruption that will shed new light on the country's current struggles with the same issues. As the presidential election approaches, public U.S. and Mexican interest in democratic reform in Mexico is at an all-time high. U.S. documents concerning past patterns and practices of these critical issues will enhance the public's understanding of how U.S. policy is crafted in response.

The National Security Archive considers dissemination to be the core of our work. We make the declassified records we obtain under FOIA available through our comprehensive published collections (distributed digitally and on microfiche to university libraries), frequent postings on our Web site (www.nsarchive.org/mexico), publications in the U.S. and international media, participation in academic associations, and through our Washington-based reading room, open to the general public.

SUBJECT: Indigenous/Peasant Communities and relationship with Mexican Government
F-2006-00083 Archive 20051545CIA195
El Bosque Military Operation (Chiapas)
F-2006-00084 Archive 20051541CIA194
Acteal Massacre (Chiapas)
F-2006-00114 Archive 20051582CIA207
El Charco Incident (Guerrero)
F-2006-00127 Archive 20051598CIA212
Ejército Popular Revolucionario
F-2006-00194 Archive 20051632CIA218
Military Harassment of Indigenous Communities
F-2006-00195 Archive 20051629CIA217
Aguas Blancas Massacre (Guerrero)
F-2006-00202 Archive 20051652CIA222
EZLN Crackdown

This set of requests is related to indigenous/peasant communities in Mexico and their relationship with the Mexican government. Indigenous and peasant communities have endured marginalization, poverty and

9

Letter to Scott Koch
January 27, 2006

discrimination accentuated by a lack of adequate policies addressing their needs. Indigenous and peasant communities have been subject to military harassment and in some cases violence that has resulted in brutal massacres. Some of these communities have organized themselves in armed movements (e.g. the Ejército Zapatista de Liberación Nacional based in the state of Chiapas and the Ejército Popular Revolucionario from the state of Guerrero).

Declassified U.S. records on these issues are particularly relevant today due to the political campaign recently launched by the EZLN. "La Otra Campaña" is an attempt by the Zapatistas to draw attention to the struggle faced by 50 million Mexicans living in poverty. The campaign is a six-month road trip, from Mexico's southernmost state to the border with the U.S., and is headed by Zapatista leader Subcomandante Marcos, and has been the focus of articles and analyses both in Mexico and abroad.

Moreover with leftist trends sweeping through Latin America and the election of the first Indian president of Bolivia, the status of these communities across the continent has acquired even more relevance, and might require a reshaping of American foreign policy. The documents we are requesting will enhance the public understanding of the operations of the U.S. government in response to questions of poverty, indigenous activism and human rights, and will provide valuable background to current events in Latin America.

The National Security Archive considers dissemination to be the core of our work. We have published documents concerning issues related to the current requests on both our website and in the Mexican newsweekly Proceso. An article written by Senior Analyst and Mexico Project Director Kate Doyle about the Zapatista uprising (Rebellion in Chiapas and the Mexican Military, available at http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB109) made headlines in Mexico and contributed to the understanding of the situation in Chiapas. An accompanying posting in our website contained 41 related documents, including several declassified by the CIA.

SUBJECT: Pertamina and Pertamina President Ibnu Sutowo - Indonesia state-owned oil company
F-2006-00286 Archive 20051686CIA225

As part of its effort to help document abuse that took place during the thirty-two year reign of Suharto, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate the history of U.S.-Indonesian relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

The corruption scandal in the mid 1970s at Pertamina, the Indonesian national oil company (of which Ibnu Sutowo was director) was a central economic and political event which left Indonesia with nearly ten billion dollars in external debt and symbolized the growing corruption of the Suharto regime. This corruption scandal also erupted as the U.S. was increasing its military and economic aid to Indonesia and as Indonesia was preparing to invade the territory of East Timor. Documents pertaining to this issue will thus offer a crucial window into the workings and activities of the U.S. government at a crucial time in its relationship with Indonesia, in particular the degree to which U.S. officials were aware of ongoing corruption and raised them with Indonesian officials.

10

Letter to Scott Koch
January 27, 2006

Corruption continues to plague Indonesian politics and business and serves as a chief barrier to the democratization process underway in the world's fourth largest country. As the below article details, Indonesia is regularly ranked among the most corrupt countries in Asia. This issue is thus of clear relevance and public interest both to Indonesian and American audiences seeking to understand the historical roots of one of the most important phenomenon of Indonesian political and economic life.

For Questions Regarding Public Interest and Current Events, Please See:
*Agence France Press, December 5, 2005*
*Corruption seen as most serious in Asia's developing economies: PERC*

*Corruption is the major obstacle to investment and business growth in Asia's developing economies with Indonesia suffering the most, according to a poll of foreign executives.*

*In contrast, Hong Kong and Singapore — two of the most developed Asian economies — are rated as the places where graft is most under control, the Political and Economic Risk Consultancy (PERC) said.*

*Singapore topped the survey of 96 leading foreign executives based in the region with a score of 0.89 where the best grade is zero and the worst is 10.*

*Arch economic rival Hong Kong was second at 1.22 while Indonesia was the worst with a score of 9.44, PERC said in its survey of 12 regional economies.*

*Japan was third, followed by South Korea, Malaysia, Taiwan, Thailand, China, India, the Philippines and Vietnam.*

*The gradings by Singapore and Hong Kong reflect confidence in the judiciary system which is why the former British colonies have remained big recipients of foreign investment despite lower labour costs elsewhere, PERC said.*

*"Labor is usually much less expensive in neighboring countries, and except for the excellent harbors, world class physical infrastructure facilities and educated labor forces, neither Hong Kong nor Singapore has many natural resources to draw investors," it said.*

*"However, foreign companies find it easier and more straightforward to do many types of business in Asia's two island economies, which is one of the main reasons they have attained "regional business center" status.*

*"The low level of corruption and victims' ability to seek legal redress though the local legal system when they do encounter graft are major attributes of Hong Kong and Singapore that enhance the quality of the overall business environment."*

*In Indonesia, graft is seen a major drawback for foreign investors but they are encouraged by President Susilo Bambang Yudhoyono's drive to stamp out corruption, the survey showed.*

*"The legal system in that country remains highly suspect, but President Susilo Bambang Yudhoyono has stepped up the fight against graft," PERC said, "There have been a few high profile examples of officials being arrested and prosecuted, and these anecdotes are raising hopes that one of the biggest barriers to doing business in Indonesia, namely, corruption, is being reduced."*

11

Letter to Scott Koch
January 27, 2006

*Similarly in China, investors like efforts by Beijing to punish corrupt government officials, PERC said, adding that being a member of the World Trade Organisation (WTO) has helped the anti-graft drive.*

*"China stands out as the country where the trend seems to be improving the most," it said.*

*In Malaysia, graft is seen as a problem but it is not as severe as in most neighbouring economies, like the Philippines where the problem is not improving and the government is seen as nothing about it, the survey said.*

*Meanwhile, executives recognise Thai authorities have changed laws and regulations but consider it to benefit large businesses, many of which have close links with influential politicians, the survey said.*

SUBJECT: President Reagan and Secretary Shultz to Indonesia 1986
F-2006-00293 Archive 20051693CIA226

In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth and Reconciliation Commission charged with investigating human rights abuses during the "New Order" period of President Suharto from 1966 to 1998. Such efforts in Indonesia to document past human rights abuses and the historical context of political conflict are crucial to its ongoing democratic transition and thus of clear interest to both the Indonesian and U.S. general public.
As part of this process, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government
(http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

The visit to Indonesia of a high ranking official, especially the Secretary of State or the President of the United States, is an inherently significant political event and thus of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context. As the CIA is aware, the agency regularly provides analyses of significant events and trends for high-ranking officials visiting other countries. These visits were significant because they took place at a time when the Indonesian armed forces were escalating military operations and repressive activities against pro-independence activists in the territory of West Papua.

Documents pertaining to this visit will thus offer a crucial window into the workings and activities of the U.S. government at a crucial time in its relationship with Indonesia, in particular the degree to which U.S. officials were aware of ongoing human rights abuses in West Papua or elsewhere and raised them with Indonesian officials. CIA briefing papers and materials for the President and Secretary of State offer insight into the awareness of the U.S. government at the highest levels of these issues.

SUBJECT: Riot in Ujung Pandang, Sulawesi, Indonesia 1987
F-2006-00296 Archive 20051700CIA227

Letter to Scott Koch
January 27, 2006

In 2004 the Indonesian Parliament passed legislation providing for the establishment of a Truth and Reconciliation Commission charged with investigating human rights abuses during the "New Order" period of President Suharto from 1966 to 1998. Such efforts in Indonesia to document past human rights abuses and the historical context of political conflict are crucial to its ongoing democratic transition and thus of clear interest to both the Indonesian and U.S. general public.

As part of this process, the National Security Archive is collaborating with Indonesian nongovernmental organizations to investigate and document the history of U.S.-Indonesian military relations and human rights abuses in Indonesia during the New Order period. In November 2005 the Archive published online a selection of similar documents that it provided to East Timor's Commission for Reception, Truth and Reconciliation, generating widespread publicity as a result and demonstrating their relevance to current events, interest to the general public, method of dissemination, and enhancing of public understanding of the operations or activities of the U.S. government (http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB174/index.htm).

During the New Order period, riots served as a potent expression of popular discontent with the Suharto regime. The May, 1998, protests which brought down the Suharto regime, for example, included widespread rioting, some of which was orchestrated by Indonesian military units. As such, efforts to document the history of such events and official responses to them are of clear interest and concern to Indonesians and Americans currently seeking to place the human rights abuses of the Suharto regime in their proper historical context.

A crucial component of the National Security Archive's efforts to support the Truth Commission process underway in Indonesia involves establishing the international context in which New Order era human rights abuses took place, such as the awareness of foreign governments of such abuses. Documents concerning U.S. government knowledge of the causes and consequences of popular protest against the Suharto regime will thus help increase public understanding of the workings and activities of the U.S. government, in particular the degree to which U.S. officials in Indonesia were aware of ongoing human rights abuses.

---

In a democracy the public acts as a check on government conduct. As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment." The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate information to the public. Again, in the Supreme Court's words: "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). In carrying out its civic role in our society, the public is entitled to the wide range of information that can be useful to inform debate, to act as a check against abuse, and to impact government policy.

Furthermore, if you decide to deny news media status for any of the above-listed requests or any other requests that the Archive has filed, please specifically indicate which of the criteria in 32 C.F.R. Sec. 1900.02 you have determined is not met. Your failure to specify which criterion has not been satisfied will be viewed by the Archive, as well as by the news media organizations that have been briefed, as further evidence of your effort to interfere with the Archive's legitimate FOIA activities. As

13

Letter to Scott Koch
January 27, 2006

you noted in a previous letter on the issue (dated November 25, 2005), it would assist the CIA if the Archive addresses these factors on its initial request. Our ability to do so would be enhanced by an understanding of which criteria the CIA believes are not met.

Please feel free to contact me by telephone if you wish to discuss this further. I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

14

# ATTACHMENT 9

# The National Security Archive

**The George Washington University**
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

**Phone: 202/994-7000**
**Fax: 202/994-7005**
nsarchiv@gwu.edu
www.nsarchive.org

May 8, 2006

<u>Letter by Facsimile and First Class Mail</u>

Scott Koch
Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC  20505

RE:     Fee Categorization Determination for FOIA Requests F-2006-00622 - 20060134CIA012
                                    F-2006-00623 - 20060132CIA011

Dear Mr. Koch:

This is in response to your letters of April 5, 2006 (**Enclosure A**) in which you question the categorization of the National Security Archive (the "Archive") as a "representative of the news media" with respect to the two FOIA requests listed above submitted by Mr. Michael Evans on February 3, 2006. The April 5, 2006 letters request the National Security Archive address the third issue in the criteria specified in 32 C.F.R. § 1900.02 (3). In order to qualify as a representative of the news media, the requests must "enhance the public understanding of the operations or activities of the U.S. Government."

As background, the agencies should be aware that these requests were filed on behalf of the National Security Archive's Colombia Documentation Project, which seeks to assemble a collection of primary source declassified material on the making of United States policy toward Colombia, including support for counterdrug and counterguerrilla operations, security assistance and military training programs, petroleum sector security, trade policy, and human rights issues. The overarching goal of the project to enhance the public understanding of U.S. policy by making these documents available to the public through the National Security Archive Web site, books, articles, and other publishing outlets.

It is thus important to have access to a broad range of declassified documents, including reports, memoranda and other analytical documents produced by the CIA and other members of the U.S. intelligence community. These documents provide the evaluations and judgments of trained intelligence professionals that policymakers rely upon in making decisions about how to approach policy matters. As such, it is critical that the project have access to properly declassified CIA material, so that students, scholars and journalists have a complete picture of the policymaking process.

## F-2006-00622 - 20060134CIA012

*Request enhances the public understanding of the operations or activities of the U.S. Government:*
In December 2005, the Colombian government and the National Liberation Army (ELN) guerrillas opened peace talks in Cuba aimed at negotiating an end to 40 years of conflict between the government and the rebel group. I expect that the declassification of CIA records pertaining to these talks, and the potential for the demobilization of the ELN's 4,000-man guerrilla fighting force, would significantly

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

Letter to Scott Koch
May 2, 2006

enhance public understanding of how these developments would impact U.S. security initiatives in Colombia.

The ELN is one of three Colombian groups listed as a State Department-designated Foreign Terrorist Organization (FTO) and is also heavily involved in the drug trade. In 2002, the U.S. Congress and President Bush significantly enhanced the U.S. role in Colombia's counter-terrorism efforts by approving legislation allowing the use of U.S. military equipment and training in operations against Colombian terrorist organizations including the ELN, superseding previous requirements that such assistance be tied specifically to anti-narcotics operations. Also approved at that time was funding for the training and equipping of a new Colombian military unit established to protect a vital oil pipeline owned in part by a U.S. company that is frequently the target of sabotage attacks by ELN rebels.

In November 2005, President Bush signed legislation authorizing U.S. assistance to help disarm, demobilize and re-train former members of Colombian terrorist groups (including the ELN). According to media sources, the decision came after more than two years of legal debate between the Departments of State and Justice over whether such assistance would violate a ban on providing "material support" to Foreign Terrorist Organizations.

It is thus clear that the negotiations between the ELN and the Colombian government have a direct impact on U.S. policy in Colombia, with serious implications for U.S. counter-narcotics and counter-terrorism programs. The possibility of a peace agreement with one of Colombia's main terrorist groups would no doubt impact decisions on how these programs are designed and funded. For these reasons, we strongly believe that the declassification of CIA material on the subject would significantly enhance public understanding of the operations and activities of the U.S. government.

**F-2006-00623 - 20060132CIA011**

*Request enhances the public understanding of the operations or activities of the U.S. Government:*
This FOIA request asked for records pertaining to a December 2005 agreement between the Venezuelan and Colombian governments on the construction of a gas pipeline from the Paraguana Refinery Complex in Venezuela to the Colombian port at Punta Ballenas on the Pacific coast, and the potential for similar pipeline projects extending to other parts of South America.

The pipeline agreement between Colombia and Venezuela has been widely viewed as a kind of rapprochement for the two countries after a recent period of political and ideological estrangement. The agreement unites Colombian President Alvaro Uribe, a strong U.S. ally, and Venezuelan President Hugo Chavez, whose policies and rhetoric have often been at odds with U.S. objectives in the region and around the world.

The pipeline project has significant implications for U.S. energy policy. Venezuela is the world's fifth-largest oil exporter and the third-largest foreign supplier of oil to the U.S.—supplying around 10 percent of U.S. oil imports. Recently, Venezuela's oil minister warned the U.S. that Venezuela may choose to shift its oil exports away from the U.S. and toward other markets, particularly China, while supplying discounted fuel to other countries around Latin American and the Caribbean. Complaining about U.S. "aggression," President Chavez himself has warned that "ships filled with Venezuelan oil, instead of going to the United States, could go somewhere else."

The construction of a pipeline to a port on the Pacific is seen as a signal that Venezuela is serious about finding new markets for its petroleum exports. There is no doubt that such developments have serious

2

Letter to Scott Koch
May 2, 2006

implications for U.S. energy policy and for U.S. relations with both Venezuela and Colombia. Surely the CIA has been called upon to analyze the issue and its implications for U.S. policy. As oil prices continue to climb higher and higher in the U.S., there is little doubt that the declassification of CIA records on this issue would enhance the public's understanding of how political and ideological differences affect the global energy market and the supply of fuel to the U.S. market.

As previously clarified for your agency, in *National Security Archive v. U.S. Dep't of Defense*, 880 F. 2d 1381 (D.C. Cir 1989), *cert. denied* (Mar. 19, 1990), the D.C. Circuit held that the National Security Archive is entitled to a waiver of all search and review fees under the FOIA as a "representative of the news media." *Id.* at 1387. The D.C. Circuit's decision was based on the fact the Archive had published one book and intended to publish document sets in the future. The now-Chief Judge of the D.C. Circuit, Judge Ginsburg, writing for a unanimous court, explained: "A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.* Since the time of the court decision, the Archive's publication activity has expanded dramatically. Moreover, the Archive's journalistic work has received numerous awards, including, most recently, the 2005 Emmy Award for Outstanding Achievement in News and Documentary Research, presented by the National Television Academy at the 26th Annual News & Documentary Emmy Awards.

In a democracy the public acts as a check on government conduct. As the Supreme Court recognized in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), "informed public opinion is the most potent of all restraints upon misgovernment." The power of the public to act as a check on government misconduct is directly impacted by the ability of news media organizations such as the National Security Archive to research government activity and disseminate information to the public. Again, in the Supreme Court's words: "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). In carrying out its civic role in our society, the public is entitled to the wide range of information that can be useful to inform debate, to act as a check against abuse, and to impact government policy.

I hope to receive your response granting news media fee status related to FOIA requests F-2006-00622 and F-2006-00623.

Please feel free to contact me by telephone if you wish to discuss this further. I can be reached on my direct line at 202-994-7059.

Sincerely,

Meredith Fuchs
General Counsel

3

# ATTACHMENT 10



Central Intelligence Agency

Washington, D.C. 20505

25 November 2005

Meredith Fuchs
General Counsel
The National Security Archive
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Re: National Security Archive Freedom of Information Act Requests F-2005-01773, F-2005-01811, F-2006-00039, F-2006-00052, F-2006-00057

Dear Ms. Fuchs:

We have received your letter and supporting documentation of 10 November 2005 explaining why you believe the Freedom of Information Act requests below meet the criteria for "news media" status warranting preferential fee treatment.

You are correct in acknowledging that our regulations require us to make fee determinations on a case-by-case basis. Using that standard, the facts you have provided, and after fully considering the arguments you set forth in your letter, I have made the following determinations in my capacity as CIA Information and Privacy Coordinator.

- F-2005-01773, request for biographical material from 1 January 1985 through 1 July 2005 on Taliban officials Mullah Mohammad Omar and Mullah Mohammad Rabbani. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

- F-2005-01811, request for biographical material from 1 January 1985 through 1 July 2005 on Taliban officials Maulawi Wakil Mutawakil and Mullah Abdul Jalil. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

20051224CIA157          CIA
RECNO:31804          SEQCOR:118112
11/30/2005          FOISG: Elias, Barbara
Taliban Members (Omar, Rabbani)

Meredith Fuchs                      2                     25 November 2005
General Counsel

- F-2006-00039, request for documents relating to the 12-14 May 1973 meetings between US Secretary of State William Rogers, Mexican President Luis Echeverria, and Mexican Foreign Minister Emilio Rabasa. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

- F-2006-00052, request for documents from 1 October through 31 December 1994 related to the APEC Economic Leaders' Meeting, official meetings between US and Indonesian officials, the occupation of the US Embassy in Jakarta in November 1994, and November-December 1994 protests in East Timor and the Indonesian government's reaction thereto. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

- F-2006-00057, request for documents created between October 1976 and June 1977 related to Muslim extremist activities in Indonesia and the Indonesian government's reaction thereto. I deny your request for news media status in this case because it does not meet each of the criteria defining news our regulations set forth at 32 C.F.R § 1900.02 (h)(3).

I therefore place these requests in the "all other" category, which means that the Archive will be responsible for charges associated with searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction. Copies beyond the first 100 pages are ten cents per page. The first two hours of search time for each request will be free. In accordance with Section (a) of the fee schedule enclosed, search fees are assessable even if we find no records or, if we find any, we determine that they are not releasable. This means we will charge you even if our search results are negative or if we determine that we cannot release any information under the FOIA. In accordance with the provisions of the FOIA, you have the right to seek judicial review of these decisions in a United States district court.

Before our office can begin processing these requests, we must receive the Archive's commitment to pay fees incurred under the conditions stated above. The search fees for each item in a request are usually about $150. We will hold these requests in abeyance for 45 days pending our receipt of the Archive's commitment to pay fees. So as not to disadvantage the Archive pending our receipt of its fee commitment, we will not move these five

Meredith Fuchs                    3                    25 November 2005
General Counsel

requests to the end of the line, but will process them as of the date we
received the initial request.

My decision in these cases is limited to the facts of each request. You
should not conclude that every Archive request will have the same result. If
future requests meet the criteria, they will warrant preferential news media
status. Your initial explanation why each request meets the criteria will
eliminate our need to ask for further clarification and will help make
processing as efficient as possible.

Sincerely,

Scott A. Koch, Ph.D.
CIA Information and Privacy Coordinator