# EXHIBIT C

1 of 1 DOCUMENT

Copyright 2005 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

June 2, 2005 Thursday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 4534 words

**HEADLINE:** How Mark Felt Became 'Deep Throat';
As a Friendship -- and the Watergate Story -- Developed, Source's Motives Remained a Mystery to Woodward

**BYLINE:** Bob Woodward, Washington Post Staff Writer

**BODY:**

In 1970, when I was serving as a lieutenant in the U.S. Navy and assigned to Adm. Thomas H. Moorer, the chief of naval operations, I sometimes acted as a courier, taking documents to the White House.

One evening I was dispatched with a package to the lower level of the West Wing of the White House, where there was a little waiting area near the Situation Room. It could be a long wait for the right person to come out and sign for the material, sometimes an hour or more, and after I had been waiting for a while a tall man with perfectly combed gray hair came in and sat down near me. His suit was dark, his shirt white and his necktie subdued. He was probably 25 to 30 years older than I and was carrying what looked like a file case or briefcase. He was very distinguished-looking and had a studied air of confidence, the posture and calm of someone used to giving orders and having them obeyed instantly.

I could tell he was watching the situation very carefully. There was nothing overbearing in his attentiveness, but his eyes were darting about in a kind of gentlemanly surveillance. After several minutes, I introduced myself. "Lieutenant Bob Woodward," I said, carefully appending a deferential "sir."

"Mark Felt," he said.

I began telling him about myself, that this was my last year in the Navy and I was bringing documents from Adm. Moorer's office. Felt was in no hurry to explain anything about himself or why he was there.

This was a time in my life of considerable anxiety, even consternation, about my future. I had graduated in 1965 from Yale, where I had a Naval Reserve Officers' Training Corps scholarship that required that I go into the Navy after getting my degree. After four years of service, I had been involuntarily extended an additional year because of the Vietnam War.

During that year in Washington, I expended a great deal of energy trying to find things or people who were interesting. I had a college classmate who was going to clerk for Chief Justice Warren E. Burger, and I made an effort to develop a friendship with that classmate. To quell my angst and sense of drift, I was taking graduate courses at George Washington University. One course was in Shakespeare, another in international relations.

When I mentioned the graduate work to Felt, he perked up immediately, saying he had gone to night law school at GW in the 1930s before joining -- and this is the first time he mentioned it -- the FBI. While in law school, he said, he

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

had worked full time for a senator  --  his home-state senator from Idaho. I said that I had been doing some volunteer work at the office of my congressman, John Erlenborn, a Republican from the district in Wheaton, Ill., where I had been raised.

So we had two connections  --  graduate work at GW and work with elected representatives from our home states.

Felt and I were like two passengers sitting next to each other on a long airline flight with nowhere to go and nothing really to do but resign ourselves to the dead time. He showed no interest in striking up a long conversation, but I was intent on it. I finally extracted from him the information that he was an assistant director of the FBI in charge of the inspection division, an important post under Director J. Edgar Hoover. That meant he led teams of agents who went around to FBI field offices to make sure they were adhering to procedures and carrying out Hoover's orders. I later learned that this was called the "goon squad."

Here was someone at the center of the secret world I was only glimpsing in my Navy assignment, so I peppered him with questions about his job and his world. As I think back on this accidental but crucial encounter  --  one of the most important in my life  --  I see that my patter probably verged on the adolescent. Since he wasn't saying much about himself, I turned it into a career-counseling session.

I was deferential, but I must have seemed very needy. He was friendly, and his interest in me seemed somehow paternal. Still the most vivid impression I have is that of his distant but formal manner, in most ways a product of Hoover's FBI. I asked Felt for his phone number, and he gave me the direct line to his office.

I believe I encountered him only one more time at the White House. But I had set the hook. He was going to be one of the people I consulted in depth about my future, which now loomed more ominously as the date of my discharge from the Navy approached. At some point I called him, first at the FBI and then at his home in Virginia. I was a little desperate, and I'm sure I poured out my heart. I had applied to several law schools for that fall, but, at 27, I wondered if I could really stand spending three years in law school before starting real work.

Felt seemed sympathetic to the lost-soul quality of my questions. He said that after he had his law degree his first job had been with the Federal Trade Commission. His first assignment was to determine whether toilet paper with the brand name Red Cross was at an unfair competitive advantage because people thought it was endorsed or approved by the American Red Cross. The FTC was a classic federal bureaucracy  --  slow and leaden  --  and he hated it. Within a year he had applied to the FBI and been accepted. Law school opened the most doors, he seemed to be saying, but don't get caught in your own equivalent of a toilet-paper investigation.

A Two-week tryout

In August 1970, I was formally discharged from the Navy. I had subscribed to The Washington Post, which I knew was led by a colorful, hard-charging editor named Ben Bradlee. There was a toughness and edge to the news coverage that I liked; it seemed to fit the times, to fit with a general sense of where the world was much more than law school. Maybe reporting was something I could do.

During my scramble and search for a future, I had sent a letter to The Post asking for a job as a reporter. Somehow -- I don't remember exactly how -- Harry Rosenfeld, the metropolitan editor, agreed to see me. He stared at me through his glasses in some bewilderment. Why, he wondered, would I want to be a reporter? I had zero -- zero! -- experience. Why, he said, would The Washington Post want to hire someone with no experience? But this is just crazy enough, Rosenfeld finally said, that we ought to try it. We'll give you a two-week tryout.

After two weeks, I had written perhaps a dozen stories or fragments of stories. None had been published or come close to being published. None had even been edited.

See, you don't know how to do this, Rosenfeld said, bringing my tryout to a merciful close. But I left the newsroom more enthralled than ever. Though I had failed the tryout  --  it was a spectacular crash  --  I realized I had found something that I loved. The sense of immediacy in the newspaper was overwhelming to me, and I took a job at the Montgomery Sentinel, where Rosenfeld said I could learn how to be a reporter. I told my father that law school was off and that I was taking a job, at about $115 a week, as a reporter at a weekly newspaper in Maryland.

"You're crazy," my father said, in one of the rare judgmental statements he had ever made to me.

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

I also called Mark Felt, who, in a gentler way, indicated that he, too, thought this was crazy. He said he thought newspapers were too shallow and too quick on the draw. Newspapers didn't do in-depth work and rarely got to the bottom of events.

Well, I said, I was elated. Maybe he could help me with stories.

He didn't answer, I recall.

During the year I spent on the Sentinel, I kept in touch with Felt through phone calls to his office and home. We were becoming friends of a sort. He was the mentor, keeping me from toilet-paper investigations, and I kept asking for advice. One weekend I drove out to his home in Virginia and met his wife, Audrey.

Somewhat to my astonishment, Felt was an admirer of J. Edgar Hoover. He appreciated his orderliness and the way he ran the bureau with rigid procedures and an iron fist. Felt said he appreciated that Hoover arrived at the office at 6:30 each morning and everyone knew what was expected. The Nixon White House was another matter, Felt said. The political pressures were immense, he said without being specific. I believe he called it "corrupt" and sinister. Hoover, Felt and the old guard were the wall that protected the FBI, he said.

In his own memoir, "The FBI Pyramid: From the Inside," which received almost no attention when it was published in 1979, five years after President Richard M. Nixon's resignation, Felt angrily called this a "White House-Justice Department cabal."

At the time, pre-Watergate, there was little or no public knowledge of the vast pushing, shoving and outright acrimony between the Nixon White House and Hoover's FBI. The Watergate investigations later revealed that in 1970 a young White House aide named Tom Charles Huston had come up with a plan to authorize the CIA, the FBI and military intelligence units to intensify electronic surveillance of "domestic security threats," authorize illegal opening of mail, and lift the restrictions on surreptitious entries or break-ins to gather intelligence.

Huston warned in a top-secret memo that the plan was "clearly illegal." Nixon initially approved the plan anyway. Hoover strenuously objected, because eavesdropping, opening mail and breaking into homes and offices of domestic security threats were  basically the FBI bailiwick and the bureau didn't want competition. Four days later, Nixon rescinded the Huston plan.

Felt, a much more learned man than most realized, later wrote that he considered Huston "a kind of White House gauleiter over the intelligence community." The word "gauleiter" is not in most dictionaries, but in the four-inch-thick Webster's Encyclopedic Unabridged Dictionary of the English Language it is defined as "the leader or chief official of a political district under Nazi control."

There is little doubt Felt thought the Nixon team were Nazis. During this period, he had to stop efforts by others in the bureau to "identify every member of every hippie commune" in the Los Angeles area, for example, or to open a file on every member of Students for a Democratic Society.

None of this surfaced directly in our discussions, but clearly he was a man under pressure, and the threat to the integrity and independence of the bureau was real and seemed uppermost in his mind.

On July 1, 1971 -- about a year before Hoover's death and the Watergate break-in -- Hoover promoted Felt to be the number three official in the FBI. Though Hoover's sidekick, Clyde Tolson, was technically the number two official, Tolson was also ill and did not come to work many days, meaning he had no operational control of the bureau. Thus, my friend became the day-to-day manager of all FBI matters as long as he kept Hoover and Tolson informed or sought Hoover's approval on policy matters.

EARLY TIPS

In August, a year after my failed tryout, Rosenfeld decided to hire me. I started at The Post the next month.

Though I was busy in my new job, I kept Felt on my call list and checked in with him. He was relatively free with me but insisted that he, the FBI and the Justice Department be kept out of anything I might use indirectly or pass onto others. He was stern and strict about those rules with a booming, insistent voice. I promised, and he said that it was essential that I be careful. The only way to ensure that was to tell no one that we knew each other or talked or that I knew someone in the FBI or Justice Department. No one.

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

In the spring, he said in utter confidence that the FBI had some information that Vice President Spiro T. Agnew had received a bribe of $2,500 in cash that Agnew had put in his desk drawer. I passed this on to Richard Cohen, the top Maryland reporter for The Post, not identifying the source at all. Cohen said, and later wrote in his book on the Agnew investigation, that he thought it was "preposterous." Another Post reporter and I spent a day chasing around Baltimore for the alleged person who supposedly knew about the bribe. We got nowhere. Two years later, the Agnew investigation revealed that the vice president had received such a bribe in his office.

About 9:45 a.m. on May 2, 1972, Felt was in his office at the FBI when an assistant director came to report that Hoover had died at his home. Felt was stunned. For practical purposes, he was next in line to take over the bureau.

Yet Felt was soon to be visited with immense disappointment. Nixon nominated L. Patrick Gray III to be the acting director. Gray was a Nixon loyalist going back years. He had resigned from the Navy in 1960 to work for candidate Nixon during the presidential contest that Nixon lost to John F. Kennedy.

As best I could tell Felt was crushed, but he put on a good face. "Had I been wiser, I would have retired," Felt wrote.

On May 15, less than two weeks after Hoover's death, a lone gunman shot Alabama Gov. George C. Wallace, then campaigning for president, at a Laurel shopping center. The wounds were serious, but Wallace survived.

Wallace had a strong following in the deep South, an increasing source of Nixon's support. Wallace's spoiler candidacy four years earlier in 1968 could have cost Nixon the election that year, and Nixon monitored Wallace's every move closely as the 1972 presidential contest continued.

That evening, Nixon called Felt -- not Gray, who was out of town -- at home for an update. It was the first time Felt had spoken directly with Nixon. Felt reported that Arthur H. Bremer, the would-be assassin, was in custody but in the hospital because he had been roughed up and given a few bruises by those who subdued and captured him after he shot Wallace.

"Well, it's too bad they didn't really rough up the son of a bitch!" Nixon told Felt.

Felt was offended that the president would make such a remark. Nixon was so agitated and worried, attaching such urgency to the shooting, that he said he wanted full updates every 30 minutes from Felt on any new information that was being discovered in the investigation of Bremer.

In the following days I called Felt several times and he very carefully gave me leads as we tried to find out more about Bremer. It turned out that he had stalked some of the other candidates, and I went to New York to pick up the trail. This led to several front-page stories about Bremer's travels, completing a portrait of a madman not singling out Wallace but rather looking for any presidential candidate to shoot. On May 18, I did a Page One article that said, among other things, "High federal officials who have reviewed investigative reports on the Wallace shooting said yesterday that there is no evidence whatsoever to indicate that Bremer was a hired killer."

It was rather brazen of me. Though I was technically protecting my source and talked to others besides Felt, I did not do a good job of concealing where the information was coming from. Felt chastised me mildly. But the story that Bremer acted alone and without accomplices was a story that both the White House and the FBI wanted out.

The story breaks

A month later, on Saturday, June 17, the FBI night supervisor called Felt at home. Five men in business suits, pockets stuffed with $100 bills, and carrying eavesdropping and photographic equipment, had been arrested inside the Democrats' national headquarters at the Watergate office building about 2:30 a.m.

By 8:30 a.m. Felt was in his office at the FBI, seeking more details. About the same time, The Post's city editor woke me at home and asked me to come in to cover an unusual burglary.

The first paragraph of the front-page story that ran the next day in The Post read: "Five men, one of whom said he is a former employee of the Central Intelligence Agency, were arrested at 2:30 a.m. yesterday in what authorities described as an elaborate plot to bug the offices of the Democratic National Committee here."

The next day, Carl Bernstein and I wrote our first article together, identifying one of the burglars, James W. McCord Jr., as the salaried security coordinator for Nixon's reelection committee. On Monday, I went to work on E.

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

Howard Hunt, whose telephone number had been found in the address books of two of the burglars with the small notations "W. House" and "W.H." by his name.

This was the moment when a source or friend in the investigative agencies of government is invaluable. I called Felt at the FBI, reaching him through his secretary. It would be our first talk about Watergate. He reminded me how he disliked phone calls at the office but said the Watergate burglary case was going to "heat up" for reasons he could not explain. He then hung up abruptly.

I was tentatively assigned to write the next day's Watergate bugging story, but I was not sure I had anything. Carl had the day off. I picked up the phone and dialed 456-1414 -- the White House -- and asked for Howard Hunt. There was no answer, but the operator helpfully said he might be in the office of Charles W. Colson, Nixon's special counsel. Colson's secretary said Hunt was not there this moment but might be at a public relations firm where he worked as a writer. I called and reached Hunt and asked why his name was in the address book of two of the Watergate burglars.

"Good God!" Hunt shouted before slamming down the phone. I called the president of the public relations firm, Robert F. Bennett, who is now a Republican U.S. senator from Utah. "I guess it's no secret that Howard was with the CIA," Bennett said blandly.

It had been a secret to me, and a CIA spokesman confirmed that Hunt had been with the agency from 1949 to 1970. I called Felt again at the FBI. Colson, White House, CIA, I said. What did I have? Anyone could have someone's name in an address book. I wanted to be careful about guilt by association.

Felt sounded nervous. He said off the record -- meaning I could not use the information -- that Hunt was a prime suspect in the burglary at the Watergate for many reasons beyond the address books. So reporting the connections forcefully would not be unfair.

In July, Carl went to Miami, home of four of the burglars, on the money trail, and he ingeniously tracked down a local prosecutor and his chief investigator, who had copies of $89,000 in Mexican checks and a $25,000 check that had gone into the account of Bernard L. Barker, one of the burglars. We were able to establish that the $25,000 check had been campaign money that had been given to Maurice H. Stans, Nixon's chief fundraiser, on a Florida golf course. The Aug. 1 story on this was the first to tie Nixon campaign money directly to Watergate.

I tried to call Felt, but he wouldn't take the call. I tried his home in Virginia and had no better luck. So one night I showed up at his Fairfax home. It was a plain-vanilla, perfectly kept, everything-in-its-place suburban house. His manner made me nervous. He said no more phone calls, no more visits to his home, nothing in the open.

I did not know then that in Felt's earliest days in the FBI, during World War II, he had been assigned to work on the general desk of the Espionage Section. Felt learned a great deal about German spying in the job, and after the war he spent time keeping suspected Soviet agents under surveillance.

So at his home in Virginia that summer, Felt said that if we were to talk it would have to be face to face where no one could observe us.

I said anything would be fine with me.

We would need a preplanned notification system -- a change in the environment that no one else would notice or attach any meaning to. I didn't know what he was talking about.

If you keep the drapes in your apartment closed, open them and that could signal me, he said. I could check each day or have them checked, and if they were open we could meet that night at a designated place. I liked to let the light in at times, I explained.

We needed another signal, he said, indicating that he could check my apartment regularly. He never explained how he could do this.

Feeling under some pressure, I said that I had a red cloth flag, less than a foot square -- the kind used as warnings on long truck loads -- that a girlfriend had found on the street. She had stuck it in an empty flowerpot on my apartment balcony.

Felt and I agreed that I would move the flowerpot with the flag, which usually was in the front near the railing, to the rear of the balcony if I urgently needed a meeting. This would have to be important and rare, he said sternly. The

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

signal, he said, would mean we would meet that same night about 2 a.m. on the bottom level of an underground garage just over the Key Bridge in Rosslyn.

Felt said I would have to follow strict countersurveillance techniques. How did I get out of my apartment?

I walked out, down the hall, and took the elevator.

Which takes you to the lobby? he asked.

Yes.

Did I have back stairs to my apartment house?

Yes.

Use them when you are heading for a meeting. Do they open into an alley?

Yes.

Take the alley. Don't use your own car. Take a taxi to several blocks from a hotel where there are cabs after midnight, get dropped off and then walk to get a second cab to Rosslyn. Don't get dropped off directly at the parking garage. Walk the last several blocks. If you are being followed, don't go down to the garage. I'll understand if you don't show. All this was like a lecture. The key was taking the necessary time -- one to two hours to get there. Be patient, serene. Trust the prearrangements. There was no fallback meeting place or time. If we both didn't show, there would be no meeting.

Felt said that if he had something for me, he could get me a message. He quizzed me about my daily routine, what came to my apartment, the mailbox, etc. The Post was delivered outside my apartment door. I did have a subscription to the New York Times. A number of people in my apartment building near Dupont Circle got the Times. The copies were left in the lobby with the apartment number. Mine was No. 617, and it was written clearly on the outside of each paper in marker pen. Felt said if there was something important he could get to my New York Times -- how, I never knew. Page 20 would be circled, and the hands of a clock in the lower part of the page would be drawn to indicate the time of the meeting that night, probably 2 a.m., in the same Rosslyn parking garage.

The relationship was a compact of trust; nothing about it was to be discussed or shared with anyone, he said.

How he could have made a daily observation of my balcony is still a mystery to me. At the time, before the era of intensive security, the back of the building was not enclosed, so anyone could have driven in the back alley to observe my balcony. In addition, my balcony and the back of the apartment complex faced onto a courtyard or back area that was shared with a number of other apartment or office buildings in the area. My balcony could have been seen from dozens of apartments or offices, as best I can tell.

A number of embassies were located in the area. The Iraqi Embassy was down the street, and I thought it possible that the FBI had surveillance or listening posts nearby. Could Felt have had the counterintelligence agents regularly report on the status of my flag and flowerpot? That seems highly unlikely, if not impossible.

A KINSHIP

In the course of this and other discussions, I was somewhat apologetic for plaguing him and being such a nag, but I explained that we had nowhere else to turn. Carl and I had obtained a list of everyone who worked for Nixon's reelection committee and were frequently going out into the night knocking on the doors of these people to try to interview them. I explained to Felt that we were getting lots of doors slammed in our faces. There also were lots of frightened looks. I was frustrated.

Felt said I should not worry about pushing him. He had done his time as a street agent, interviewing people. The FBI, like the press, had to rely on voluntary cooperation. Most people wanted to help the FBI, but the FBI knew about rejection. Felt perhaps tolerated my aggressiveness and pushy approach because he had been the same way himself when he was younger, once talking his way into an interview with Hoover and telling him of his ambition to become a special agent in charge of an FBI field office.

It was an unusual message, emphatically encouraging me to get in his face.

With a story as enticing, complex, competitive and fast-breaking as Watergate, there was little tendency or time to consider the motives of our sources. What was important was whether the information checked out and whether it was

How Mark Felt Became 'Deep Throat'; As a Friendship -- and the

true. We were swimming, really living, in the fast-moving rapids. There was no time to ask why they were talking or whether they had an ax to grind.

I was thankful for any morsel or information, confirmation or assistance Felt gave me while Carl and I were attempting to understand the many-headed monster of Watergate. Because of his position virtually atop the chief investigative agency, his words and guidance had immense, at times even staggering, authority. The weight, authenticity and his restraint were more important than his design, if he had one.

It was only later after Nixon resigned that I began to wonder why Felt had talked when doing so carried substantial risks for him and the FBI. Had he been exposed early on, Felt would have been no hero. Technically, it was illegal to talk about grand jury information or FBI files -- or it could have been made to look illegal.

Felt believed he was protecting the bureau by finding a way, clandestine as it was, to push some of the information from the FBI interviews and files out to the public, to help build public and political pressure to make Nixon and his people answerable. He had nothing but contempt for the Nixon White House and their efforts to manipulate the bureau for political reasons. The young eager-beaver patrol of White House underlings, best exemplified by John W. Dean III, was odious to him.

His reverence for Hoover and strict bureau procedure made Gray's appointment as director all the more shocking. Felt obviously concluded he was Hoover's logical successor.

And the former World War II spy hunter liked the game. I suspect in his mind I was his agent. He beat it into my head: secrecy at all cost, no loose talk, no talk about him at all, no indication to anyone that such a secret source existed.

In our book "All the President's Men," Carl and I described how we had speculated about Deep Throat and his piecemeal approach to providing information. Maybe it was to minimize his risk. Or because one or two big stories, no matter how devastating, could be blunted by the White House. Maybe it was simply to make the game more interesting. More likely, we concluded, "Deep Throat was trying to protect the office, to effect a change in its conduct before all was lost."

Each time I raised the question with Felt, he had the same answer: "I have to do this my way."

**LOAD-DATE:** June 2, 2005

FOCUS - 140 of 166 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

June 1, 2005 Wednesday
Late Edition - Final

**SECTION:** Section A; Column 1; National Desk; A MYSTERY SOLVED: THE OVERVIEW; Pg. 1

**LENGTH:** 1675 words

**HEADLINE:** 'Deep Throat' Unmasks Himself: Ex-No. 2 at F.B.I.

**BYLINE:** By TODD S. PURDUM

**DATELINE:** WASHINGTON, May 31

**BODY:**

Deep Throat, the mystery man who reigned as Washington's best-kept secret source for more than 30 years, was not just any shadowy, cigarette-smoking tipster in a raincoat. He was the No. 2 official of the F.B.I., W. Mark Felt, who helped The Washington Post unravel the Watergate scandal and the presidency of Richard M. Nixon, a feat that he lived to see disclosed on Tuesday, frail but smiling at 91.

In a final plot twist worthy of the saga that Mr. Felt helped to spawn, Vanity Fair magazine released an article from its July issue reporting that Mr. Felt, long a prime suspect to Nixon himself, had in recent years confided to his family and friends, "I'm the guy they used to call 'Deep Throat.'"

Within hours -- after Mr. Felt himself, in failing health since suffering a stroke in 2001, appeared in the doorway of his daughter's home in Santa Rosa, Calif. -- The Post confirmed his role. He was the official who encouraged its reporters Bob Woodward and Carl Bernstein to follow the trail from the break-in at Democratic National Committee headquarters in the Watergate complex in Washington to the highest levels of the Nixon administration.

Mr. Woodward and Mr. Bernstein initially declined to confirm the Vanity Fair article, believing they had promised Mr. Felt unconditional confidentiality till his death. Meanwhile, The Post, which had guarded the secret as closely as the formula for Coca-Cola, suddenly found itself scrambling to deal with a monthly magazine's scoop of the final footnote to the biggest story in its history.

"It's been The Post's story forever," said Tom Wilkinson, an assistant managing editor of the paper, "and you never like to see those things go to somebody else."

Mr. Felt spent more than 30 years at the Federal Bureau of Investigation, a protege of its legendary director, J. Edgar Hoover, and was bitterly disappointed after Hoover's death in May 1972 -- a month before the Watergate break-in -- that Nixon went outside the agency for a new chief. In the past, he repeatedly denied being Deep Throat, and his family said he had been torn about whether to reveal his role and about whether his actions were appropriate for a law enforcement officer.

Indeed, some old Nixon hands like Patrick J. Buchanan, the onetime presidential speechwriter, and G. Gordon Liddy, a convicted Watergate conspirator, reacted to the disclosure of his identity with derision that a top government official would pass word of possible crimes to Mr. Woodward rather than to a prosecutor.

The Post's articles eventually led to Congressional investigations, a special criminal prosecutor, an impeachment inquiry in the House of Representatives and Nixon's resignation in the face of probable conviction by the Senate.

Mr. Felt's grandson Nick Jones, a 23-year-old law student, read a statement on his family's behalf on Tuesday, explaining, "As he recently told my mother, 'I guess people used to think Deep Throat was a criminal, but now they think

'Deep Throat' Unmasks Himself: Ex-No. 2 at F.B.I. The New York

he's a hero.'" Mr. Jones added that his grandfather believed that "the men and women of the F.B.I. who have put their lives at risk for more than 50 years to keep this country safe deserve more recognition than he."

Mr. Felt later appeared and spoke briefly to reporters, saying: "Hey, look at that. We appreciate you coming out like this."

Deep Throat began life as someone Mr. Woodward described only as "my friend," but he was rechristened by a Post editor in honor of the pornographic film of that name that was then a national sensation. Over the years, the list of possible real-life counterparts for the shadowy figure Hal Holbrook played in the film of Mr. Woodward and Mr. Bernstein's best-selling book, "All The President's Men," has ranged widely -- and often improbably -- including Henry Kissinger and the first President George Bush, who was then ambassador to the United Nations.

But much of the most serious and informed speculation has long centered on the F.B.I., and on Mr. Felt, who was convicted in 1980 on unrelated charges of authorizing government agents to break into homes secretly, without warrants, in a search for anti-Vietnam War bombing suspects from the radical Weather Underground in 1972 and 1973. Five months later, President Ronald Reagan pardoned him on the grounds that he had "acted on high principle to bring an end to the terrorism that was threatening our nation."

In 1992, on the 20th anniversary of the Watergate break-in, the journalist James Mann cited Mr. Felt as a suspect in an article for The Atlantic Monthly, in which he theorized that Deep Throat's motive was to defend the nation from another kind of threat: to the institutional power, prerogatives and integrity of the F.B.I., which under Hoover had spent decades telling presidents what to do. Suddenly, veterans like Mr. Felt were being told what to do by the Nixon White House, and did not like it.

Mr. Woodward, who did not return telephone calls seeking comment, confirmed as much in comments to The Post's Web site on Tuesday. He said he had decided to confirm his source's identity, despite his concerns that Mr. Felt might not be competent enough to release him from his 33-year-old pledge of confidentiality.

"There's a principle involved," Mr. Bernstein said in a telephone interview from New York, before The Post's confirmation. "Reporters may be going to jail today for upholding that principle, and we don't and won't belittle it now."

The reality may be a bit more complex. The Vanity Fair article, written by a Felt family friend and lawyer, John D. O'Connor, portrays a polite but persistent dialogue between the Felt family and Mr. Woodward in recent years over who should control the rights (and benefits) to such a sensational story.

In encouraging her father to tell his own story, Mr. Felt's daughter, Joan, spoke of the money it might make to help pay tuition bills for her children. For his part, the article says, Mr. Woodward, who has built a lucrative career as a best-selling author, had expressed repeated concerns about whether Mr. Felt, his memory fading and faculties diminished, was really in a position to understand what he was doing.

Told by Mr. Felt's daughter that her father seemed to have unusually clear memories of him, Mr. Woodward, the Vanity Fair article says, simply responded: "He has good reason to remember me."

The Watergate tapes disclosed that Nixon himself had singled out Mr. Felt for special suspicion, once asking his chief of staff, H.R. Haldeman, "Is he a Catholic?" Mr. Haldeman replied that Mr. Felt, who is of Irish descent, was Jewish, and Nixon, who often liked to see Jews at the root of his troubles, replied: "It could be the Jewish thing. I don't know. It's always a possibility."

William D. Ruckelshaus, who resigned as Nixon's deputy attorney general rather than fire the Watergate special prosecutor, Archibald Cox, in 1973, said Tuesday that he had often wondered whether Deep Throat was a composite, simply because of the sheer amount of information he seemed to know about the extent of the Watergate conspiracy.

But Mr. Ruckelshaus noted that Mr. Felt had access to the voluminous F.B.I. interview files, some 1,500 in all, in the agency's investigation into the Watergate affair. "He would see all the agent interviews -- they would come through his office -- so he would have been privy to an awful lot of information," he said.

Indeed, more than 30 years ago, well before he and Mr. Bernstein had become household names and Deep Throat a legend, Mr. Woodward tantalizingly told the writer Timothy Crouse, in his 1972 campaign book, "The Boys on the Bus," that they had "got somebody at the Justice Department to say, 'Yeah, this whole damn thing is a Haldeman operation,'" directed from the White House, but that the source had said, "We'll never get him and you'll never get him."

'Deep Throat' Unmasks Himself: Ex-No. 2 at F.B.I. The New York

In "All The President's Men," Mr. Woodward and Mr. Bernstein paint Deep Throat as a colorful character, steeped in the Washington of an earlier time, "an incurable gossip, careful to label rumor for what it was, but fascinated by it." They added: "He could be rowdy, drink too much, overreach. He was not good at concealing his feelings, hardly ideal for a man in his position. Of late, he had expressed fear for the future of the executive branch, which he was in a unique position to observe."

In the current climate of public skepticism about the use of anonymous sources in journalism, Mr. Woodward and Mr. Bernstein went out of their way in their statement yesterday to note that "many other sources and officials assisted us and other reporters for the hundreds of stories that were written in The Washington Post about Watergate."

But Mr. Bernstein, in a second telephone interview after their confirmation, said: "This is a case history and a case lesson of why it is so important that we have confidential sources. If you were to look back at the original stories, I think hardly any of them had named sources. There's no way this reporting could have been done, nor is there any way that good reporting at a lot of places can be done, without anonymous sources."

At least one prominent Washingtonian expressed a slight nostalgia that the mystery had been solved.

"I mean, I always suspected it, but I never asked," said Sally Quinn, whose husband, Benjamin C. Bradlee, the former executive editor of The Post, was until Tuesday one of only four people publicly known to know the truth. "First of all, I didn't want to be rejected, and I knew he wouldn't tell me. And I knew that if somebody else blabbed, I would get blamed."

Mr. Bradlee himself told The Post that while he had known Deep Throat was a senior F.B.I. official during the investigation, he learned his name only after Nixon resigned.

Ms. Quinn added: "There's been a certain mystique about the story that will not be there any more. Everybody loves a secret that can be kept. Deep Throat has become this living legend, like Camelot. And now it isn't anymore."


**URL:** http://www.nytimes.com

**GRAPHIC:** Photos: W. Mark Felt, above, as he appeared in 1976, on the CBS News program "Face the Nation," and yesterday at his home in California. (Photo by Associated Press)
(Photo by John Burgess/The Press Democrat)(pg. A1)
W. Mark Felt, who had been confiding "I'm the guy they used to call 'Deep Throat,'" yesterday with his daughter, Joan, and grandson Nick Jones. (Photo by Lou Dematteis/Reuters)
Carl Bernstein, left, and Bob Woodward in 1973. Their articles on Watergate in The Washington Post helped bring down a president. (Photo by Associated Press)
 Recorder from the Nixon White House (Photographs by Associated Press)(pg. A16)Chart/Photos: "Watergate and the President"JUNE 1972 -- After breaking into the Democratic National Committee offices, five men are arrested at the Watergate complex.AUG. 1972 -- The Washington Post reports that a check for the Nixon campaign ended up in the bank account of one of the burglars.OCT. 1972 -- The Post reports that the F.B.I. has linked the Watergate incident to a spying campaign for the Nixon reelection effort.NOV. 1972 -- President Nixon is re-elected in a landslide.JAN. 1973 -- Two former Nixon aides are convicted in the burglary incident, and five other men plead guilty.MAY 1973 -- Senate Watergate hearings begin.JUNE 1973 -- A former White House counsel, John Dean, reveals that he discussed the Watergate coverup with the president.JULY 1973 -- President Nixon refuses to turn over White House tape recordings.JULY-AUG. 1974 -- The Supreme Court rules that President Nixon must hand over the recordings. He resigns before the House can consider impeachment.W. Mark Felt and Deep ThroatMAY 1972 -- After J. Edgar Hoover's death, President Nixon appoints L. Patrick Gray acting director of the F.B.I. Mr. Felt, in his memoir, says, "It did not cross my mind that the president would appoint an outsider to replace Hoover. Had I known this, I would not have been hopeful about the future."JUNE 1972-EARLY 2003 -- Bob Woodward, a reporter for The Post, and Deep Throat arrange most of their meetings by signaling to each other with a flower pot and a marked page in The New York Times.JULY 1972 -- Mr. Felt and two other F.B.I. officials meet with Mr. Gray to protest that the Watergate investigation is being obstructed by the White House.OCT. 1972 -- Mr. Felt is named by H.R. Haldeman on White House tapes as the source of most of the leaks. "We know what's left, and we know who leaked it."APRIL 1973 -- Mr. Felt again has ambitions to be the F.B.I. director, but the position goes to William D. Ruckelshaus. Mr. Felt retires in June.AUG. 1974 -- When asked if he is Deep Throat, Mr. Felt tells Washingtonian magazine, "I can tell you that it was not I, and it is not I."1979 -- Mr. Felt's memoir, "The F.B.I. Pyramid From the Inside," is published. He is shown at right in 1981.(Source

'Deep Throat' Unmasks Himself: Ex-No. 2 at F.B.I. The New York

by News reports, including those from The Washington Post, Vanity Fair, The Atlantic Monthly and Washingtonian magazine)(pg. A16)

**LOAD-DATE:** June 1, 2005

16 of 251 DOCUMENTS

Copyright 2006 The New York Times Company
The New York Times

June 7, 2006 Wednesday
Late Edition - Final

**SECTION:** Section A; Column 1; Foreign Desk; Pg. 3

**LENGTH:** 1040 words

**HEADLINE:** C.I.A. Knew Where Eichmann Was Hiding, Documents Show

**BYLINE:** By SCOTT SHANE

**DATELINE:** WASHINGTON, June 6

**BODY:**

The Central Intelligence Agency took no action after learning the pseudonym and whereabouts of the fugitive Holocaust administrator Adolf Eichmann in 1958, according to C.I.A. documents released Tuesday that shed new light on the spy agency's use of former Nazis as informants after World War II.

The C.I.A. was told by West German intelligence that Eichmann was living in Argentina under the name Clemens -- a slight variation on his actual alias, Ricardo Klement -- but did not share the information with Israel, which had been hunting for him for years, according to Timothy Naftali, a historian who examined the documents. Two years later, Israeli agents abducted Eichmann in Argentina and flew him to Israel, where he was tried and executed in 1962.

The Eichmann papers are among 27,000 newly declassified pages released by the C.I.A. to the National Archives under Congressional pressure to make public files about former officials of Hitler's regime later used as American agents. The material reinforces the view that most former Nazis gave American intelligence little of value and in some cases proved to be damaging double agents for the Soviet K.G.B., according to historians and members of the government panel that has worked to open the long-secret files.

Elizabeth Holtzman, a former congresswoman from New York and member of the panel, the Nazi War Crimes and Japanese Imperial Government Records Interagency Working Group, said the documents showed that the C.I.A "failed to lift a finger" to hunt Eichmann and "force us to confront not only the moral harm but the practical harm" of relying on intelligence from ex-Nazis.

The United States government, preoccupied with the cold war, had no policy at the time of pursuing Nazi war criminals. The records also show that American intelligence officials protected many former Nazis for their perceived value in combating the Soviet threat.

But Ms. Holtzman, speaking at a news briefing at the National Archives on Tuesday, said information from the former Nazis was often tainted both by their "personal agendas" and their vulnerability to blackmail. "Using bad people can have very bad consequences," Ms. Holtzman said. She and other group members suggested that the findings should be a cautionary tale for intelligence agencies today.

As head of the Gestapo's Jewish affairs office during the war, Eichmann put into effect the policy of extermination of European Jewry, promoting the use of gas chambers and having a hand in the murder of millions of Jews. Captured by the United States Army at the end of the war, he gave a false name and went unrecognized, hiding in Germany and Italy before fleeing to Argentina in 1950.

C.I.A. Knew Where Eichmann Was Hiding, Documents Show The New York Times

Israeli agents hunting for Eichmann came to suspect that he was in Argentina but did not know his alias. They temporarily abandoned their search around the time, in March 1958, that West German intelligence told the C.I.A. that Eichmann had been living in Argentina as Clemens, said Mr. Naftali, of the University of Virginia.

The West German government was wary of exposing Eichmann because officials feared what he might reveal about such figures as Hans Globke, a former Nazi government official then serving as a top national security adviser to Chancellor Konrad Adenauer, Mr. Naftali said.

In 1960, also at the request of West Germany, the C.I.A. persuaded Life magazine, which had purchased Eichmann's memoir from his family, to delete a reference to Mr. Globke before publication, the documents show.

Ironically, in view of the information the C.I.A. received in 1958, documents previously released by the C.I.A. showed that it was surprised in May 1960 when the Israelis captured Eichmann. Cables from the time show that Allen Dulles, the C.I.A. director, demanded that officers find out more about the capture.

Since Congress passed the Nazi War Crimes Disclosure Act in 1998, the Interagency Working Group has worked to declassify more than eight million pages of documents.

Norman J. W. Goda, an Ohio University historian who reviewed the C.I.A. material, said it showed in greater detail than previously known how the K.G.B. aggressively recruited former Nazi intelligence officers after the war. In particular, he said, the documents fill in the story of the "catastrophic" Soviet penetration of the Gehlen Organization, the postwar West German intelligence service sponsored by the United States Army and then the C.I.A.

Mr. Goda described the case of Heinz Felfe, a former SS officer who was bitter over the Allied firebombing of his native city, Dresden, and secretly worked for the K.G.B. Mr. Felfe rose in the Gehlen Organization to oversee counter-intelligence, a Soviet agent placed in charge of combating Soviet espionage.

The C.I.A. shared much sensitive information with Mr. Felfe, Mr. Goda found. A newly released 1963 C.I.A. damage assessment, written after Mr. Felfe was arrested as a Soviet agent in 1961, found that he had exposed "over 100 C.I.A. staffers" and caused many eavesdropping operations to end with "complete failure or a worthless product."

The documents also provide new information about the case of Tscherim Soobzokov, a former SS officer who was the subject of a much-publicized deportation case in 1979 when he was living as an American citizen in Paterson, N.J. He was charged with having falsified his immigration application to conceal his SS service, which ordinarily would have barred his entry. But the charge was dropped when a C.I.A. document turned up showing that he had disclosed his SS membership.

The newly declassified records show that he was employed by the C.I.A. from 1952 to 1959 despite "clear evidence of a war crimes record," said another historian at the briefing, Richard Breitman of American University.

Because it valued Mr. Soobzokov for his language skills and ties to fellow ethnic Circassians living in the Soviet Union, the C.I.A. deliberately hid details of his Nazi record from the Immigration and Naturalization Service after he moved to the United States in 1955, Mr. Breitman said.

But Mr. Soobzokov ultimately did not escape his past. He died in 1985 after a pipe bomb exploded outside his house. The case has never been solved.

**URL:** http://www.nytimes.com

**GRAPHIC:** Photo: The C.I.A. found out in 1958 that Adolf Eichmann was living in Argentina, but took no action. (Photo by David Rubinger/Time Life Pictures/Getty Images)

**LOAD-DATE:** June 7, 2006

Copyright 2006 Chicago Tribune Company
Chicago Tribune

June 27, 2006 Tuesday
Chicago Final Edition

**SECTION:** NEWS ; ZONE C; Pg. 1

**LENGTH:** 3079 words

**HEADLINE:** DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?;
THE SECRET THAT WASN'T

**SERIES:** DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?
TRIBUNE INVESTIGATION: Last of three parts

**BYLINE:** By Maurice Possley and Steve Mills, Tribune staff reporters.

**DATELINE:** CORPUS CHRISTI, Texas

**BODY:**

It was a secret they all shared. Some kept it out of fear. Some because no one ever asked. Whatever their reasons, it was a secret that might have saved Carlos De Luna from the execution chamber.

Twenty-three years after Wanda Lopez was murdered in the gas station where she worked, family members and acquaintances of another man, Carlos Hernandez, have broken their silence to support what De Luna had long asserted: Hernandez, a violent felon, killed Lopez in 1983.

A Tribune investigation has identified five people who say Hernandez told them that he stabbed Lopez and that De Luna, whom he called his "stupid tocayo," or namesake, went to Death Row in his place.

They also say he admitted killing another woman, in 1979, a crime for which he was indicted but never tried.

Although some aspects of De Luna's actions on the night of Lopez's killing remain suspicious, the Tribune uncovered substantial evidence that undermines his conviction. Among the findings:

The only witness who came face to face with the killer at the station after Lopez was stabbed now says he was not positive of his identification of De Luna. He identified De Luna, he said, after police told him they had arrested De Luna hiding under a truck near the scene of the attack--information that eased his uncertainty.

The Tribune's analysis of financial records from the Sigmor gas station also undercuts the state's assertion that the killing took place during a robbery, an aggravating circumstance that elevated the murder to a death penalty case. Newly examined inventory documents suggest no money was taken at all.

The prosecution argued that Hernandez was a "phantom," even though one of the prosecutors knew well of Hernandez but failed to inform De Luna's attorneys--a possible legal error that could have been a reason to overturn his conviction.

And one of Corpus Christi's senior detectives at the time of the crime now says he believes De Luna was wrongly executed. The former detective, Eddie Garza, said tipsters told him that Hernandez killed Lopez, the mother of a 6-year-old girl. Yet it appears those tips were not pursued.

Garza knew both men and said Lopez's slaying was the kind of crime Hernandez would commit, not De Luna.

"I don't think [De Luna] had it in him to do something like this and stab somebody to death," Garza said.

DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?; THE SECRET THAT WASN'

But Hernandez, he added, "was a ruthless criminal. He had a bad heart. I believe he was a killer."

A SECRET NO MORE

After Hernandez died in prison in 1999, word reached Corpus Christi, and people began to talk.

Janie Adrian remembered how Hernandez bragged about stabbing Lopez, how he said Carlos De Luna, the man who shared his first name, was innocent.

"He said, `My stupid tocayo took the blame for it,'" she recalled recently.

Adrian, a neighbor of Hernandez's mother, Fidela, said she always thought someone would ask what she knew. Nobody ever did, so she never told.

"I kept it to myself," she said in her Corpus Christi home. "Maybe I could have said something then."

Dina Ybanez waited because she was afraid. She met Hernandez in 1985, and after he befriended her and her husband, he confided that he killed Lopez.

"He said he was the one that did it, but that they got somebody else--his stupid tocayo--for that one," Ybanez said in an interview. "Carlos would just laugh about it because he got away with it."

Like a number of people in Corpus Christi who knew Hernandez, Ybanez said he also admitted committing the 1979 murder of Dahlia Sauceda, a local woman who was strangled and had an "X" carved into her back. Hernandez was questioned in the murder in 1979, then indicted for it in 1986, although prosecutors never took him to trial.

Ybanez said she so feared Hernandez that she never contacted police about his admissions, not even after he cut her from her navel to her sternum during a quarrel. "He said he was going to kill me like he did her," she said.

Beatrice Tapia and Priscilla Jaramillo never spoke about what they knew because they wanted to forget.

Although they had not seen each other in years, they independently recalled the same chilling details from the day they heard Hernandez say he killed Lopez.

Jaramillo is Hernandez's niece, and during the 1980s she lived at his mother's home, where, she said, she was sexually abused by Hernandez.

Not long after Lopez was slain, Jaramillo, then 11, and Tapia, 16, a neighborhood friend, were sitting on the front steps, mostly talking but also listening to Hernandez and his brother Javier, who were on the porch drinking beer.

Carlos told his brother that he had killed the woman at the gas station.

"He was saying he did something wrong and said Wanda's name. He said he killed her," recalled Tapia, who still lives in Corpus Christi. "He said he felt sorry about it."

Jaramillo's recollection is similar. "My Uncle Carlos said that he had hurt somebody--that he had stabbed somebody," said Jaramillo, who now lives elsewhere in Texas. "Javier didn't believe it.

"Carlos said, `I did.' And he named her, and Javier knew her," Jaramillo said. "He said the name was Wanda."

In addition to the four women who recounted Hernandez's admissions, the Tribune interviewed a Corpus Christi man who told a similar story. Miguel Ortiz, who has a criminal record, said the two were drinking in a park when Hernandez talked about a clerk he had "wasted" at a gas station.

"I just let that go," Ortiz said.

TIPS ON HERNANDEZ

While some in Corpus Christi kept silent about Hernandez, others apparently did not.

Garza, a detective at the time, recalled getting tips just days after De Luna was arrested that someone else was talking about how he had stabbed the gas station clerk.

"We were getting information that Carlos Hernandez was the one that had done the case," said Garza, who now is a private investigator. "Several people were telling us that."

Garza says he passed along the information to the detective leading the investigation, Olivia Escobedo.

DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?; THE SECRET THAT WASN'

Escobedo, now a real estate agent and police consultant in Florida, said she remembers no such tips. "I don't recall anything about a Carlos Hernandez," she said in a recent interview.

"I always followed every lead," added Escobedo, who primarily had investigated sex crimes and handled the De Luna case alone. "I went down rabbit trails when I didn't have to. I followed everything I could think of."

Garza's partner at the time, Paul Rivera, now a captain in the county sheriff's department, also said he doesn't remember the tips.

Garza did not testify at the trial but did at De Luna's sentencing, asserting that the defendant had a "bad" reputation in town. Garza says that by then he assumed the tips had been checked out and determined to be false. Now he believes the tips were ignored.

His recent examination of the case's police reports, at the Tribune's request, renewed his skepticism about De Luna's guilt. Garza concluded the initial crime scene investigation was sloppy and brief.

He noted that none of the blood spattered on the floor of the station was collected for testing, so there was no way to determine whether the attacker's blood was present. The only items sent for blood testing were the knife, De Luna's clothing and a $5 bill.

One police photo shows Escobedo standing in the middle of the spattered blood behind the station counter. The station reopened a few hours after the crime.

"This case wasn't put together right," Garza said.

Noting that investigators found no physical evidence that could be used to identify the attacker, he said, "It probably was there to be found. It was just overlooked."

WITNESS' DOUBTS

With no forensic evidence linking De Luna to the crime, prosecutors relied heavily on two eyewitnesses who said they saw him at the station--one before and one after the murder.

Arrested less than an hour after the attack, De Luna was handcuffed and placed in a patrol car, then driven to the gas station, where an officer shone a light on his face.

Of those witnesses, only Kevan Baker came eye to eye with the killer after Lopez had been stabbed. Now living near Jonesville, Mich., Baker recalls that night vividly.

He had stopped to buy gas and saw Lopez and a man struggling inside the station. When he approached the door to help, the assailant emerged, they locked eyes and the attacker fled.

De Luna and Hernandez were about the same height and looked alike in police mug shot profiles.

Baker identified De Luna but now says he was uncertain. "I wasn't all that sure, but him being Hispanic and all . . . I said, `Yeah, I think it is him,'" Baker recalled recently. "The cops told me they found him hiding under a truck. That led me to believe this is probably the guy."

This form of identification--called a show-up, in which a witness views only one suspect instead of attempting to pick a suspect out of a lineup--can be accurate, but it also can give eyewitnesses a false sense of certainty, according to experts. They say shackling a suspect exacerbates the potential for a mistaken identification.

"Law enforcement figures `we got our guy,' so their whole demeanor, their language, the way they handle the guy suggests to the witness that this is the person," said Gary Wells, a research psychologist at Iowa State University and a leading expert on eyewitness identification issues. "That's a lot of pressure to put on a witness."

The other witness who identified De Luna as he sat in the police car, George Aguirre, declined to be interviewed for this article. At a pretrial hearing, Aguirre was unable to point out De Luna in the courtroom. At trial a month later, though, he did.

Two additional witnesses at the trial, John and Julie Arsuaga, said they caught a glimpse of De Luna's face as he ran slowly through a parking lot east of the station a few minutes after Lopez was attacked.

De Luna told authorities that when he saw Hernandez struggling with Lopez, he fled from the area because he was on parole and didn't want to be spotted by police.

DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?; THE SECRET THAT WASN'

Julie Arsuaga could not be reached for comment. In a recent interview, her former husband said he still believes De Luna was the man he saw down the street.

But he acknowledged he never saw De Luna at the gas station: "I didn't see the man commit a crime."

NOT A ROBBERY?

The discovery of $149 in De Luna's pocket when he was arrested was important to the prosecution's case because it was one more way to tie him to the crime.

But a review of the station's business records show that's a shaky assumption.

De Luna's defense lawyers established that he had cashed a paycheck for $135 the day of the murder and $71 a week earlier. Further, they noted that the $149 was in a neat roll--unlikely if the money had just been snatched from a cash register--and that none of the bills tested positive for blood. Money found scattered in the Sigmor station was bloodstained.

At trial, a district manager for the chain of stations told the jury that an inventory performed the night of the crime showed a shortage of $166. He couldn't say how much of that was merchandise and how much, if any, was cash.

But another Sigmor employee at the time, Robert Stange, never believed any money was taken.

Stange, who said he was never interviewed by police, prosecutors or defense lawyers, worked the day shift at the station before Lopez. In a recent interview, he said he was called back that night after the murder to clean up the blood and conduct the inventory.

He said he found $55 in cash receipts as well as $200 kept at the station to make change for customers.

Lopez, he said, always made sure that when she accumulated $100 in receipts, she immediately put it in the safe and noted the time and the amount of the cash drop in the station's daily log.

A copy of the log shows that Lopez last made a drop of $100 at 7:31 p.m., 38 minutes before she was attacked.

For De Luna's $149 to have been robbery proceeds, Stange explained, Lopez would have had to take in at least that much in the half-hour before the crime occurred, without putting any of it in the safe. Lopez, he said, "would have never kept that kind of money in the drawer without making a drop. She didn't want that kind of money on hand. Nobody did."

At the request of the Tribune, Kevin Stevens, a DePaul University accounting professor, examined the inventory report prosecutors used at trial. Stevens, who coincidentally worked at a gas station while in college, concluded that the Sigmor's bookkeeping system was too haphazard to be accurate.

"They can't know how much cash was missing," Stevens said, "because they can't know how much cash was there."

STILL CONFIDENT

After the Tribune began its investigation, the lead prosecutor in De Luna's trial, Steve Schiwetz, decided to examine the case file.

Troubled by some of the questions being raised, he spent hours at the Nueces County district attorney's office with a reporter poring over the trial exhibits, police reports and other documents in the case, as well as studying documents the Tribune provided.

Now a lawyer in private practice, Schiwetz acknowledged that the case relied heavily on eyewitness testimony. "Sometimes it's reliable. Sometimes it isn't reliable," he said in an interview. "And sometimes, in cases like this, you're not entirely sure how reliable it is."

Schiwetz labeled Hernandez a "phantom" at trial, but said he would not have done so if he'd been informed by a fellow prosecutor that Hernandez had been a suspect in the murder of another woman. Schiwetz also said that if he had been told of reports that Carlos Hernandez was claiming to be Lopez's killer, he would have investigated them.

"Anytime somebody's going around saying they killed somebody, I think it's worth looking at," he said. "But I've heard a lot of people make claims for stuff they did or didn't do that weren't true."

DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?; THE SECRET THAT WASN'

Ultimately, Schiwetz points to several elements of the case that still persuade him the jury convicted the right man. De Luna, he said, lied when he claimed to have talked to two women at a skating rink on the night of the crime and lied when he apparently said he first met Hernandez in jail. De Luna had lost all credibility, Schiwetz said.

"He's lying about the most important story he's ever going to tell in his entire life," he said.

In addition, while De Luna said he lost his shirt while scaling a fence, he gave no explanation for how he lost his shoes, Schiwetz noted. Though the crime lab found no blood or other evidence on them, Schiwetz told the jury that De Luna could have stabbed Lopez without getting blood on his shirt and that any blood on his shoes washed off when he ran through wet grass.

As for Hernandez's history of knife crimes, he said, "Every man in this town has carried a knife. And most of us still do. I carry a knife. I did not kill Wanda Lopez or anybody else."

Schiwetz's co-prosecutor on the De Luna case, Ken Botary, also remains confident the verdict was correct.

"I'm not ready to concede Carlos De Luna was innocent," Botary said.

ANGER AND REGRETS

Wanda Lopez's murder still haunts those who were touched by it.

Her brother, Louis Vargas, no longer is filled with the rage that so consumed him that he imagined sneaking into the prison and killing De Luna himself.

Now, when he thinks about his sister's death, he mainly is filled with horror at how she died. He cannot forget her screams on the 911 tape.

"This is like opening a can of worms," he said. "All this time, we were told it was this one guy. Now do we have to think it was somebody else?"

His parents adopted Wanda's young daughter. Now a mother of four, she is raising a family of her own and still lives in Corpus Christi.

De Luna's sister, Rose Rhoton, has long believed in her brother's innocence. She blames his lawyers for not mounting a more aggressive defense and authorities for not pursuing Hernandez as a suspect.

She has regrets of her own as well.

"If God ever gave me a second chance," Rhoton said, sitting in her Dallas home and beginning to cry, "I would fight harder for Carlos."

When Rhoton departed the death house in Huntsville, having seen her brother for the last time, she left him in the care of a minister, Carroll Pickett.

The death house chaplain, Pickett prayed with De Luna and, as he did with all inmates facing execution, gave De Luna an opportunity to confess and make his peace. De Luna, he said, insisted he was innocent.

De Luna was the 33rd Death Row inmate to whom Pickett ministered, and in the years that followed he would minister to 62 more. But this one stayed with him always: how De Luna claimed he was innocent, how he took longer to die than most inmates, how he tried to raise his head from the gurney and speak to Pickett before the lethal injection left him lifeless.

"When I saw him die," Pickett said, "part of me died too."

The experience forced him to ask a question he says he still can't answer: Do the innocent die differently than the guilty?

mpossley@tribune.com

smmills@tribune.com

MORE ONLINE Read the complete series online at chicagotribune.com/deluna

- - -

The crime scene and the evidence

DID ONE MAN DIE FOR ANOTHER MAN'S CRIME?; THE SECRET THAT WASN'

Detectives investigated the crime scene for about one hour and were unable to link Carlos De Luna to any forensic evidence. Store transaction logs suggest no money was taken from the Sigmor station store.

Store entrance / Back room door

KNIFE

The weapon, a lock-blade knife, was Hernandez's "trademark," according to a former Corpus Christi detective. Police reports identify similar weapons in several crimes Hernandez committed.

LACK OF FINGERPRINTS

Detectives did not find fingerprints on the weapon, the phone, the counter or a pack of cigarettes, which the killer may have handled.

FAULTY EYEWITNESS IDENTIFICATION

Kevan Baker saw a struggle inside the station and then saw a Hispanic man exit and run around to the back of the station. Later that night he identified the man as De Luna. Baker now says he is not sure the man he saw was De Luna.

SAFE

Prosecutors said De Luna robbed the station when he killed Lopez, citing $149 in De Luna's pocket at the time of his capture. But a review of the station's financial records shows that scenario was unlikely. A station log shows that Lopez deposited $100 into the safe just 38 minutes before she was killed. Because $55 in cash was found in the station, she would have had to have taken in $204 in that 38-minute period without dropping any in the safe.

BLOOD

A large amount of blood was spattered on the floor and counter, but police did not collect any for samples and did not find any on De Luna's clothing.

Source: Tribune reporting

Chicago Tribune / Max Rust and Steve Layton

**GRAPHIC:** PHOTO: Carlos De Luna

PHOTO: Carlos Hernandez

PHOTO (color): ROSE RHOTON: The sister of Carlos De Luna (top left) thinks police should have pursued Carlos Hernandez (top right) as a suspect. Tribune photo by Chuck Berman.

PHOTO: THE CRIME SCENE: Detective Olivia Escobedo stands amid spattered blood behind the counter. Another detective said the crime scene probe was sloppy. Corpus Christi Police Department photo.

PHOTO: KEVAN BAKER: He witnessed the attack on Wanda Lopez. "I saw a man and a woman fighting," he recalled. That night he identified Carlos De Luna as the assailant, but now he says he was uncertain. Tribune photos by Chuck Berman.

PHOTO: FORMER DETECTIVES: Paul Rivera (left) and Eddie Garza were Corpus Christi investigators in the 1980s. Rivera doesn't remember getting tips about Carlos Hernandez, but his former partner is adamant. "We were getting information that Carlos Hernandez was the one that had done the case," Garza said recently.

PHOTO: Beatrice Tapia overheard Carlos Hernandez confess. "He said he killed her."
PHOTOS 7 GRAPHIC

**LOAD-DATE:** June 27, 2006

# EXHIBIT D

cc:



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

APR 10  '0

Mr. Ted M. Chaskelson
General Counsel
Federal Mediation and
  Conciliation Service
Washington, D.C.  20427

Dear Mr. Chaskelson:

    This is in response to your letter of November 14, 1989.  In
it you ask for confirmation that the decision of the U.S. Court
of Appeals for the District of Columbia Circuit in National
Security Archive v. U.S. Department of Defense does not conflict
with guidance issued by this office in 1988 regarding the
charging of fees under the Freedom of Information Act (FOIA), as
amended.  [see 52 Federal Register 10012]

    We note that you are prompted by the need to publish final
rules regarding FOIA fees, and that you have received comments
from the Reporters Committee for Freedom of the Press on your
proposed version.  Those comments specifically challenged Federal
Mediation and Conciliation Service's (FMCS) definition of
"representative of the news media" which incorporated in its
entirety the Office of Management and Budget's (OMB) definition
for this category of requester.  The commentators urged FMCS to
adopt a definition consistent with what they asserted the court
had held in the National Security Archive decision.  They
specifically asked that the "restrictive definitions proposed
here for 'news' and for 'freelance journalists'...be deleted."

    There are really two key issues relating to agencies'
adoption of the OMB fee guidelines, including the categorical
definitions:

    o   Was OMB authorized to promulgate only a government-wide
        uniform schedule of fees for FOIA services, or did the
        1987 amendment to the FOIA require OMB to issue
        interpretive guidelines which properly could include
        definitions of the categories of requesters the amendment
        established?

    o   Were agencies obliged to adopt OMB schedule and
        guidelines in promulgating their own fee regulations?

    In developing our guidelines, we proceeded under the
assumption that the wording of the Act precluded the mere
issuance of a price list.   That is because the FOIA limits fees
to the reasonable and direct costs agencies incur, and because
Congress left this limitation intact in the 1987 amendment.

HANDOUT 11

2

since agency costs vary widely depending on many factors, the arbitrary establishment of a single price list could be unfair both to FOIA requesters and to agencies, and thus "unreasonable."

Thus, we interpreted Congress' mandate as intending the establishment of a set of definitions and procedures to permit agencies to develop their own specific rates in conformance with government-wide uniform standards. It follows that uniformity goes by the board if each agency is free to define who is included in each category of requester.

Our decision has been validated by the Court of Appeals for the D.C. Circuit in a recent decision, Media Access Project v. F.C.C. 883 F.2d 1063 (D.C. Cir 1989). In this case, Media Access Project sought to have the final FOIA fee rules of the Federal Communications

Commission (FCC) reviewed by the court. The petitioners made the following substantive claims regarding the FCC's verbatim adoption of OMB fee guidelines:

o  That "the Commission unlawfully delegated its independence to OMB by adopting verbatim OMB's guidelines defining the preferred categories for assessment of search fees...!" and

o  That the Commission's blind adoption of OMB guidelines deprived them of their right to meaningful notice and comment.

The petitioners amplified their first point by asserting that OMB had no statutory authority to provide categorical definitions, but only to develop and issue a price list for FOIA services.

In disposing of these arguments, the court held that "Section 552(a)(4)(A)(i) [of the FOIA as amended] plainly delegates...[to OMB] authority to establish uniform fee schedule guidelines....If Congress had intended OMB to establish only a 'price list,' it would not have directed OMB to establish 'guidelines...which shall provide for a uniform schedule of fees for all agencies'.....We find...that OMB's express mandate to establish a fee schedule is broad enough to encompass guidelines for determining the assessment of fees for statutory categories. Given Congress' desire for a 'consistent government-wide framework for the calculation and collection of FOIA fees'...we hold that the Commission's decision to adopt OMB guidelines was 'rational and consistent with the statute.'"

The court also found without merit the argument that petitioners were deprived of the right of meaningful notice and comment. It noted that they were in fact given "notice and a

3

full opportunity to comment on both the Commission's and OMB's
regulations and that the Commission gave full consideration to
comments that did not address matters within OMB's authority...."

Given the court's ruling in this case, we think your
adoption of OMB's definitions is both proper and consistent with
congressional intentions.

As to the National Security Archive case, it was decided by
the same three judge panel as Media Access. We do not read the
decision as affecting either OMB's definition of "representative
of the news media" or the Department of Defense's adoption of
that definition. Rather, the ruling in the case examines the
activities an entity must engage in to be included in the
category and finds that the National Security Archive is, in
fact, carrying out those activities and is thus eligible for
inclusion.

The OMB guidelines define the term "representative of the
news media" as "any person actively gathering news (i.e.
information 'about current events or [that] would be of current
interest to the public,') for an entity that is organized and
operated to publish or broadcast news to the public."
The court's ruling focussed on the latter part of the definition:
what activities constitute publishing or broadcasting news, and
did the National Security Archive engage in such activities? It
found that the following elements constitute the publication or
broadcasting of news:

   o  Gathering information of potential interest to a segment
      of the public;

   o  Using editorial skills to turn the raw materials into a
      distinct work;

   o  Distributing that work to an audience.

In examining the activities of the Archive, it found exact
parallels to the activities of representatives of the news media,
i.e. they

   o  Gather "information from a variety of sources;"

   o  Exercise "a significant degree of editorial discretion in
      deciding what documents to use and how to organize
      them...,[and] devise...indices and finding aids;"

   o  Distribute "the resulting work to the public."

It should be noted that the decision did not find that the
Archive was always and inevitably a representative of the news
media - only when engaging in the activities described above.

4

Thus, when acting as a mere repository of documents without actively publishing its news product, the Archive (or any other similar requester seeking access to the news media category) would not be eligible. Indeed, the court concludes by suggesting that if the Archive's publication plans do not "pan out," the agency would be justified in concluding that it was no longer a representative of the news media. We think that the decision reinforces the need for agencies to obtain solid assurances from requesters that the information sought is in furtherance of their publishing or broadcasting activities.

We should also note that we are sensitive to the points the Reporters Committee makes about "news." It was not OMB's intention in providing a definition of "news" to put agencies in the position of deciding whether the information sought by representatives of the news media was, in fact, newsworthy. That is the job of the media. The agency's responsibility is twofold:

   o  To obtain assurances from the requester that information is sought as part of its news gathering activity;

   o  To determine that the requester intends to engage in (and is, in fact, capable of engaging in) the activities that the court held that a representative of the news media engages in.

Where the answers to these questions are not apparent from the face of the request, the agency should not hesitate to delve further before granting the favorable fee status.

We are less sympathetic to the Committee's comments about freelancers. They note that congressional intent was to "bestow upon 'any person or organization which regularly publishes or disseminates information to the public'..., [the benefit of membership in the favorable fee category]." They nevertheless urge that that membership be broadened to include those whose expectation of publication is merely speculative. We think this suggestion is contrary to congressional intent. The likelihood of publication ought to be more than mere speculation, albeit short of absolute certainty. Our guidance tries to find a reasonable compromise. It does not posit a contractual relationship between a freelancer and a publisher before granting access to the category. It suggests that agencies look at all the relevant data, including evidence of past publication. Admittedly, this interpretation will make it more difficult for first-time freelancers without solid links to a publisher to meet the test. But, it will not be impossible, provided the proper showing is made. Anything else would be contrary to congressional intent to favor those who "regularly publish...or disseminate...information to the public.

5

I hope this response has been helpful.  If you have further questions, please contact Robert N. Vaeder of my staff.  He can be reached on 395-4814.

Sincerely,


James B. MacRae, Jr.
Acting Administrator
  and Deputy Administrator
Office of Information
  and Regulatory Affairs