However, because the basis of the additional shares of T stock will be determined when P has an excess loss account in its original shares of T stock, under paragraph (d)(1) of this section, the basis that P would otherwise have in such additional shares will eliminate the excess loss account in P's original shares of T stock such that each original share of T stock will have a basis of $0 and each share of T stock deemed received will have a basis of $0.20. Then, under § 1.358–2(a)(2)(iii), the T stock is deemed to be recapitalized in a reorganization under section 368(a)(1)(E) in which P receives 100 shares of T stock (those shares P actually owns immediately after the transfer) in exchange for those 100 shares of T stock that P held immediately prior to the transfer and those 150 shares of T stock P is deemed to receive in the transfer. Under § 1.358–2(a)(2)(i), immediately after the transfer, P holds 100 shares of T stock, 60 of which take a basis of $0.50 each and 40 of which take a basis of $0 each. In addition, T takes a $1 basis in each share of S stock under section 362. (If P had actually received an additional 150 shares of T stock of the same class, paragraph (d)(1) of this section would apply to shift basis from such additional T shares to P's original T shares because the basis of the additional T stock would be determined when P had an excess loss account in its original T shares. P would have a basis of $0 in each of the original T shares and a basis of $0.20 in each of the additional T shares.)

(iii) *Transfer of shares with an excess loss account.* The facts are the same as in paragraph (i) of this *Example 2*, except that P transfers T's stock to S without receiving additional S stock. The transfer is an exchange described in both section 351 and section 354. Under paragraph (c) of this section, P's transfer is treated as a disposition of T's stock. Under sections 351 and 354 and paragraph (b)(2) of this section, P does not recognize gain from the disposition. Under § 1.358–2(a)(2)(iii), P is deemed to have received 100 shares of S stock of the same class. Without regard to the application of paragraph (d) of this section, P would have a $1.20 excess loss account in each such share. However, because P will have an excess loss account in such shares and P owns other shares of S stock of the same class, under paragraph (d)(2) of this section, the excess loss account that P would otherwise have in such shares will decrease P's basis in its original shares of S's stock such that each such original share will have a basis of $0.20 and each share deemed received will have a basis of $0. Then, under § 1.358–2(a)(2)(iii), the S stock is deemed to be recapitalized in a reorganization under section 368(a)(1)(E) in which P receives 150 shares of S stock (those shares P actually owns immediately after the transfer) in exchange for those 150 shares of S stock that P held immediately prior to the transfer and those 100 shares of S stock that P is deemed to receive in connection with the transfer. Under § 1.358–2(a)(2)(i), immediately after the transfer, P holds 150 shares of S stock, 90 of which take a basis of $0.33 each and 60 of which take a basis of $0 each. In addition, S takes an excess loss account of $1.20 in each share of T stock under section 362. (If P had actually received 100 additional shares of S stock of the same class, paragraph (d)(2) of this section would apply to shift basis from P's original S stock because P would have otherwise had an excess loss account in such additional shares and P owned other shares of S stock of the same class. The excess loss account that P would have otherwise had in such additional shares would have decreased P's basis in its original shares of S's stock. P would have had a basis of $0.20 in each of the original shares and a basis of $0 in each of the additional shares.)

(iv) *Intercompany merger—shares with excess loss account retained.* The facts are the same as in paragraph (i) of this *Example 2*, except that S merges into T in a reorganization described in section 368(a)(1)(A) (and in section 368(a)(1)(D)), and P receives 150 additional shares of T stock of the same class in the reorganization. Under section 354, P does not recognize gain. Without regard to the application of paragraph (d) of this section, under section 358 and § 1.358–2(a)(2)(i), P would have a $1 basis in each such share. However, because the basis of the additional shares of T stock will be determined when P has an excess loss account in its original shares of T stock, under paragraph (d)(1) of this section, the basis that P would otherwise have in such additional shares eliminates the excess loss account in P's original shares of T stock such that each original share of T stock has a basis of $0 and each additional share of T stock has a basis of $0.20.

(v) *Intercompany merger—shares with excess loss account surrendered.* The facts are the same as in paragraph (i) of this *Example 2*, except that T merges into S in a reorganization described in section 368(a)(1)(A) (and in section 368(a)(1)(D)), and P receives 100 additional shares of S stock of the same class in the reorganization. Under section 354 and paragraph (b)(2) of this section, P does not recognize gain from the disposition. Without regard to the application of paragraph (d) of this section, under section 358 and § 1.358–2(a)(2)(i), P would have a $1.20 excess loss account in each additional share of S stock received. However, because P would have an excess loss account in such shares and P owns other shares of S stock of the same class, under paragraph (d)(2) of this section, the excess loss account that P would otherwise have in such shares decreases P's basis in its original shares of S's stock such that each original share of S stock has a basis of $0.20 and each additional share of S stock has a basis of $0.

\* \* \* \* \*

(h) \* \* \*

(2) \* \* \*

(iv) *Intercompany reorganizations.* Paragraphs (d) and (g) *Example 2* of this section apply to transactions occurring on or after July 18, 2007. For transactions occurring on or after January 23, 2006, and before July 18, 2007, see § 1.1502–19T as contained in 26 CFR part 1 in effect April 1, 2007. For transactions occurring before January 23, 2006, see § 1.1502–19 as contained in 26 CFR part 1 in effect April 1, 2005.

\* \* \* \* \*

### § 1.1502–19T   [Removed]

■ **Par. 3.** Section 1.1502–19T is removed.

■ **Par. 4.** Section 1.1502–80 is amended by revising paragraph (c) to read as follows:

### § 1.1502–80   Applicability of other provisions of law.

\* \* \* \* \*

(c) *Deferral of section 165*—(1) *General rule.* Subsidiary stock is not treated as worthless under section 165 until immediately before the earlier of the time—

(i) The stock is worthless within the meaning of § 1.1502–19(c)(1)(iii); or

(ii) The subsidiary for any reason ceases to be a member of the group.

(2) *Cross reference.* See §§ 1.337(d)–2 and 1.1502–35 for additional rules relating to loss on subsidiary stock.

(3) *Effective/applicability date.* This paragraph (c) applies to taxable years for which the original consolidated Federal income tax return is due (without extensions) after July 18, 2007. However, taxpayers may apply this paragraph (c) to taxable years beginning on or after January 1, 1995.

\* \* \* \* \*

### § 1.1502–80T   [Removed]

■ **Par. 5.** Section 1.1502–80T is removed.

**Kevin M. Brown,**
*Deputy Commissioner for Services and Enforcement.*

  Approved: July 10, 2007.

**Eric Solomon,**
*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. E7–13839 Filed 7–17–07; 8:45 am]
**BILLING CODE 4830–01–P**

---

## CENTRAL INTELLIGENCE AGENCY

## 32 CFR Part 1900

## FOIA Processing Fees

**AGENCY:** Central Intelligence Agency.
**ACTION:** Final rule.

**SUMMARY:** On January 8, 2007, the Central Intelligence Agency submitted a proposed rule for public comment on Freedom of Information Act processing fees to the **Federal Register**. The CIA has reviewed and carefully considered all of the comments that were submitted in response to our proposal. As a result of that review, the CIA hereby issues its final rule on FOIA processing fees.

**EFFECTIVE DATE:** July 18, 2007.

**FOR FURTHER INFORMATION CONTACT:** Scott A. Koch, Information and Privacy Coordinator, Central Intelligence Agency, Washington, DC 20505 or by telephone, 703–613–1287.

**SUPPLEMENTARY INFORMATION:** In the January 8, 2007 edition of the **Federal Register**, the CIA published a proposed rule which reflected a zero-based review of its public FOIA regulations on processing fees. The proposed rule was an expansive attempt to streamline our administrative approach in order to improve our processing of FOIA requests. The proposed system contained a number of innovative features to make this new approach workable. The CIA received comments that supported some aspect of the proposed rule, while also receiving comments which were very critical of other aspects of this approach. After a review and consideration of all of the comments, it was clear that there was no way to reconcile the positive and negative comments into a refinement of our approach that was workable. We concluded that if any features of the proposed system were dropped, the advantages would not outweigh the disadvantages of adopting this system.

Since there was no support to proceed with the proposed rule as originally drafted, rather than implementing the sweeping changes set forth in the proposed rule, we have a more modest change by simply adopting the definition of "news media" contained in the March 27, 1987, Office of Management and Budget FOIA Guidelines. Although, the CIA remains confident in the adequacy and sufficiency of its previous interpretation of "news media" fee status, it has concluded that it is preferable to avoid sterile and unproductive technical litigation and the associated diversion of resources from more productive pursuits that that entails.

**List of Subjects in 32 CFR Part 1900**

Classified information, Freedom of Information.

■ As stated in the preamble, the CIA is amending 32 CFR part 1900 as follows:

## PART 1900—PUBLIC ACCESS TO CIA RECORDS UNDER THE FREEDOM OF INFORMATION ACT (FOIA)

■ 1. The authority citation for part 1900 continues to read as follows:

**Authority:** The Freedom of Information Act (FOIA), as amended (5 U.S.C. 552); the CIA Information Act of 1984 (50 U.S.C. 431); sec. 102 of the National Security Act of 1947, as amended (50 U.S.C. 403); and sec. 6 of the Central Intelligence Agency Act of 1949, as amended (50 U.S.C. 403(g)).

■ 2. In § 1900.02, revise paragraph (h)(3) to read as follows:

**§ 1900.02  Definitions.**

\* \* \* \* \*

(h) \* \* \*

(3) *Representative of the News Media* refers to any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public. The term "news" means information that is about current events or that would be of current interest to the public. Examples of news media entities include television or radio stations broadcasting to the public at large, and publishers of periodicals (but only in those instances when they can qualify as disseminators of "news") who make their products available for purchase or subscription by the general public. These examples are not intended to be all-inclusive. Moreover, as traditional methods of news delivery evolve (e.g., electronic dissemination of newspapers through telecommunications services), such alternative media would be included in this category. In the case of "freelance" journalists, they may be regarded as working for a news organization if they can demonstrate a solid basis for expecting publication through that organization, even though not actually employed by it. A publication contract would be the clearest proof, but agencies may also look to the past publication record of a requestor in making this determination:

\* \* \* \* \*

Dated: July 9, 2007.

**Edmund Cohen,**

*Chief of Information Management Services.*

[FR Doc. E7–13931 Filed 7–17–07; 8:45 am]

**BILLING CODE 6310–02–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**Coast Guard**

**33 CFR Part 165**

**[CGD09–07–055]**

**RIN 1625–AA00**

**Safety Zone; Oswego Harborfest 2007, Oswego, NY**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary safety zone on Lake Ontario, Oswego, NY. This zone is intended to restrict vessels from a portion of Lake Ontario during the Oswego Harborfest Fireworks display on July 28, 2007. This temporary safety zone is necessary to protect spectators and vessels from the hazards associated with fireworks displays.

**DATES:** This rule is effective from 9 p.m. to 10 p.m. on July 28, 2007.

**ADDRESSES:** Documents indicated in this preamble as being available in the docket, are part of docket CGD09–07–055 and are available for inspection or copying at U.S. Coast Guard Sector Buffalo, 1 Fuhrmann Boulevard, Buffalo, NY 14203 between 8 a.m. and 3 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** LT Tracy Wirth, U.S. Coast Guard Sector Buffalo; (716) 843–9573.

**SUPPLEMENTARY INFORMATION:**

### Regulatory Information

We did not publish a notice of proposed rulemaking (NPRM) for this regulation. Under 5 U.S.C. 553(b)(B), the Coast Guard finds that good cause exists for not publishing an NPRM. The permit application was not received in time to publish an NPRM followed by a final rule before the effective date. Under 5 U.S.C. 553(d)(3), good cause exists for making this rule effective less than 30 days after publication in the **Federal Register**. Delaying this rule would be contrary to the public interest of ensuring the safety of spectators and vessels during this event and immediate action is necessary to prevent possible loss of life or property.

### Background and Purpose

This temporary safety zone is necessary to ensure the safety of vessels and spectators from hazards associated with a fireworks display. Based on accidents that have occurred in other Captain of the Port Zones, and the explosive hazards of fireworks, the Captain of the Port Buffalo has determined that fireworks launches proximate to watercraft pose a significant risk to public safety and property. The likely combination of large numbers of recreation vessels, congested waterways, darkness punctuated by bright flashes of light, alcohol use, and debris falling into the water could easily result in serious injuries or fatalities. Establishing a safety zone to control vessel movement around the location of the launch platform will help ensure the safety of persons and property at these events and help minimize the associated risks.